# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

National Shooting Sports Foundation, Inc.,

     *Plaintiff*,

     v.

Kwame Raoul,
Attorney General of the State of Illinois,

     *Defendant*.

## **<u>COMPLAINT</u>**

Plaintiff National Shooting Sports Foundation, Inc. ("NSSF"), brings this complaint against Kwame Raoul, Attorney General for the State of Illinois.  NSSF brings this complaint based on personal knowledge as to all NSSF facts, and on information and belief as to all other matters.

## **PRELIMINARY STATEMENT**

1.     This lawsuit challenges the constitutionality of a new Illinois statute specifically designed to evade the judgment of Congress—and the Constitution.

2.     On August 12, 2023, Governor J.B. Pritzker signed into law Illinois House Bill 218 ("HB 218"), which radically expands liability in Illinois for members of the firearm industry—and them alone.  Under HB 218, the "sale, manufacturing, importing, or marketing of a firearm-related product" anywhere in the country may be deemed to violate Illinois law (and justify the imposition of sweeping liability), even if it complied with all state and federal regulations, if an Illinois judge or jury later finds that such conduct "contribute[d] to a condition in Illinois that endangers the safety or health of the public."  815 Ill. Comp. Stat. 505/2BBBB-(b)(1).

3.     Although the statute purports to be aimed at preventing firearms from being used in such a way that endangers public safety or health, HB 218 does not regulate the use (or misuse) of firearms.  Nor does it impose liability on individuals who misuse firearms to the detriment of themselves or others.  Instead, HB 218 regulates selling, manufacturing, and advertising lawful (and constitutionally

protected) firearms and related products.  In other words, HB 218 regulates commerce in and speech relating to arms—even when that commerce and speech takes place entirely outside of Illinois, as will often be the case.  HB 218 also removes traditional elements of tort law that ensure that judges and juries do not impose liability on private parties for constitutionally protected conduct.  Making matters worse, the statute jettisons traditional proximate cause in favor of allowing state courts to impose liability on licensed industry members for the actions of third-party criminals with whom the industry members never dealt.

4.     None of that is consistent with the Constitution.  The First Amendment prohibits states from punishing wide swaths of truthful speech about lawful products, even if the products are dangerous or the speech is unpopular.  The Second Amendment protects commerce in arms.  Numerous constitutional provisions prohibit states from regulating conduct that takes place wholly beyond their borders, even when that commerce has effects within the state.  And the Due Process Clause prohibits states from punishing one private party for the conduct of another.

5.     All of that is reason enough to invalidate Illinois' new statute.  But there is an even more obvious problem with HB 218:  It is squarely preempted by federal law.  In the late 1990s and early 2000s, several state and local governments sought to use novel applications of common-law theories like negligence and nuisance to impose civil liability on manufacturers and sellers of firearms and ammunition when

third parties misused their products.  Congress saw these lawsuits for what they were: unconstitutional efforts to stamp out lawful and constitutionally protected activity.  To end such incursions, Congress enacted the Protection of Lawful Commerce in Arms Act in 2005 by wide margins on a substantially bipartisan basis. The PLCAA expressly prohibits and preempts state-law civil actions "brought by any person against a manufacturer or seller of [firearms or ammunition] … for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of [firearms or ammunition] by the person or a third party."  15 U.S.C. §7903(5)(A).

6.    Illinois is now trying to resurrect the very kinds of lawsuits that the PLCAA was enacted to eliminate.  Under HB 218, state officials and private parties may bring civil actions against licensed manufacturers and sellers of firearms, ammunition, and related products for damages and other relief resulting from the criminal use of a firearm by a third party.  HB 218 therefore falls squarely within the express-preemption provision of the PLCAA.

7.    For these reasons and those set forth below, NSSF seeks a declaration that HB 218 is preempted and unconstitutional, an injunction preventing Illinois from enforcing it against NSSF and/or its members, nominal damages, and any other relief this Court deems proper.

## THE PARTIES

8.     NSSF is a Connecticut non-profit, tax-exempt, non-stock corporation with its principal place of business in Connecticut.  It is the trade association for the firearm, ammunition, and hunting and shooting sports industry.  It has a membership of approximately 10,000 manufacturers, distributors, and retailers of firearms, ammunition, and related products, as well as other industry members throughout the United States.  NSSF's mission is to promote, protect, and preserve hunting and shooting sports by providing leadership in addressing industry challenges, advancing participation in and understanding of hunting and shooting sports, reaffirming and strengthening its members' commitment to the safe and responsible sale and use of their products, and promoting a political environment supportive of America's traditional hunting and shooting heritage.  NSSF serves the interests of its members, which are impaired by the threat of sweeping liability under HB 218. NSSF is authorized to bring this action on their behalf.

9.     Defendant Kwame Raoul is the Attorney General of Illinois.  He is "the legal officer of the State" and has the duty to "institute and prosecute all actions and proceedings in favor of … the State," as well as to "defend all actions and proceedings against any State officer."  Ill. Const. art. V, §15; 15 Ill. Comp. Stat. 205/4; *see* 20 Ill. Comp. Stat. 2610/1, 2610/16.  He is a resident of Illinois, and his principal places of business are 100 W. Randolph St., Chicago, IL 60601; 500 S.

Second St., Springfield, IL 62701; and 601 S. University Ave., Carbondale, IL 62901. At all relevant times, Attorney General Raoul, as well as those subject to his supervision, direction, or control, are and will be acting under color of state law.

## BACKGROUND

**Congress Enacted the PLCAA to Prevent State-Law Civil Actions that Unduly Burden the National Firearm Industry and Infringe Fundamental Constitutional Rights.**

10.   The Constitution "confer[s] an individual right to keep and bear arms." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111, 2127 (2022) (quoting *Heller*, 554 U.S. at 595); *see* U.S. Const. amend. II. And "the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017).

11.   Nevertheless, in the late 1990s, state and local governments began trying to use novel applications of state tort law to hold "manufacturers, distributors, dealers, and importers of firearms that operate as designed and intended" accountable "for the harm caused by the misuse of firearms by third parties, including criminals." 15 U.S.C. §7901(a)(3); *see id.* §7901(a)(4). They invoked a variety of theories, including: strict liability for abnormally dangerous activities or defective design, *Penelas v. Arms Tech., Inc.*, 778 So.2d 1042, 1043-44 (Fla. Ct. App. 2001); negligent marketing, *City of St. Louis v. Cernicek*, 145 S.W.3d 37, 38, 40 (Mo.

Ct. App. 2004) (per curiam); negligent distribution, *District of Columbia v. Beretta U.S.A. Corp.*, 847 A.2d 1127, 1131 (D.C. Ct. App. 2004); deceptive trade practices, *Taurus Holdings, Inc. v. U.S. Fidelity & Guar. Co.*, 367 F.3d 1252, 1252-53 (11th Cir. 2004); and public nuisance, *Sills v. Smith & Wesson Corp.*, 2000 WL 33113806, at *7 (Del. Super. Ct. Dec. 1, 2000), among others.

12.     Some of these suits succeeded in stretching the common law far beyond its traditional limits—and in permitting one state's courts to police the business practices of industry members operating elsewhere.  *See, e.g.*, *City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1143-47 (Ohio 2002); *James v. Arms Tech., Inc.*, 820 A.2d 27, 37-44, 46-47, 50-53 (N.J. Super. Ct. 2003); *City of Gary ex rel. King v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1231-32, 1241-42 (Ind. 2003). Others were unsuccessful.  *See, e.g.*, *Camden Cnty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*, 273 F.3d 536, 540 (3d Cir. 2001) (per curiam); *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1137, 1147-48 (Ill. 2004).

13.     But the final tally told only part of the story.  Had these sprawling suits been permitted to persist and proliferate, "[t]he legal fees alone" would have been "enough to bankrupt the industry."  Sharon Walsh, *Gun Industry Views Accord as Dangerous Crack in Its Unity*, Wash. Post (Mar. 18, 2000), https://wapo.st/2Zcp5KS. That, indeed, was in large part the point: "[M]unicipal leaders pressed on regardless of their chance of success, spending taxpayers' money in a war of attrition against

the firearms industry."  Recent Legislation, *Protection of Lawful Commerce in Arms Act*, 119 Harv. L. Rev. 1939, 1940 (2006).

14.    It did not take long for Congress to recognize these lawsuits for what they were:  a coordinated effort to try to destroy the firearms industry by saddling it with liability for the acts of criminals.  States pressed "theories without foundation in hundreds of years of the common law and jurisprudence of the United States" and threatened interstate comity by permitting one state to penalize lawful conduct in another state.  15 U.S.C. §7901(a)(7)-(8).  They did so, moreover, at substantial cost to individual rights, including the Second Amendment right to keep and bear arms, *id.* §7901(a)(2), (a)(6), as well as the rights of industry members to pursue their trade consistent with the Constitution's privileges and immunities guarantee, *id.* §7901(a)(7).  And it was profoundly unfair, to boot, to hold lawful businesses engaged in the lawful sale of constitutionally protected products liable "for the harm caused by those who criminally or unlawfully misuse … products that function as designed and intended."  *Id.* §7901(a)(5).

15.    Congress enacted the PLCAA to put an end to such state-law actions.  Indeed, the PLCAA's very first enumerated "purpose[]" is to "prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products, and their trade associations" based on harm "caused by the criminal or unlawful misuse of firearm products" by third parties.  *Id.* §7901(b)(l);

*see also id.* §790l(a)(6) (finding that such suits are "an abuse of the legal system, …

threaten[] the diminution of a basic constitutional right and civil liberty, … and

constitute[] an unreasonable burden on interstate and foreign commerce").

16. The statute makes good on that promise, prohibiting all such suits from

being "brought in any Federal or State court." *Id.* §7902(a). The PLCAA preempts

"civil action[s] … brought by any person against a manufacturer or seller of a

qualified product, or a trade association, for damages, punitive damages, injunctive

or declaratory relief, abatement, restitution, fines, or penalties, or other relief,

resulting from the criminal or unlawful misuse of a qualified product by the person

or a third party." *Id.* §7903(5)(A); *see id.* §7903(2)-(4), (6), (8)-(9) (defining

"person," "manufacturer," "seller," "trade association," "qualified product," and

"unlawful misuse").

17. Only six enumerated types of claims are not so prohibited. *See id.*

§7903(5)(A). These exceptions are limited to circumstances in which the

manufacturer or seller itself engaged in some well-defined type of wrongful conduct,

such as claims for design or manufacturing defect, fraudulent transfer, negligent

entrustment, and breach of contract or warranty.

18. None of the enumerated exceptions extends to state laws that impose

liability against manufacturers and sellers of firearms and ammunition for the harm

more directly caused by the unlawful or criminal conduct of third parties. In fact,

such efforts, founded on novel expansions of general common-law tort theories, are exactly what the PLCAA was enacted to—and does—stamp out.  *See id.* §7901(a)(7); *cf. Camden Cnty.*, 273 F.3d at 540-41 ("To extend public nuisance law to embrace the manufacture of handguns would be unprecedented ….").

**Courts Uphold the PLCAA Against Constitutional Challenges and Routinely Reject Efforts to Circumvent Its Protections.**

19.    After Congress passed the PLCAA, federal and state courts routinely rejected efforts to evade the law's protections for the firearms industry.

20.    Some plaintiffs challenged the statute's constitutionality, but courts across the country rejected such challenges, holding that the PLCAA is a lawful exercise of Congress' Commerce power, *see, e.g.*, *Adames v. Sheahan*, 909 N.E.2d 742, 765 (Ill. 2009); *City of N.Y. v. Beretta U.S.A. Corp.*, 524 F.3d 384, 393-95 (2d Cir. 2008); that the PLCAA is consistent with the Constitution's separation of powers, *see, e.g.*, *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1139-40 (9th Cir. 2009); *District of Columbia v. Beretta*, 940 A.2d 163, 172-73 (D.C. Ct. App. 2008); *City of N.Y.*, 524 F.3d at 395-96; that the PLCAA comports with the Tenth Amendment, *see, e.g.*, *Delana v. CED Sales, Inc.*, 486 S.W.3d 316, 323-24 (Mo. 2016); *City of N.Y.*, 524 F.3d at 396-97; *Adames*, 909 N.E.2d at 765; and that the PLCAA does not violate the Takings, Equal Protection, Due Process, or Petition Clauses, *see, e.g.*, *Ileto*, 565 F.3d at 1140-42; *Delana*, 486 S.W.3d at 324; *District of Columbia*, 940 A.2d at 173-82; *City of N.Y.*, 524 F.3d at 397-98.

21.     Other plaintiffs sought to skirt the PLCAA's general prohibition on covered actions.  Just as often, courts carefully policed the statute's ban and rejected efforts to expand its narrow exceptions.  For instance, the Missouri Supreme Court held that, to qualify as a prohibited action "resulting from criminal misuse" of a firearm under §7903(5)(A), the PLCAA does not require the criminal misuse to have resulted in criminal conviction or to have been the sole cause of injury.  *Delana*, 486 S.W.3d at 321.  The Supreme Court of Texas rejected an effort to invoke the negligent entrustment exception under §7903(5)(A)(ii) because that state's common law did not recognize such an action.  *In re Academy, Ltd.*, 625 S.W.3d 19, 30-32 (Tex. 2021).   And the Ninth and Second Circuits concluded that statutory codification of state tort law on wrongful death, nuisance, and negligence actions could not satisfy the so-called "predicate exception" set forth in §7903(5)(A)(iii). *City of N.Y.*, 524 F.3d at 400-04; *Ileto*, 565 F.3d at 1137-38.

**In the Wake of *Bruen*, States Again Attempt to Circumvent the PLCAA.**

22.     Last June, the Supreme Court decided *New York State Rifle & Pistol Association v. Bruen*, which confirmed that the right "to keep and bear Arms" means just that—the right to keep *and bear* arms, whether inside or outside of the home. 142 S.Ct. at 2134-35.  That guarantee, moreover, is no "second-class right," subject to a unique set of rules or available to only those with "some special need" to exercise it.  *Id.* at 2156.  Accordingly, when evaluating government burdens on the

Second Amendment's "unqualified command," courts must assess "this Nation's historical tradition" of regulating firearms—not conduct some means-end balancing. *Id.* at 2125-34.  Applying that test, the Court invalidated a New York law requiring law-abiding citizens to show special need to carry a firearm outside the home.  *Id.* at 2134-56.

23.   *Bruen* should have prompted states to reconsider their laws to make them more protective of rights the Supreme Court had just reaffirmed as fundamental.  Unfortunately, it has prompted the opposite reaction in states that are least protective of the Second Amendment right.  Almost immediately, some of the same very few states that had endeavored to keep their law-abiding citizens from carrying firearms undertook efforts "to offset the impact of the court's decision." Giavanni Alves, *N.Y.'s New Gun Control Laws*, Staten Island Live (July 9, 2022), https://bit.ly/3Q8l2K0.  Some of those efforts were re-runs.  In particular, a few states (following the lead of New York, the state whose restrictive carry regime was invalidated in *Bruen*) passed legislation purporting to authorize civil suits against firearms manufacturers, distributors, and sellers based on the harms caused by gun violence—in other words, purporting to authorize the very same types of lawsuits that prompted Congress to pass the PLCAA almost 20 years ago.  *See, e.g.*, N.J. Stat. Ann. §§2C:58-35 (July 5, 2022); Del. Code Ann. tit. 10, §3930 (June 30, 2022); *cf.* N.Y. Gen. Bus. Law §§898-a – 898-e (July 9, 2021).

**Illinois' Recently Enacted House Bill 218 Authorizes Sweeping Liability on Firearm Industry Members, in Direct Contravention of the Constitution and Federal Law.**

24.     On August 12, 2023, Governor J.B. Pritzker signed into law HB 218, which tracks these recent efforts to circumvent the PLCAA.

25.     HB 218 adds a new section to the Consumer Fraud and Deceptive Business Practices Act, and is codified at 815 Ill. Comp. Stat. 505/2BBBB.

26.     HB 218 applies only to "firearm industry member[s]." 815 Ill. Comp. Stat. 505/2BBBB-(b). That term ("firearm industry member") is defined broadly to mean "a person, firm, corporation, company, partnership, society, joint stock company, or any other entity or association engaged in the design, manufacture, distribution, importation, marketing, wholesale, or retail sale of firearm-related products, including sales by mail, telephone, or Internet or in-person sales." *Id.* 505/2BBBB-(a). "Firearm-related product" is defined in turn to mean "a firearm, firearm ammunition, a firearm precursor part, a firearm component, or a firearm accessory that … is sold, made, or distributed in Illinois," "is intended to be sold or distributed in Illinois," or "is or was possessed in Illinois, [if] it was reasonably foreseeable that the item would be possessed in Illinois." *Id.*[1]

---

[1] *See also* 815 Ill. Comp. Stat. 505/2BBBB-(a) (defining "firearm" and "firearm ammunition" to have "the meaning set forth in Section 1.1 of the Firearm Owners Identification Card Act"); *id.* (defining "Firearm accessory" to mean "an attachment or device designed or adapted to be inserted into, affixed onto, or used in conjunction with a firearm that is designed, intended, or functions to alter or enhance (i) the firing

27.     The only conduct that HB 218 regulates is "the sale, manufacturing, importing, or marketing of a firearm-related product" by a "firearm industry member." *Id.* 505/2BBBB-(b).

28.     Despite limiting the universe of potential defendants and cabining the scope of regulation to commerce in and speech about arms, the new cause of action HB 218 creates is sweeping.  A "firearm industry member" may be held liable merely for "the sale, manufacturing, importing, or marketing a firearm-related product," *even if that conduct was fully lawful where it occurred and fully compliant with federal law*, if an Illinois court later decides that it "contribute[d] to a condition in Illinois that endangers the safety or health of the public." *Id.* 505/2BBBB-(b)(1); *see id.* (authorizing liability where the relevant conduct was "*either* unlawful in itself *or* unreasonable under all circumstances" (emphases added)).

29.     Lawful conduct protected by the First Amendment ("marketing") and the Second Amendment ("the sale, manufacturing, [and] importing … [of] a firearm-related product") thus may be the basis of an Illinois tort action if a product lawfully marketed, lawfully made, and lawfully sold is later used or possessed unlawfully *by someone else* in Illinois.  HB 218 provides no protection for manufacturers or sellers of firearms who are fully compliant with applicable law from being held liable for

---

capabilities of a firearm, frame, or receiver, (ii) the lethality of the firearm, or (iii) a shooter's ability to hold and use a firearm").

the criminal misdeeds of a third party.

30.     And the law does not stop there.  "A firearm industry member" may also be held liable under HB 218 for "failing to establish or utilize reasonable controls" regarding its, sale, manufacture, and marketing, *id.*, even if the relevant products were not "sold, made, or distributed in Illinois," *id.* 505/2BBBB-(a), and again even if the "fail[ure]" was not "unlawful in itself," *id.* 505/2BBBB-(b)(1).

31.     To make matters worse, the statute does not key "reasonable controls" solely to the many federal, state, and local laws with which firearms manufacturers and sellers must already comply.  Nor does it identify what controls beyond compliance with existing statutory obligations are or are not "reasonable."  Instead, the most HB 218 does to define "reasonable controls" is supply a recursive gloss: "Reasonable controls," the law says, "include *reasonable* procedures, safeguards, and business practices."  *Id.* 505/2BBBB-(b)(1) (emphasis added).  Then, in a gloss upon this gloss, HB 218 points to what such "controls" are supposed to accomplish:

(A) prevent the sale or distribution of a firearm-related product to a straw purchaser, a person prohibited by law from possessing a firearm, or a person who the firearm industry member has reasonable cause to believe is at substantial risk of using a firearm-related product to harm themselves or another individual or of possessing or using a firearm-related product unlawfully;

(B) prevent the loss or theft of a firearm-related product from the firearm industry member; or

(C) comply with all provisions of applicable local, State, and federal law, and do not otherwise promote the unlawful manufacture, sale, possession,

marketing, or use of a firearm-related product.

*Id.*

32.    In other words, "reasonable controls" under HB 218 are whatever "reasonable procedures" a state court decides will achieve goals as sweeping and abstract as preventing criminal conduct by third parties and complying with all federal and state law—and the failure to "utilize" any one of potentially infinite and unnamed procedures "designed to" achieve those goals likewise is a violation of Illinois law, regardless of where the supposed failure occurred.  *Id.*

33.    Illinois thus requires industry members to have in place certain unnamed and indeterminable "procedures" that, among other things, are "designed to" screen for customers who appear "at substantial risk of using a firearm-related product to harm … another individual," *id.*, which describes most individuals with a heightened need to lawfully possess and lawfully carry a lawful firearm for self-defense.  After all, using a firearm-related product for self-defense may entail harm to another—namely, against an assaultive person—and nothing in HB 218 limits its reach to only unlawful harm of others.

34.    A firearm industry member must employ all of these unidentified "reasonable controls," moreover, even if it manufactures all of its products outside of Illinois, even if it completes all of its sales outside of Illinois (i.e., it has no Illinois stores), and even if all of its product distributions take place outside of Illinois.

35.     HB 218 does not stop there.  Under 815 Ill. Comp. Stat. 505/2BBBB-(b)(2), firearm industry members may not "[a]dvertise, market, or promote a firearm-related product in a manner that reasonably appears to support, recommend, or encourage individuals" who are not in "any duly authorized military organization" to "use a firearm-related product for a military-related purpose in Illinois."

36.     The statute provides no definition for what constitutes using a firearm-related product for a "military-related purpose," and nothing in HB 218 requires that purpose to be unlawful.

37.     HB 218 goes on to prohibit firearm industry members from "advertis[ing], market[ing], promot[ing], design[ing], or sell[ing] any firearm-related product in a manner that reasonably appears to support, recommend, or encourage persons under 18 years of age to unlawfully purchase or possess or use a firearm-related product in Illinois."  *Id.* 505/2BBBB-(b)(3); *see id.* 505/2BBBB-(b)(3)(B) ("This paragraph does not apply to communications or promotional materials regarding lawful recreational activity with a firearm such as, but not limited to, practice shooting at targets on established public or private target ranges or hunting, trapping, or fishing in accordance with the Wildlife Code or the Fish and Aquatic Life Code.").

38.     In determining whether an industry member's conduct violates this prohibition, HB 218 directs courts to consider "the totality of the circumstances,

16

including, but not limited to, whether the marketing, advertising, promotion, design, or sale": "offers brand name merchandise for minors … that promotes a … firearm-related product"; "offers firearm-related products in sizes … specifically designed to be used by … minors"; "uses images or depictions of minors in advertising or marketing, or promotion materials, to depict the use of firearm-related products." *Id.* 505/2BBBB-(b)(3)(A).

39.     Finally, in a summary catch-all, a firearm industry member may not "[o]therwise engage in unfair methods of competition or unfair or deceptive acts or practices declared unlawful under Section 2 of this Act." *Id.* 505/2BBBB-(b)(4).

40.     "Paragraphs (2), (3), and (4) of subsection (b)" (i.e., 815 Ill. Comp. Stat. 505/2BBBB-(b)(2)-(4)) are deemed "declarative of existing law and shall not be construed as new enactments." *Id.* 505/2BBBB-(c).

41.     The provisions of HB 218 are actionable pursuant to Sections 7 and 10a of the Consumer Fraud and Deceptive Business Practices Act.

42.     Section 7 of the Consumer Fraud and Deceptive Business Practices Act provides that "the Attorney General or a State's Attorney" "may bring an action in the name of the People of the State" against any person who "is using, has used, or is about to use any method, act or practice declared by [HB 218] to be unlawful." *Id.* 505/7-(a).  In such a suit, the court "may exercise all powers necessary, including but not limited to: injunction; revocation, forfeiture or suspension of any license,

17

charter, franchise, certificate or other evidence of authority" and "may impose a civil penalty in a sum not to exceed $50,000" with an additional civil penalty not to exceed $10,000 if "the violation was committed against a person 65 years of age or older." *Id.* 505/7(a)-(c); *see also id.* 505/10 ("In any action brought under the provisions of this Act, the Attorney General or the State's Attorney is entitled to recover costs for the use of this State.").

43.    Section 10a of the Consumer Fraud and Deceptive Business Practices Act authorizes "[a]ny person who suffers actual damage as a result of a violation of [HB 218] committed by any other person" to "bring an action against such person." *Id.* 505/10a(a).  In such a suit, the court "may award actual economic damages or any other relief which the court deems proper," including punitive damages.  *Id.*

44.    HB 218 took effect immediately upon being signed into law by Governor Pritzker.  *See* HB 218 §99.

## JURISDICTION AND VENUE

45.    Plaintiff's causes of action arise under 42 U.S.C. §1983 and the United States Constitution.  This Court thus has jurisdiction pursuant to 28 U.S.C. §1331.

46.    This Court also has jurisdiction under 28 U.S.C. §1343(a)(3) because this action seeks to "redress the deprivation, under color of a[] State law," of "right[s], privilege[s] or immunit[ies] secured by … an[] Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United

States."

47.     Venue lies in this district pursuant to 28 U.S.C. §1391 because Defendant is located in and performs his official duties in the Southern District of Illinois and is therefore considered to reside within this district as a matter of law.

**CLAIMS FOR RELIEF**

**COUNT ONE**
**(Preemption)**

48.     Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

49.     The Supremacy Clause, which provides that the Constitution, federal statutes, and treaties are "the supreme Law of the Land," U.S. Const. art. VI, cl. 2, provides "a rule of decision" for determining whether federal or state law applies in a particular situation. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015).  When a federal law "imposes restrictions" and a state law "confers rights … that conflict with the federal law," "the state law is preempted." *Kansas v. Garcia*, 140 S.Ct. 791, 801 (2020); *cf. Nat'l Pork Producers Council v. Ross*, 143 S.Ct. 1142, 1165 (2023) ("[T]he Framers equipped Congress with considerable power to regulate interstate commerce and preempt contrary state laws.").

50.     That is exactly the situation here.  To stamp out unjustified expansions of the common law and undue intrusions into lawful commerce in arms, the PLCAA imposes clear restrictions:  Courts may not entertain any "civil action … against a

manufacturer or seller of a [firearms] product … for damages … or other relief, resulting from the criminal or unlawful misuse of a [firearms] product by … a third party."  15 U.S.C. §7903(5)(A).  Yet HB 218 explicitly authorizes parties to sue "firearm industry members" for damages and other relief resulting from a third party's misuse of an industry member's products.  815 Ill. Comp. Stat. 505/2BBBB-(b)(1).  That direct effort to countermand federal law is preempted.

51.     Under the PLCAA, a "qualified civil liability action may not be brought in any Federal or State court."  15 U.S.C. §7902(a).  Yet the whole point of HB 218 is to authorize "qualified civil liability action[s]."

52.     The PLCAA defines a "qualified civil liability action" as a "[1] civil action … [2] brought by any person" ("including any governmental entity") "[3] against a manufacturer or seller of a qualified product, or a trade association [4] for damages … or other relief, [5] resulting from the criminal or unlawful misuse of a qualified product by … a third party."  *Id.* §7903(5)(A).

53.     HB 218 actions satisfy each element.

54.     A suit under HB 218 is [1] a "civil action" that [2] can be brought by individuals and state officials alike.  *See* 815 Ill. Comp. Stat. 505/7-(a) ("Whenever the Attorney General or a State's Attorney has reason to believe that any person is using, has used, or is about to use any method, act or practice declared by this Act to be unlawful, and that proceedings would be in the public interest, he or she may

bring an action in the name of the People of the State against such person."); *id.* 505/10a-(a) ("Any person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person.").

55.    A suit under HB 218 [3] can be brought "against a manufacturer or seller of a qualified product, or trade association."  15 U.S.C. §7903(5)(A).  In fact, a suit under HB 218 can be brought *only* against such a party; the statute applies to "firearm industry member[s]" and them alone.  815 Ill. Comp. Stat. 505/2BBBB-(b); *see id.* 505/2BBBB-(a) (defining "Firearm industry member" to mean "a person, firm, corporation, company, partnership, society, joint stock company, or any other entity or association engaged in the design, manufacture, distribution, importation, marketing, wholesale, or retail sale of firearm-related products, including sales by mail, telephone, or Internet or in-person sales").

56.    Finally, HB 218 [4] authorizes recovery of damages and other relief from firearm industry members [5] for injuries "resulting from" third parties' misuse of their products.  *See id.* 505/2BBBB-(b); *id.* 505/7-(a); *id.* 505/10a(a).  Indeed, this appears to be the statute's very reason for being.  HB 218 subjects a firearm industry member to liability for "failing to establish or utilize reasonable controls" to keep firearms out of the hands of third parties who go on to criminally misuse them, but imposes no liability on criminals who actually injure public harm.  *Id.* 505/2BBBB-(b)(1)(A).  HB 218 suits are therefore "qualified civil liability actions" under the

PLCAA.

57.     The kind of liability HB 218 seeks to impose does not fit within any of the narrow exceptions to the PLCAA's preemptive scope enumerated in 15 U.S.C. §7903(5)(A).   HB 218 does not authorize suits by the U.S. Attorney General to enforce any federal laws (§7903(5)(A)(vi)); and it does not confine liability to instances in which a manufacturer or seller knowingly transferred a firearm to a prohibited person (§7903(5)(A)(i)), negligently entrusted a firearm (§7903(5)(A)(ii)), breached a contract or warranty (§7903(5)(A)(iv)), or defectively made a product (§7903(5)(A)(v)).

58.     Nor does HB 218 fit within the PLCAA's so-called "predicate exception," which exempts "an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." *Id.* §7903(5)(A)(iii).

59.     As the Ninth and Second Circuits have explained, the term "applicable" in §7903(5)(A)(iii) must be read in light of both "the specific context in which [it] is used" and "the broader context of the statute as a whole."   *Ileto*, 565 F.3d at 1134 (quoting *Robinson v. Shell Oil Co*, 519 U.S. 337, 341 (1997)); *accord City of N.Y.*, 524 F.3d at 400.  And both the immediately surrounding text and the language that immediately follows provide clear indications that the predicate exception exempts

from the PLCAA's preemptive reach only statutes that impose concrete obligations and prohibitions that a firearm industry member can understand and comply with, not statutes that merely impose broad duties of care.  Indeed, that is the only sensible way to read the predicate exception, as interpreting it to permit states to reinstate exactly the same kinds of novel nuisance suits that led Congress to enact the PLCAA through the simple expedient of codifying the same amorphous theories in statutes would "allow the predicate exception to swallow the statute."  *City of N.Y.*, 524 F.3d at 403; *see also Ileto*, 565 F.3d at 1137 (noting that, in enacting the PLCAA, "Congress was primarily concerned with novel nuisance cases like *Ileto*," in which the plaintiffs alleged that manufacturers contributed to a public nuisance by making and selling more firearms than the plaintiffs believed the market should bear).

60.     A law that instructs industry members merely to act reasonably, and authorizes liability to be imposed for harms caused by remote third parties, is not and cannot be saved by the predicate exception.  *Nat'l Shooting Sports Found. v. Platkin*, 2023 WL 1380388, at *6 (D.N.J. Jan. 31, 2023).  Because that is precisely what HB 218 does, it is preempted.

61.     At a minimum, HB 218 is preempted to the extent it authorizes the imposition of liability in the absence of traditional proximate cause.

62.     The predicate exception exempts only "an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal

statute applicable to the sale or marketing of the product, *and the violation was a proximate cause of the harm for which relief is sought*." 15 U.S.C. §7903(5)(A)(iii) (emphases added).

63.     But HB 218 does not require "proximate causation" in the traditional sense with respect to the public suits it authorizes pursuant to Section 7 of the Consumer Fraud and Deceptive Business Practices Act.

64.     Courts "ordinarily presume that 'Congress intends to incorporate the well-settled meaning of the common-law terms it uses,'" *Jam v. Int'l Fin. Corp.*, 139 S.Ct. 759, 769-70 (2019), and "proximate cause" is a familiar common-law term. "The term 'proximate cause' is shorthand for a concept:  Injuries have countless causes, and not all should give rise to legal liability." *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 692 (2011) (emphasis omitted).  To distinguish proximate cause from cause-in-fact, courts have set down several guidelines:  "[F]oreseeability alone is not sufficient to establish proximate cause," *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 201 (2017), and there must be a "direct relation between the injury asserted and the injurious conduct alleged," *Holmes v. Secs. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992).

65.     HB 218 discards any such inquiry when it comes to suits brought by the Illinois Attorney General or an Illinois State's Attorney under Section 7 of the

Consumer Fraud and Deceptive Business Practices Act.[2]

66.    Under HB 218, a member of the firearm industry can be held liable whenever it can be said to have "contribute[d] to a condition in Illinois that endangers the safety or health of the public by … failing to establish or utilize reasonable controls." 815 Ill. Comp. Stat. 505/2BBBB-(b)(1). And for purposes of suits initiated under Section 7, the statute does not require that the failure "to establish or utilize reasonable control" be a traditional proximate cause of the

---

[2] "Proximate causation is an element of all *private* causes of action under the Act." *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 861 (Ill. 2005) (emphasis added). "Where an independent criminal act of a third person intervenes between defendant's act and plaintiff's injury, which causes the injury and without which the injury could not have occurred, the criminal act is a superseding cause of the injury relieving defendant of liability," unless "the criminal act is reasonably foreseeable at the time of defendant's act." *Petrauskas v. Wexenthaller Realty Mgmt., Inc.*, 542 N.E.2d 902, 909 (Ill. Ct. App. 1989); *see also Abrams v. City of Chicago*, 811 N.E.2d 670, 675 (Ill. 2004) ("If the negligence charged does nothing more than furnish a condition by the which the injury is made possible, and that condition causes an injury by the subsequent, independent act of a third person, the creation of the condition is not the proximate cause of the injury."); *cf. Thomas v. Khoury*, 190 N.E.3d 245, 251 (Ill. 2021) (declining to construe a statute such "that an abortion is a superseding cause as a matter of law in all instances where a defendant physician has injured a fetus in a separate procedure," given the background principle that "'[p]roximate cause is ordinarily a question of fact for the jury to decide'" (alteration in original) (quoting *Heastie v. Roberts*, 877 N.E.2d 1064, 1083 (Ill. 2007))). The Illinois Supreme Court held in *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099 (Ill. 2004), that licensed firearm industry members' "lawful commercial activity … may not be considered a proximate cause of" "harm to person and property caused directly and principally by the criminal activity of intervening third parties." *Id.* at 1136 (quoting *People ex rel. Spitzer v. Sturm, Ruger & Co.*, 309 A.D.2d 91, 103 (N.Y. App. Div. 2003)).

ultimate harm.

67.     That, of course, is consistent with HB 218's discernable aim of imposing liability on members of the firearm industry for harms caused by third parties.  But it is fundamentally inconsistent with what the PLCAA demands.  The whole point of the PLCAA is to immunize industry members from harms caused by "the criminal or unlawful misuse of firearm products or ammunition products by others when the product functioned as designed and intended."   15 U.S.C. §7901(b)(1).  That objective would be defeated if states could simply redefine proximate cause to exclude consideration of whether harms were caused by the criminal or unlawful acts of third parties.  Yet HB 218 purports to do exactly that.

### COUNT TWO
### (First Amendment)

68.     Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

69.     In addition to regulating commerce (e.g., "the sale, manufacturing," and "importing" "of a firearm-related product"), HB 218 also regulates speech ("marketing").  815 Ill. Comp. Stat. 505/2BBBB-(b).  In fact, the statute singles out speech on the basis of its content or viewpoint.  "A firearm industry member" may be held liable under HB 218 if its "marketing" is deemed to have "create[d], maintain[ed], or contribute[d] to a condition in Illinois that endangers the safety or health of the public" including by "failing to establish or utilize reasonable controls."

26

*Id.* 505/2BBBB-(b)(1). Similarly, HB 218 prohibits "[a]dvertis[ing], market[ing[], or promot[ing]" that encourages individuals "to use a firearm-related product for a military-related purpose." *Id.* 505/2BBBB-(b)(2).

70. HB 218 thus regulates speech based on content or "the topic discussed." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S.Ct. 1464, 1471 (2022). After all, the statute does not apply to all marketing; it applies only to "marketing of a firearm-related product." 815 Ill. Comp. Stat. 505/2BBBB-(b)(1)-(2). Indeed, it does not even apply to all such speech by all speakers—only the speech of "firearm industry member[s]," *id.*, i.e., those "engaged in the design, manufacture, distribution, importation, marketing, wholesale, or retail sale of firearm-related products," *id.* 505/2BBBB-(a). And that speaker-based discrimination is no accident. HB 218 fixates on gun-related speech by gun-related actors because their speech is uniquely likely to communicate a point of view that Illinois apparently disfavors. *See Sorrell v. IMS Health Inc*., 564 U.S. 552, 564 (2011).

71. Laws that single out speech on the basis of its content or viewpoint are subject to the strictest of scrutiny, which they "rare[ly]" survive. *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 790-91, 799 (2011); *see also Sorrell*, 564 U.S. at 555-56 ("The First Amendment requires heightened scrutiny whenever the government creates 'a regulation of speech because of disagreement with the message it conveys.'… Commercial speech is no exception." (quoting *Ward v. Rock*

*Against Racism*, 491 U.S. 781, 791 (1989))).

72.    The topics and views that Illinois has singled out in HB 218 do not fall into any "well-defined and narrowly limited classes of speech" unprotected by the First Amendment. *Brown*, 564 U.S. 786, 791. To be sure, the First Amendment does not preclude imposing liability for false, deceptive, or otherwise "misleading" commercial speech. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980). But HB 218 does not even purport to target only speech that is false or misleading. It authorizes the imposition of liability for speech about a product—a product expressly protected by the Constitution, no less— even when that speech is truthful and not misleading. Indeed, the words "false," "misleading," and "deceptive" appear nowhere in the relevant provisions. A manufacturer that places online advertisements containing entirely accurate specifications of its products and subsequently sells that product to a distributor, could be liable under HB 218, even if that product is fully lawful in every state in which it is sold, if a Illinois court later deems the product to have been marketed (1) in a way that "contribute[d] to a condition in Illinois that endangers the safety or health of the public," 815 Ill. Comp. Stat. 505/2BBBB-(b)(1), or (2) encouraged non-servicemembers to use it for "a military-related purpose," *id.* 505/2BBBB-(b)(2). *See id.* 815 Ill. Comp. Stat. 505/2BBBB-(b)(1) (authorizing liability for marketing that is deemed to have contributed to a public nuisance, regardless of

whether it was "unlawful").

73.     The state apparently thinks that laws restricting speech about firearms are subject to more relaxed scrutiny, perhaps because firearms are dangerous.  But the Supreme Court has made clear that truthful speech promoting a lawful product or service is protected by the First Amendment even if the product or service is known to have deleterious health effects.  *See, e.g.*, *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (tobacco); *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 184-85 (1999) (gambling); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 504 (1996) (liquor); *Bigelow v. Virginia*, 421 U.S. 809, 818-25 (1975) (abortion).  Simply put, the mere fact a product is dangerous does not transform promotion of that product (i.e., speech) into a tort for which liability may be imposed.  And that is of course true *a fortiori* when it comes to promotion of products that not only are legal, but protected by the Second Amendment.

74.     The only way Illinois could justify HB 218's speech restrictions, then, would be to affirmatively prove that those restrictions are sufficiently tailored to achieve a sufficiently important state interest.  *See Ams. for Prosperity Found. v. Bonta*, 141 S.Ct. 2373, 2384 (2021).  That, it cannot do, as HB 218 is both "seriously underinclusive" and "seriously overinclusive" in relating to any public safety interests the state may assert.  *Brown*, 564 U.S. at 805.

75.     HB 218's most obvious defect—and one of the reasons it runs headfirst

into the PLCAA—is its underinclusiveness. Clearly, HB 218 is aimed at deterring and punishing those who "create, maintain, or contribute to a condition in Illinois that endangers the safety or health of the public." 815 Ill. Comp. Stat. 505/2BBBB-(b)(1). But HB 218 does nothing to police the conduct of third parties who actually misuse firearms. Nor does it regulate, e.g., direct incitements to violence or countless other forms of speech that may actually contribute to a condition that endangers the safety or health of the public. That, in First Amendment terms, is "wildly underinclusive." *Brown*, 564 U.S. at 801-02.

76.     Conversely, by imposing sweeping liability for any firearms marketing that could later be thought to "contribute to a condition in Illinois that endangers the safety or health of the public," 815 Ill. Comp. Stat. 505/2BBBB-(b)(1), even if it is nothing more than entirely truthful, non-misleading speech, HB 218 is "vastly overinclusive." *Brown*, 564 U.S. at 804; *see also United States v. Stevens*, 559 U.S. 460, 480 (2010). Moreover, HB 218 restricts the marketing of firearms in a manner that encourages individuals "to use a firearm-related product for a military-related purpose." 815 Ill. Comp. Stat. 505/2BBBB-(b)(2). But it does not require that these purposes be illegal in Illinois. The statute therefore restricts the provision of information that may encourage the use of firearms even in lawful ways.

77.     In short, HB 218 "prohibit[s] or chill[s]" vast swaths of fully protected expression, *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002), destroying

the "breathing space" that "the First Amendment needs," *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973).

78.    HB 218 also suffers from fatal vagueness problems.

79.    Vagueness "raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. ACLU*, 521 U.S. 844, 871-72 (1997). After all, vague laws risk chilling would-be speakers by forcing them "to steer far wider of the unlawful zone" than they otherwise would "if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964). For that reason, laws touching on speech must themselves speak "only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963).

80.    HB 218 does the opposite.  The statute makes it virtually impossible for regulated parties to tell what speech is and is not permitted, leaving them with no realistic choice but to err on the side of refraining from exercising their First Amendment rights.  By its terms, HB 218 renders unlawful any marketing of a firearm-related product that "create[s], maintain[s], or contribute[s] to a condition in Illinois that endangers the safety or health of the public" if it is deemed "unreasonable under all circumstances."  815 Ill. Comp. Stat. 505/2BBBB-(b)(1). This restriction "will provoke uncertainty among speakers," *Reno*, 521 U.S. at 871, as such indeterminable and subjective abstractions do not articulate at all—let alone articulate with "narrow specificity"—what kind(s) of speech may later be deemed to

have unreasonably contributed to a "condition … that endangers the safety or health of the public."

81.     Those restrictions are problematic enough, but HB 218 further prohibits marketing "in a manner that reasonably appears to support, recommend, or encourage individuals" who are not in the military "to use a firearm-related product for a military-related purpose."   815 Ill. Comp. Stat. 505/2BBBB-(b)(2).   The problem with this broad prohibition is that Illinois provides no guidance on what qualifies as a "military-related" purpose, leaving industry members to guess whether their marketing materials will later be deemed unlawful.  *See Matter of Oil Spill by Amoco Cadiz Off Coast of France on Mar. 16, 1978*, 954 F.2d 1279, 1314 (7th Cir. 1992) ("A navy has many uses: not only offense and defense but also clearing channels for civilian vessels, the rescue of vessels in storms, and removing oil from the waters."); *cf. Heller*, 554 U.S. at 589 (the right "'to bear arms'" guaranteed by the Second Amendment "is not limited to military use").

82.     HB 218 goes on, moreover, to prohibit an industry member from "advertis[ing], market[ing], promot[ing], design[ing], or sell[ing] any firearm-related product in a manner that reasonably appears to support, recommend, or encourage persons under 18 years of age to unlawfully purchase or possess or use a firearm-related product."  815 Ill. Comp. Stat. 505/2BBBB-(b)(3).  A state of course may prohibit speech directly concerning unlawful conduct.   But, unless this

provision covers nothing more than advertisements that tell minors to buy guns (despite being minors), it is not at all clear what it means.  Does any advertisement that shows minors *lawfully* using firearms (e.g., with a parent while hunting, or at a Boy Scouts shooting event) fall on the wrong side of the line?  What about marketing in a way targeted toward young men, who share many characteristics with those just a few years younger—but are lawfully able to purchase firearms (and serve in the armed forces)?  The questions vastly outnumber the answers.  And while no statute must preempt all potential complications, when it comes to a prohibition on speech, the lack of clarity is destined to create a massive chilling problem.

83.    That is particularly clear here given that, in determining whether an industry member's marketing is prohibited, HB 218 instructs courts to consider practices that have no connection to unlawful activity.  For example, a court should look at whether the industry member "offers brand name merchandise for minors … that promotes a firearm industry member or firearm-related product."  *Id.* 505/2BBBB-(b)(3)(A)(ii).  Thus, an industry member could not sell clothing with its logo on it to minors, even though there is nothing unlawful about a minor wearing such clothing.   In addition, the statute instructs courts to consider whether the industry member "offers firearm-related products … that are specifically designed to be used by … minors."  *Id.* 505/2BBBB-(b)(3)(A)(iii).  This would restrict a sporting goods store or firearms manufacturer from pointing out which firearms it

sells are safest for minors.  These provisions make it impossible for industry members to know what types of marketing towards minors are prohibited by HB 218.

84.    To be sure, HB 218 provides a narrow exception for "communications or promotional materials regarding lawful recreational activity."  *Id.* 505/2BBBB-(b)(3)(B).  But the fact that the statute exempts speech that is explicitly directed at a narrow set of activities does not render the rest of its wide-sweeping and vague applications unproblematic.  HB 218 thus necessarily "will provoke uncertainty among speakers" as to how they can promote any of their lawful (and constitutionally protected) products without incurring Illinois' wrath.  *Reno*, 521 U.S. at 871.

85.    That profound uncertainty not only "raises special First Amendment concerns because of its obvious chilling effect on free speech," but creates a "risk of discriminatory enforcement," which make the chilling effect even more acute.  *Id.* After all, "[i]t is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion."  *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940).  And that threat is even more pervasive when, as here, a law "does not aim specifically at evils within the allowable area of State control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech

or of the press." *Id.* HB 218 therefore violates the First Amendment because it is unconstitutionally vague.

86. There is another problem here too. Even when speech about a product is actually proven to be false or misleading—which, again, is not required for liability to attach under HB 218—the traditional principles that govern judicial actions for misrepresentations, including proof of reliance on the allegedly false speech, have always required a substantial link between that speech and the injury for which redress is sought. *See*, *e.g.*, *Restatement (Second) of Torts* §525 (1977); Dee Pridgen & Richard M. Alderman, *Consumer Protection and the Law* §2.26, at 2-64 (2002); *Stewart v. Wyo. Cattle Ranche Co*., 128 U.S. 383 (1888). That link is essential to ensure that efforts to impose liability based on speech remain consistent with the First Amendment. After all, if liability could be imposed for misleading (or even truthful) speech at the behest of plaintiffs who did not rely on it and cannot demonstrate injury from it (as opposed to from the intervening acts of a third party), then the threat of massive tort liability could inhibit a speaker from voicing his view "even though [he] believe[s] [it] to be true and even though it is in fact true." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964). Yet HB 218 does not require proof of reliance.

87. Nor does it require a plaintiff to trace alleged injuries directly to the speech in question. Under HB 218, a firearm industry member may be held

accountable even for the actions of an intervening third-party (including one who is breaking the law) so long as the industry member is deemed to have marketed the product in a way that, for example, "create[s], maintain[s], or contribute[s] to a condition … that endangers the safety or health of the public."

88.    Furthermore, given that speech can now be broadcast across the world (including into Illinois) nearly instantaneously, allowing liability based on speech without that core causation requirement could expose defendants to nearly limitless liability.  A causation-free regime may well lead individuals to confine themselves to "statements which 'steer far wider of the unlawful zone,'" thereby "dampen[ing] the vigor and limit[ing] the variety of public debate."  *Sullivan*, 376 U.S. at 279.

89.    The First Amendment jealously protects speech by guarding against the imposition of massive liability on speech without significant protections.  That is true even of torts that pre-date the Republic and the First Amendment.  And it is true *a fortiori* of novel and extreme theories of liabilities with no comparable historical pedigree.  By removing the traditional, constitutionally grounded safeguards for all speech-based torts, HB 218 flunks First Amendment 101 at every turn.

## COUNT THREE
### (Due Process)

90.    Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

91.    For many of the same reasons that HB 218 is unconstitutionally vague

with respect to speech protected by the First Amendment, it is also unconstitutionally vague under the Due Process Clause with respect to all other conduct it polices. The Fourteenth Amendment prohibits a state from "depriv[ing] any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, §1. A law that forbids or requires an act "in terms so vague that men of common intelligence must necessarily guess at its meaning … violates the first essential of due process of law." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 390 (1926). So too does a law with terms so malleable that it authorizes "arbitrary [or] discriminatory enforcement." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

92.     Because the text of the Fourteenth Amendment applies to all manner of state-sanctioned "depriv[ations]," moreover, this anti-vagueness guarantee applies to both criminal and civil laws. *See id.* at 108-09 (collecting cases); *see also Sessions v. Dimaya*, 138 S.Ct. 1204, 1224-26 (2018) (Gorsuch, J., concurring in part and concurring in the judgment).

93.     For all the reasons already discussed, "[t]he vice of unconstitutional vagueness is further aggravated" in the First Amendment context. *Cramp v. Bd. of Pub. Instruction of Orange Cty.*, 368 U.S. 278, 287 (1961). A more "stringent" vagueness test applies, moreover, for statutes that "threaten to inhibit the exercise of constitutionally protected rights"—including not just the First Amendment, but also

the Second Amendment—or that impose "quasi-criminal" penalties.    *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc*., 455 U.S. 489, 499 (1982).

94.    The most protective vagueness standard known to our law therefore applies here several times over.  HB 218 not only restricts speech, but also directly restricts the activities of those engaged in the lawful business of selling arms protected by the Second Amendment.  And the liability it threatens is no small matter:  "The Court, in its discretion, may exercise all powers necessary, including but not limited to: injunction; revocation, forfeiture or suspension of any license, charter, franchise, certificate or other evidence of authority of any person to do business in this State," "a civil penalty in a sum not to exceed $50,000," and "actual economic damages or any other relief which the court deems proper."  815 Ill. Comp. Stat. 505/7-(a), 815 Ill. Comp. Stat. 505/10a-(a).  HB 218 thus brings with it the "possibility of imposing liability on an entire industry," which, among other things, "threatens the diminution of a basic constitutional right" enabled by that industry— namely, individuals' right to keep and bear arms.  15 U.S.C §7901(a)(6).  As a result, HB 218 is subject to an especially "stringent" vagueness test even as to the non-speech conduct that it regulates.

95.    HB 218 flunks that test, as the prohibitions it imposes are hopelessly vague.

96.    HB 218, requires firearm industry members to "establish [and] utilize

reasonable controls." 815 Ill. Comp. Stat. 505/2BBB-(b)(1). But it remains a mystery what "reasonable controls" means. The statute's modest effort to supply a definition only makes matters worse. Rather than identify a firearm industry member's concrete obligations with specificity, HB 218 issues a sweeping command that industry members adopt any and all "procedures, safeguards, and business practices that are designed to" "prevent" or "comply with" a litany of abstract goals including (but not limited to) preventing the loss or theft of firearms, preventing illegal arms trafficking, and so on. *See id.* 505/2BBBB-(b)(1)(A)-(C).

97.     Moreover, even establishing and using "reasonable controls" does not guarantee industry members that they are in the clear. They can still be found liable under HB 218, despite showing that they used "reasonable controls," if their conduct was nevertheless deemed "unreasonable under all circumstances." *Id.* 505/2BBBB-(b)(1). HB 218 thus offers industry member no way to know what conduct might in the future be deemed "unreasonable under all circumstances."

98.     To be clear, "[w]hat renders [this] statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *United States v. Williams*, 553 U.S. 285, 306 (2008). The problem with HB 218 is not mere imprecision at the margins, but the failure to articulate any standard whatsoever. Determining, for example, what unreasonable conduct contributes to a

condition that endangers the public safety and health invites "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Id*.

99.    Indeed, HB 218 is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015).  Given its sheer breadth, its lack of any identifiable standards, and its stark departures from the common law, HB 218 "impermissibly delegates basic policy matters to policemen, judges[,] and juries for resolution on an ad hoc and subjective basis," with the attendant dangers of arbitrary and discriminatory application.  *Chatin v. Coombe*, 186 F.3d 82, 89 (2d Cir. 1999).  The Due Process Clause demands far more.

100.    And that is not the only due process problem with HB 218.  Proof that the defendant caused the plaintiff's injury is and always has been a core element of tort law.  *See, e.g.*, *Restatement (Second) of Torts* §430 (1965); *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 201 (2017); *Lexmark Int'l, Inc. v. Static Control Components, Inc*., 572 U.S. 118, 132-33 (2014).  Indeed, even strict-liability torts require proof of causation.  *See, e.g.*, *Restatement (Second) of Torts* §§504-05, 507, 509, 519 (1977).  That is not just tradition; it is constitutionally mandated:  Denying a defendant a meaningful opportunity to demonstrate that it did not actually cause a plaintiff's injuries would be a paradigm arbitrary deprivation of private property. Yet HB 218 does just that by seeming to allow liability for harms supposedly caused

by conduct not just far out of state and back in time, but through the criminal acts of third parties.

101.   HB 218's relaxing of the traditional requirements of causation not only compounds the vagueness problem, but independently violates due process.

## COUNT FOUR
### (Second Amendment)

102.   Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

103.   "[T]he Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense." *Bruen*, 142 S.Ct. at 2125; *see also* 15 U.S.C. §7901(a)(1)-(2).  And "the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms." *Teixeira*, 873 F.3d at 677.  Commerce in arms is thus constitutionally protected.  *See Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair.").

104.   HB 218 infringes this essential component of the Second Amendment right to keep and bear arms.  Under *Bruen*, a law that regulates Second Amendment activity is unconstitutional unless the state can prove that it "is consistent with this Nation's historical tradition."   142 S.Ct. at 2126.  HB 218's restrictions on the "manufacturing, importing, [and] marketing" of lawful firearms is not remotely

consistent with that tradition.

105.   In fact, the Third Circuit explained as recently as 2001 that "[t]o extend public nuisance law to embrace the manufacture of handguns would be unprecedented." *Camden Cnty.*, 273 F.3d at 540-41; *see also* 15 U.S.C. §7901 (Congress finding the same).

106.   And the Supreme Court of Illinois itself reached the same conclusion in 2004, holding that licensed firearm industry members (i.e., those lawfully "in the business of providing a lawful product that may be used in unlawful ways, causing injury or death") cannot be liable for public nuisance merely because their "sales of [their products] create a condition that makes the eventual harm possible by putting these weapons in private hands," *City of Chicago*, 81 N.E.2d at 1137, and describing the plaintiffs' novel effort as a "change of [significant] magnitude in the law affecting [the firearm] industry," *id.* at 1148.

107.   Illinois thus cannot "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2130.

108.   As a result, HB 218 violates the Second Amendment.

## COUNT FIVE
### (Unconstitutional Extraterritorial Regulation)

109.   Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

42

110.   The Constitution restricts the power of states to directly regulate conduct that takes place entirely in another state.  That bedrock principle of equal sovereignty among the states is inherent in the plan of the Convention, apparent in several of the Constitution's structural protections, and deeply rooted in our nation's historical tradition.  *See Ross*, 143 S.Ct. at 1157 & n.1; *id.* at 1175-76 (Kavanaugh, J., concurring in part and dissenting in part).

111.   To be sure, the Supreme Court recently clarified that this principle does not erect a per se bar against laws that regulate conduct *within* one state in ways that have an "extraterritorial *effect*" in others.  *Id*. at 1155-57 (majority op.) (emphasis added).  But in doing so, the Court went out of its way to emphasize that it was not dealing with a law that "*directly* regulated out-of-state transactions."  *Id.* at 1157 n.1. And it emphasized the importance of looking to "original and historical understandings of the Constitution's structure and the principles of 'sovereignty and comity' it embraces" when it comes to cases "testing the territorial limits of state authority under the Constitution's horizontal separation of powers" in that manner. *Id.* at 1157 & n.1.  Looking to those principles, it is plain that a state may not *directly* regulate—that is, impose liability based upon—conduct that neither occurs nor is directed within its borders.

112.   At the outset, it is axiomatic that "all States enjoy equal sovereignty." *Shelby Cnty. v. Holder*, 570 U.S. 529, 535 (2013); *see also PPL Mont., LLC v.*

*Montana*, 565 U.S. 576, 591 (2012) ("the States in the Union are coequal sovereigns under the Constitution"). Indeed, "the constitutional equality of the states is essential to the harmonious operation of the scheme upon which the Republic was organized." *Coyle v. Smith*, 221 U.S. 559, 580 (1911). When a state reaches beyond its own borders to "directly regulate[] out-of-state transactions by those with no connection to the State," *Ross*, 143 S.Ct. at 1157 n.1 (emphasis omitted), it invades the sovereignty and impinges on the equality of other states. Accordingly, the plan of the Convention necessarily restricts one state from directly regulating conduct that neither occurs nor is directed within its borders, as a union of several *equal* states subject to the overarching regulation only of one federal sovereign could not succeed if each state could trump the others' sovereign powers whenever and however it saw fit. *Cf. PennEast Pipeline Co. v. New Jersey,* 141 S.Ct. 2244, 2259 (2021) ("The plan of the Convention reflects the 'fundamental postulates implicit in the constitutional design.'" (quoting *Alden v. Maine*, 527 U.S. 706, 729 (1999))); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003) ("A basic principle of federalism is that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders, and each State alone can determine what measure of punishment, if any, to impose on a defendant who acts within its jurisdiction."). Consistent with that understanding, several provisions of the Constitution impose and/or presuppose limits on the ability of one state to

override the regulatory powers of another.

113.   For instance, Article I, section 10 deprives states of several powers that one sovereign might ordinarily exercise against another, including the right to "lay any Imposts or Duties on Imports or Exports," and to "lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, [or] enter into any Agreement or Compact with another State."  U.S. Const. art. I, §10.

114.   Conversely, Article IV of the Constitution is devoted entirely to preserving the rights of each state vis-à-vis the others, requiring (among other things) that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State," U.S. Const. art. IV, §1, that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States," U.S. Const. art. IV, §2, cl. 1, that "no new State shall be formed or erected within the Jurisdiction of any other State," U.S. Const. art. IV, §3, cl. 1, and that "[t]he United States shall guarantee to every State in this Union a Republican Form of Government," U.S. Const. art. IV, §4.

115.   Furthermore, consistent with the Framers' "special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres," the Supreme Court has held that the Commerce Clause prohibits any state from *directly* "control[ling] commerce occurring wholly

outside [its] boundaries" by imposing liability on out-of-state actors for out-of-state acts.  *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 335-36 (1989) (footnote omitted); *see also, e.g.*, *Edgar v. MITE Corp.*, 457 U.S. 624, 642-43 (1982) (plurality op.).

116.   The Supreme Court has also long interpreted the Due Process Clause to impose restrictions on a state's ability to regulate conduct occurring wholly outside its borders.  *See, e.g.*, *Watson v. Emps. Liab. Assurance Corp.*, 348 U.S. 66, 70 (1954) (recognizing "the due process principle that a state is without power to exercise 'extra territorial jurisdiction,' that is, to regulate and control activities wholly beyond its boundaries"); *Home Ins. Co. v. Dick*, 281 U.S. 397, 407-08 (1930) (recognizing and applying the same principle).

117.   And, of course, the Tenth Amendment provides that "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States *respectively*, or to the people," U.S. Const. amend. X (emphasis added), making clear that each state retains its *own* "integrity, dignity, and residual sovereignty," *Bond v. United States*, 564 U.S. 211, 221 (2011).  It is little surprise, then, that the Supreme Court just reiterated that "the territorial limits of state authority under the Constitution's horizontal separation of powers" are grounded not just in any one provision, but in the "original and historical understandings of the Constitution's structure and the principles of 'sovereignty and comity' it embraces."  *Ross*, 143 S.Ct. at 1157 & n.1; *see also, e.g.*, *id.* at 1175-76

(Kavanaugh, J., concurring in part and dissenting in part); *South Dakota v. Wayfair, Inc.*, 138 S.Ct. 2080, 2100-01 (2018) (Gorsuch, J., concurring).   And those understandings distill into the basic principle that a state cannot directly regulate conduct that neither occurs nor is directed within its borders.

118.   HB 218 violates that bedrock constitutional constraint in multiple respects.

119.   First, HB 218 requires firearm industry members to "establish [and] use" "reasonable procedures, safeguards, and business practices that are designed to … prevent the loss or theft of a firearm-related product from the firearm industry member."   815 Ill. Comp. Stat. 505/2BBBB-(b)(1)(B).   Most firearm industry members, however, do not have any physical presence in Illinois, which means that most of the conduct this provision regulates will take place entirely outside of Illinois.   For instance, if an Illinois judge or jury decides that an Ohio-based manufacturer used too lax of security measures at its Ohio manufacturing plants, and a firearm produced there was later criminally used in Illinois, then that out-of-state entity could face Illinois-law liability based solely on its out-of-state conduct—even if it employed every security measure that Ohio or Congress saw fit to impose.

120.   Second, HB 218 requires firearm industry members to "establish [and] use" "reasonable procedures, safeguards, and business practices that are designed to … prevent the sale or distribution of a firearm-related product to … a person

prohibited by law from possessing a firearm, or a person who the firearm industry member has reasonable cause to believe is at substantial risk of using a firearm-related product to harm themselves or another individual or of possessing or using a firearm-related product unlawfully." *Id.* 505/2BBBB-(b)(1)(A). This provision is even more problematic. Again, most firearm industry members do not have a physical presence in Illinois, which means that most of the conduct this provision regulates will take place entirely outside it. For instance, imagine that a retailer in St. Louis, Missouri, is about to sell a firearm that is fully lawful in Missouri to a customer who is permitted to own the firearm under Missouri law and under federal law. If that same firearm is *not* lawful in Illinois, then the retailer could face liability for selling it to the customer if, say, a sales clerk overhears the customer talking about a new job opportunity in Chicago.

121. And that is not even the worst part. This provision imposes a duty on firearm industry members not to sell lawful firearms to any individual if they reasonably believe that the individual "is at substantial risk of using a firearm-related product to harm … another individual." *Id.* While such a duty might make sense if the provision applied only where a firearm industry member has cause to believe that a customer is likely to *unlawfully* use a firearm to harm another, it is not so limited. That is a problem, because the core of the Second Amendment right is the right to keep and bear firearms for lawful self-defense—and using a firearm in lawful

48

self-defense obviously may cause harm to another.  Thus, as a result of this provision, if a licensed retailer has reason to believe that a lawful customer faces an increased risk of needing to use a firearm in self-defense—because he is a Brinks truck driver, or because she has a restraining order against a stalker, or because he lives in a high-crime neighborhood, etc.—that retailer could face liability for selling the firearm to the customer, *even if that retailer is thousands of miles away from Illinois*.

122.   Third, HB 218 prohibits firearm industry members from "[a]dvertis[ing], market[ing], or promot[ing] a firearm-related product in a manner that reasonably appears to support, recommend, or encourage individuals … to use a firearm-related product for a military-related purpose in Illinois." *Id.* 505/2BBBB-(b)(2).  HB 218 does not define "military-related purpose"; nor does it even require that the "military-related purpose" be unlawful.  This means that a firearms manufacturer with no connection to Illinois, who markets products for a purpose that is *completely legal in the state in which the industry member is located*, can be held liable if an Illinois judge or jury later decide that this otherwise lawful purpose is considered to be "military-related." *Id.*

123.   Fourth, under HB 218, a firearm industry member may not "advertise, market, promote, design, or sell any firearm-related product in a manner that reasonably appears to support, recommend, or encourage persons under 18 years of age to unlawfully purchase or possess or use a firearm-related product in Illinois."

49

*Id.* 505/2BBBB-(b)(3).   And in determining whether an industry member has violated this provision, HB 218 instructs courts to consider whether the industry member "offers firearm-related products … that are specifically designed to be used by, or appeal to, minors."   *Id.* 505/2BBBB-(b)(3)(A)(iii).   This again imposes liability on industry members who do no business in Illinois, for conduct that is perfectly lawful in their state, such as parents taking their teenage children hunting or introducing them to shooting sports.

124.   For example, among NSSF's members is a licensed, Delaware-based firearms manufacturer with manufacturing facilities in New Hampshire, Arizona, and North Carolina.   This company does not sell firearms directly to civilians; it sells its products only to licensed distributors, only a very small handful of which re-sell into Illinois.   This NSSF member, then, is an out-of-state company that does not do any business in Illinois, period.   Nevertheless, it can be held liable if an Illinois judge or jury later determines that a product it sold was designed to be used by minors. Liability would attach even if it was perfectly legal for minors to use that product in the state where it was designed and manufactured, and even if the distributor to whom the NSSF member sold the product was also outside of Illinois.

125.   None of that is remotely consistent with the Constitution.   Indeed, imposing state-law liability (and damages and other relief) on out-of-state actors for actions taken entirely out of state is the definition of unconstitutional extraterritorial

state regulation.

126.   In fact, HB 218 is almost exactly like an Indiana law the Seventh Circuit held unconstitutional in *Legato Vapors, LLC v. Cook*, 847 F.3d 825 (7th Cir. 2017), except HB 218 is even more obviously problematic.  That law "impos[ed] detailed requirements … on out-of-state manufacturing operations" for e-cigarettes, "dictat[ing] how out-of-state manufacturers must build and secure their facilities, operate assembly lines, clean their equipment, and contract with security providers, if any of their products are sold in Indiana."  *Id.* at 827, 830; *see also Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 612-16 (9th Cir. 2018) (enjoining California law purporting to "dictate the method by which" companies treated medical waste "outside of California").  HB 218 is remarkably similar, as it reaches out and authorizes Illinois to control how a manufacturer in (say) Wyoming operates its business if a criminal illegally brings a gun into Illinois and misuses it.  That makes the constitutional problem especially stark, as does the fact that, unlike the Indiana law in *Legato Vapors*, HB 218's "reasonable controls" provision has not even "detailed" what out-of-state manufacturers and dealers must do to comply.

127.   HB 218 is no less unconstitutional vis-à-vis the out-of-state conduct of firearm industry members that *do* do business in Illinois.  What matters is where the regulated conduct takes place:  "If the transaction to be regulated occurs 'wholly outside' the boundaries of the state, the regulation is unconstitutional," even if the

actor resides in, is incorporated in, or does some other business in the regulating state. *A.S. Goldmen & Co. v. N.J. Bur. of Sec.*, 163 F.3d 780, 786 (3d Cir. 1999) (citation omitted); *see, e.g.*, *Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660 (7th Cir. 2010) (invalidating Indiana statute regulating loans between Indiana residents and creditors that occurred in other states); *Sam Francis Found. v. Christie's, Inc.*, 784 F.3d 1320 (9th Cir. 2015) (en banc) (invalidating California statute that regulated out-of-state art sales, even though the statute only applied to transactions involving California residents). After all, the state must have some connection to the regulated *activity*, not just to the regulated *entity*. Otherwise, a state could forever claim extraterritorial regulatory power over anyone who has ever visited, vitiating the power of other states to regulate within their own borders.

128.   By directly regulating conduct that takes place entirely in other states, HB 218 violates the constitutional prohibition on extraterritorial state regulation.

129.   The remedial provisions for HB 218 make matters worse. Under Section 7 of the Consumer Fraud and Deceptive Business Practices Act, the Attorney General or a State's Attorney bringing an action against an industry member may seek to, among other things, "restrain by preliminary or permanent injunction" the industry member's conduct. 815 Ill. Comp. Stat. 505/7-(a). And the court, "in its discretion, may exercise all powers necessary, including but not limited to" an "injunction." *Id*. If, as will almost always be the case, some or all of the industry

member's otherwise-lawful conduct takes place in other states, then the injunctive relief the statute authorizes will necessarily end up regulating conduct occurring wholly outside Illinois' borders.  Indeed, for some manufacturers or national distributors, that will allow for de facto nationwide injunctions regulating conduct far beyond—and entirely outside—Illinois' borders.  That sort of nationwide sweep is a telling sign of unlawful extraterritorial legislation.  *See Edgar*, 457 U.S. at 643 (plurality op.) (noting the "most obvious burden … impose[d] on interstate commerce arises from the statute's previously described nationwide reach"); *cf. Ross*, 143 S.Ct. at 1171 (Roberts, C.J., concurring in part and dissenting in part) (noting that "by effectively requiring compliance by farmers who do not even wish to ship their product into California," a statute might have "a 'nationwide reach' similar to the regulation at issue in *Edgar*").

130.   HB 218 violates the Constitution's limits on state power in another way too.  In addition to prohibiting states from regulating conduct that takes place outside of their borders, the Commerce Clause "prohibit[s] States from discriminating against or imposing excessive burdens on interstate commerce" within their borders. *Comptroller of Treasury of Maryland v. Wynne*, 575 U.S. 542, 549 (2015); *see also Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970); *Nw. Airlines, Inc. v. Cnty. of Kent*, 510 U.S. 355, 373 n.18 (1994) (describing "a violation of the dormant Commerce Clause" as "discrimination against interstate commerce").  HB 218 does

that too.  Because it imposes liability for commercial transactions occurring in other states by inviting civil actions in Illinois, HB 218 unlawfully discriminates against and burdens out-of-state commercial interests within the state.

131.  It also negates the legitimate regulatory regimes governing the sale, marketing, and manufacture of firearms and related products in other states and under federal law by rendering conduct that is lawful where it occurs unlawful in Illinois.  As discussed, that invades the sovereignty of other, co-equal states.

132.  Particularly given that it restricts conduct protected by the Second Amendment, the extreme burdens HB 218 imposes on interstate commerce outweigh any benefits, and the local interest in reducing crime within Illinois could be achieved by other restrictions that have a lesser impact on interstate commerce.  If other states were to enact similar laws, the PLCAA would be nullified (and the Second Amendment would be little better off).  And firearm industry members would have little choice but to attempt to comply with the strictest state restrictions (assuming compliance is even possible), regardless of federal law or the law of the individual state of operation.  HB 218 therefore unduly burdens interstate commerce.  What is more, because HB 218 creates liability even based on the behavior of third parties who are outside their control, firearm industry members can do very little to even attempt to lessen their potential liability; the only way to truly eliminate all risk of liability under HB 218 would be to cease operations altogether, even if those

operations are lawful elsewhere. That is the definition of unconstitutional discrimination against, and an unconstitutional undue burden upon, interstate commerce. *Cf. Edgar*, 457 U.S. at 643 (even non-discriminatory law is invalid where "the burden imposed on that commerce [is] excessive in relation to the local interests served by the statute").

133. Illinois' overreach into other states is all the more flagrant given the constitutional protections accorded Second Amendment activity and that this is decidedly not an area where the state law has been adopted "against the backdrop of congressional silence." *Ross*, 143 S.Ct. at 1165.

134. To the contrary, Congress anticipated exactly this sort of problem in the PLCAA, which explicitly found that allowing civil actions like the ones HB 218 authorizes would usher in "unreasonable burden on interstate and foreign commerce of the United States." 15 U.S.C. §7901(a)(6). Consistent with Congress's judgment, HB 218 violates the constitutional prohibition on extraterritorial regulation that unlawfully burdens interstate commerce.

## PRAYER FOR RELIEF

Plaintiff prays for the following relief from the Court:

1. a declaration, pursuant to 28 U.S.C. §2202, that HB 218 violates the United States Constitution and is therefore void and unenforceable as to NSSF and its members;

2.      a preliminary injunction enjoining Attorney General Raoul, as well as all officers, agents, and employees subject to his supervision, direction, and/or control, from enforcing or otherwise bringing suit against NSSF and its members under HB 218;

3.      a permanent injunction enjoining Attorney General Raoul, as well as all officers, agents, and employees subject to his supervision, direction, and/or control, from enforcing or otherwise bringing suit against NSSF and its members under HB 218;

4.      such costs and reasonable attorneys' fees to which Plaintiff may be entitled by law;

5.      nominal damages; and

6.      any further relief the Court deems just and proper.

Respectfully submitted,

_s/ Gary P. Pinter_
GARY P. PINTER
SWANSON, MARTIN & BELL, LLP
103 W. Vandalia Street
Suite 215
Edwardsville, IL 62025

_/s/ Andrew A. Lothson_
ANDREW A. LOTHSON*
SWANSON, MARTIN & BELL, LLP
330 N. Wabash
Suite 3300
Chicago, IL 60611

PAUL D. CLEMENT*
ERIN E. MURPHY*
MATTHEW D. ROWEN*
MARIEL BROOKINS*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

* application for _pro hac vice_
forthcoming

_Counsel for Plaintiff_

August 14, 2023