**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

NATIONAL SHOOTING SPORTS
FOUNDATION,

                Plaintiff,

      v.

KWAME RAOUL,
in his official capacity as Attorney General of
Illinois,

              Defendant.

Case No. 3:23-cv-2791-SMY

**ATTORNEY GENERAL RAOUL'S OPPOSITION**
**TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**KWAME RAOUL**
Attorney General for the State of Illinois

**Kathryn Hunt Muse**
Deputy Chief, Public Interest Division
**Elizabeth B. Scott**
**Michael M. Tresnowski**
Assistant Attorneys General
Office of the Illinois Attorney General
100 W. Randolph Street
Chicago, IL 60601
*Attorneys for Defendant*

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................2

LEGAL STANDARD ..........................................................................................................4

ARGUMENT ........................................................................................................................5

I.   NSSF is unlikely to succeed on the merits. ...................................................................5

   A.   The Act cannot be enjoined on the basis of PLCAA. ...................................................6

      1.   NSSF does not have a private right of action. .....................................................6

      2.   The Act is consistent with PLCAA. ....................................................................10

      3.   The Court should decline to issue the advisory opinion NSSF seeks regarding PLCAA's predicate exception.  ..........................................................................14

   B.   The Act comports with the First Amendment. ..........................................................17

      1.   Sections (b)(2) and (b)(3) permissibly regulate speech concerning unlawful conduct. ..........................................................................................................17

      2.   Section (b)(3) directly advances and is not more extensive than necessary to serve the State's substantial interest. ...........................................................................20

      3.   Sections (b)(2) and (b)(3) are not unconstitutionally vague. ...............................23

   C.   The Act comports with due process. ........................................................................24

   D.   The Act comports with the Second Amendment. ........................................................27

   E.   The Act comports with the dormant Commerce Clause. ............................................32

   F.   NSSF does not have standing for injunctive relief. ...................................................34

II.   NSSF has not shown it will suffer irreparable harm. ...............................................35

III. The equities and public interest weigh strongly against enjoining the Act. .............................37

CONCLUSION....................................................................................................................38

## INTRODUCTION

In 2005, Congress gave the firearms industry an unprecedented—but not absolute—shield against civil liability called the Protection of Lawful Commerce in Arms Act, or PLCAA. In recent years, the firearms industry's trade association ("NSSF") has unleashed a wave of litigation to try to convert this litigation shield into a sword against state laws. By seeking preemptive facial relief against state laws, NSSF has sought court orders to close exceptions in PLCAA that Congress purposefully left open. Nothing in PLCAA authorizes its affirmative use to invalidate statutes, and NSSF's campaign to rewrite an act of Congress through federal courts has thus far been unsuccessful.[1]

Undeterred, NSSF asks this Court to enjoin Illinois from amending its consumer fraud statute. In its zeal to air policy grievances, it forgets to state a claim for relief. The heart of NSSF's lawsuit is its contention that PLCAA preempts a new Illinois act. But PLCAA does not "preempt" anything. By its own terms it "prohibits" bringing certain *actions*—it does not preempt state legislatures' authority to enact *laws.* So, while courts may apply PLCAA to dismiss actions in which the facts of the case meet certain criteria, there is no basis in federal law for a court to provide the relief NSSF seeks here: invalidation of an entire state statute.

Perhaps recognizing its PLCAA theory requires the enforcement of a substantive right Congress never created, NSSF's complaint also includes a hodgepodge of constitutional counts. Those claims fare no better. The fact that a law regulates marketing does not identify a First

---

[1] Three NSSF lawsuits against state statutes have been dismissed. *See NSSF v. James*, 604 F. Supp. 3d 48 (N.D.N.Y. 2022) (appeal pending); *NSSF v. New Jersey*, 80 F.4th 215 (3d Cir. 2023); *NSSF v. Jennings*, No. 22-cv-1499, 2023 WL 5835812 (D. Del. Sept. 8, 2023). In three more recently filed suits, courts have not issued decisions. *NSSF v. Ferguson*, No. 23-cv-113 (E.D. Wash.) (filed April 25, 2023); *NSSF v. Bonta*, No. 23-cv-945 (S.D. Cal.) (filed May 23, 2023); *NSSF v. Lopez*, No. 23-cv-287 (D. Hawaii) (filed July 12, 2023).

Amendment problem, the fact that a law uses reasonableness standards does not create a due process violation, the fact that a law impacts out-of-state businesses does not state a dormant Commerce Clause claim, and the fact that a state law affects firearms commerce does not identify a Second Amendment claim.

Because NSSF has not and cannot state claims for its five counts, it also has not and cannot make the required strong showing that it is likely to succeed on the merits of its claims, as required for preliminary relief. Finally, NSSF also has failed to show it will suffer irreparable harm absent an injunction or that equitable factors favor granting preliminary relief, further precluding an injunction. The motion should be denied.

## BACKGROUND

**The Consumer Act.** The Illinois Consumer Fraud and Deceptive Business Practices Act ("Consumer Act"), 815 ILCS 505/1, *et seq*., is a regulatory and remedial statute intended to protect the public against unfair and deceptive conduct in trade and commerce. The Consumer Act's Section 2 broadly declares unlawful unfair methods of competition and unfair or deceptive practices or acts. Sections 2A through 2AAAA provide nonexhaustive examples of unfair or deceptive practices for particular contexts. *E.g*., *id*. § 2AA (immigration assistance), 2KK (animal cremation), 2LL (halal food disclosures). The act may be enforced by the Attorney General and State's Attorneys, *id*. §§ 3–7, 10, as well as private plaintiffs, *id*. § 10a. It contains a severability clause, *id*. § 11:

> If any provision of this Act or the application thereof to any person or circumstance is held invalid, the invalidity shall not affect other provisions or applications of the Act which can be given effect without the invalid provision or application and to this end the provisions of this Act are severable.

**FIRA.** On August 12, 2023, the State of Illinois ("State") amended the Consumer Act by enacting the Firearm Industry Responsibility Act ("FIRA" or the "Act"). ECF No. 35-1. FIRA

2

adds a new Section regarding how the Consumer Act applies in the context of the sale and marketing of firearms.

Section (a) of FIRA defines its terms. Section (b) includes four distinct components which each identify a different kind of prohibited business practice in the sale and marketing of firearm-related products. At a high level, (b)(1) prohibits knowingly creating dangerous conditions by conduct that is unlawful or unreasonable under all circumstances; (b)(2) prohibits advertising to promote unlawful paramilitary activity; (b)(3) prohibits advertising to encourage minors to engage in unlawful firearm use; and (b)(4) prohibits otherwise engaging in acts that are unfair or deceptive under the Consumer Act. Section (c) states that (b)(2), (3), and (4) are declarative of existing law. Section (d) states that the provisions of FIRA are severable under 5 ILCS 70/1.31.

**This Lawsuit.** Two days after FIRA was enacted, NSSF filed this lawsuit. ECF No. 1 ("Compl."). NSSF brings claims on behalf of its members, which are described as "approximately 10,000 manufacturers, distributors, and retailers of firearms, ammunition, and related products, as well as other industry members throughout the United States." Compl. ¶ 8. The complaint lists five counts titled: (I) preemption, (II) First Amendment, (III) due process, (IV) Second Amendment, and (V) unconstitutional extraterritorial regulation. It requests (1) a declaration that FIRA violates the U.S. Constitution and (2) injunctions enjoining the Attorney General from enforcing the entirety of FIRA. *Id.* at p. 55–56.

On September 15, NSSF filed a motion for a preliminary injunction, ECF No. 27 ("PI Motion"), to which this memorandum responds. Today, concurrent with this response, the State also files a motion to dismiss under Rule 12(b)(1) and 12(b)(6). ECF No. 35.

## LEGAL STANDARD

Preliminary injunctive relief is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis added). For this reason, a "preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020). To warrant such relief, the movant "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). The Seventh Circuit requires a movant to show more than "the mere possibility of success"; rather, it must "make a 'strong' showing on the merits." *Protect Our Parks v. Buttigieg*, 10 F.4th 758, 763 (7th Cir. 2021) (per curiam). If the movant makes a "strong showing" that it will prevail on the merits and shows that it is "likely" to suffer irreparable harm absent relief, the court applies a balancing test, "weigh[ing] the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction, and consider[ing] whether an injunction is in the public interest." *GEFT Outdoors v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019).

Where a plaintiff seeks to enjoin a statute with severable components, courts analyze each separately. *Pleasureland Museum v. Beutter*, 288 F.3d 988, 1005 (7th Cir. 2002) (enjoining "only the sections [the court found] unconstitutional and permit[ting] the operation of the sections that [the court] either upheld or that were unchallenged" in "deference to the [challenged ordinance's] robust severability clause"); *see also Charles v. Carey*, 627 F.2d 772, 778–79 (7th Cir. 1980) (rejecting plaintiffs' request to preliminarily enjoin an entire statute with a severability clause and instead reviewing the statute section by section).

4

**ARGUMENT**

**I.    NSSF is unlikely to succeed on the merits.**

A facial challenge to a statute is "the most difficult challenge to mount successfully[.]" *United States v. Salerno*, 481 U.S. 739, 745 (1987). "The Supreme Court has repeatedly stated that facial invalidation of legislation is disfavored." *United States v. Bonin*, 932 F.3d 523, 534 (7th Cir. 2019). In considering a facial challenge, a court must be "careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008); *accord United States v. Raines*, 362 U.S. 17, 22 (1960) ("The delicate power of pronouncing an Act of Congress unconstitutional is not to be exercised with reference to hypothetical cases thus imagined.").

Facial challenges are even more difficult when, as here, a plaintiff seeks pre-enforcement invalidation of a statute. To bring a pre-enforcement facial challenge to a statute, a plaintiff "must establish that *no set of circumstances* exists under which the statute would be valid." *United States v. Hansen*, 599 U.S. 762, 769 (2023) (emphasis in original).[2] *See also United States v. Cook*, 970 F.3d 866, 876 n.5 (7th Cir. 2020) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." (quoting *Salerno*)).[3]

---

[2] A speech regulation may be invalid if a plaintiff shows a "lopsided ratio" of unconstitutional applications. *Hansen*, 599 U.S. at 769. This standard applies only to NSSF's First Amendment claim, which is discussed *infra* in Part I.B.3.

[3] If in reply NSSF attempts to avoid the standard applicable to its facial challenge by arguing its lawsuit brings an as-applied challenge on behalf of its 10,000 plus members, such elision may be disregarded. To maintain an as-applied challenge, NSSF would need to show FIRA is unconstitutional "as applied to [its] specific activities." *Surita v. Hyde*, 665 F.3d 860, 875 (7th Cir. 2011). As explained in the State's concurrently filed motion to dismiss, NSSF falls woefully short of describing FIRA's effect on its members' specific activities, so it certainly has not shown it will be able to show FIRA is unconstitutional as applied to them. Because NSSF seeks to invalidate

A.    **The Act cannot be enjoined on the basis of PLCAA.**

NSSF does not and cannot show it is likely to succeed on the merits of Count I (preemption) for two independent reasons. First, NSSF does not have a right to seek preemptive relief under PLCAA. Second, FIRA is consistent with PLCAA.

1.    **NSSF does not have a private right of action.**

Count I is premised on a basic misunderstanding about the difference between rights of action and defenses. FIRA amends the Consumer Act, which provides a private right of action like so: "Any person who suffers actual damage as a result of a violation of the Act committed by another person may bring an action against such person." 815 ILCS 505/10a(a). In contrast, PLCAA does not provide a private right of action. Instead, PLCAA implicitly creates a defense (that can be raised to obtain dismissal of actions) by prohibiting certain actions. 15 U.S.C. § 7902. The private right of action in one statute and the defense in the other interact as follows: If a future plaintiff brings an action under FIRA and its defendant believes that PLCAA provides a defense, that defendant can raise PLCAA to ask the court for dismissal of the action. That future court will analyze the action to see whether the definitions in PLCAA are met. If so, the court will dismiss the action; if not, the action will proceed.

NSSF mistakes PLCAA's creation of a defense as creating a right of action. This error is apparent from NSSF's inability to show that PLCAA's definitions are satisfied. For example, for PLCAA to apply, the defendant must be a "manufacturer," "seller," or "trade association" under § 7903(2), § 7903(6), and § 7903(8), it must deal in the business of a "qualified product" under § 7903(4), and it must be facing a "qualified liability action" under § 7903(5). As the plaintiff here, NSSF of course establishes none of this, and instead invites the Court to imagine potential future

---

FIRA without reference to concrete applications to any party before the Court, NSSF's lawsuit is a facial challenge subject to the *Salerno* standard.

actions that hypothetical plaintiffs will bring where these definitions may be satisfied. *See, e.g.*, Compl. ¶¶ 54–56. NSSF's speculation does not provide this Court with an "action" it can analyze under PLCAA. NSSF only puts a recent public act by the State before the Court. Nothing in PLCAA, the Supremacy Clause, or Section 1983 gives NSSF a right to sue to enjoin a state statute.

### a. PLCAA does not provide a private right of action.

Whether PLCAA creates a private right of action starts and ends with PLCAA's text. PLCAA expressly states that it does not provide a private right of action. PLCAA provides "no provision of this chapter shall be construed to create a public or private cause of action or remedy." 15 U.S.C. § 7903(5)(C). Instead, PLCAA implicitly provides an affirmative defense, instructing a federal court to "immediately dismiss" any nonexempt action that meets the definition of a "qualified civil liability action." 15 U.S.C. § 7902(b). In design and practice, these affirmative defenses are assessed by courts on a case-by-case basis. *See, e.g.*, *Prescott v. Slide Fire Sols.*, 410 F. Supp. 3d 1123, 1139–40 (D. Nev. 2019) (denying motion to dismiss on PLCAA grounds where plaintiffs' allegations about bump stock manufacturer's marketing misrepresentations satisfied the elements of PLCAA's predicate exception); *Corporan v. Wal-Mart Stores East*, No. 16-cv-2305, 2016 WL 3881341, at *3–4 (D. Kan. July 18, 2016) (concluding that, with anticipated factual amendments, plaintiff's complaint would sufficiently allege the elements of PLCAA's predicate exception); *Alexander v. Coxe*, 295 P.3d 380, 393 (Alaska 2013) (finding PLCAA defense raised issues of fact precluding summary judgment).

Here, no action has been filed against NSSF or one of its members for which NSSF is requesting dismissal. Instead, NSSF asks this Court to find that a *future* plaintiff could bring a claim under FIRA against an NSSF member, and that member *could* invoke PLCAA as a defense in that *hypothetical* action. And, on the basis of these possible actions by nonparties, NSSF asks

this Court to immediately enjoin FIRA as a whole. There is simply no basis in PLCAA for the Court to provide such sweeping declarative or injunctive relief. The Court does not have before it a pleading filed by a specific plaintiff against a particular defendant, and so this Court is unable to analyze whether the various criteria in PLCAA are met for it to apply. And, even if it did, the sole relief authorized by PLCAA is dismissal of that action—not striking down a state statute.

NSSF confusingly tries to supports its theory that PLCAA can be used as a sword exclusively with reference to cases where manufacturers successfully used PLCAA as a shield. *See Ileto v. Glock*, 565 F.3d 1126, 1134–46 (9th Cir. 2009) (PLCAA shielded licensed manufacturer from negligence and public nuisance claim); *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 404 (2d Cir. 2008) (PLCAA shielded licensed manufacturer from criminal nuisance claim).[4] These cases only show that courts know how to analyze PLCAA to dismiss *actions*. Both the *Ileto* and *Beretta* courts methodically applied PLCAA's definitions to the case before the court—analysis that is impossible here without any case. In fact, *Ileto* and *Beretta* undermine NSSF's argument that a preliminary injunction is necessary here because they show that courts can and will carefully analyze future actions to determine whether PLCAA requires dismissal. Neither opinion shows a court preemptively enjoining a state statute to prevent the possibility of a future action being filed.

---

[4] NSSF also cites a third case, *NSSF v. Platkin*, No. 22-6646, 2023 WL 1380388 (D.N.J. Jan. 31, 2023) (cited at Compl. ¶ 60 and PI Motion at 7, 8, 11), but that opinion was vacated by the Third Circuit more than four weeks before NSSF filed its motion with this Court, *NSSF v. New Jersey*, 80 F.4th 215 (Aug. 17, 2023). The Third Circuit did not assess the merits of NSSF's preemption claim because NSSF had not shown a case or controversy, its intent to act was too general, and it had not shown the threat of enforcement was substantial. The court observed that "[a] brand-new civil tort statute, without more, does not justify a federal court's intervention," *id.* at 223, and vacated the January 31, 2023 order relied on by NSSF in the motion before this Court.

In sum, nothing in PLCAA's text or design creates a private right of action for a plaintiff. *See, e.g.*, *Woods v. Steadman's Hardware*, No. CV 12-33-H-CCL, 2013 WL 709110, at *3 (D. Mont. Feb. 26, 2013) ("PLCAA does not provide subject matter jurisdiction for any cause of action whatsoever[]"). Those NSSF members who meet PLCAA's definitions of "seller" and "manufacturer" of "qualified products" may invoke PLCAA as a defense if they become a *defendant* in certain *qualified* civil liability actions, but PLCAA does not provide them with a right to sue to obtain injunctive relief now.

### b.  The Supremacy Clause and Section 1983 do not provide a right of action.

NSSF cites the Supremacy Clause and broadly alleges that its causes of action "arise under 42 U.S.C. § 1983." Compl. ¶ 45. But neither the Supremacy Clause nor Section 1983 creates additional federal rights and thus cannot provide NSSF with a cause of action here.

As the Supreme Court has recognized, "[t]he Supremacy Clause is not the source of any federal rights, and certainly does not create a cause of action." *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 324–25 (2015) (cleaned up). Instead, the Supremacy Clause simply provides a "rule of decision" when there is a conflict between federal and state law. *Id. See also* Compl. ¶ 49 (quoting same). Implying a direct right of action under the Supremacy Clause "would effect a complete end-run around [the Court's] implied right of action and 42 U.S.C. § 1983 jurisprudence." *Planned Parenthood of Ind. v. Ind. State Dep't Health*, 699 F.3d 962, 983 (7th Cir. 2012). Here, NSSF points to a state law that creates private rights of action, and to a federal law that creates defenses to certain actions. There is no conflict for this Court to look to the Supremacy Clause to resolve.

Section 1983 also does not provide a foothold. "Section 1983 creates a federal remedy against anyone who, under color of state law, deprives 'any citizen of the United States . . . of any

9

rights, privileges, or immunities secured by the Constitution and laws.'" *Id.* at 972. A plaintiff seeking redress for an alleged violation of a federal statute through Section 1983 "must assert the violation of a federal right, not merely a violation of federal law." *Blessing v. Freestone*, 520 U.S. 329, 340 (1997). In assessing whether a right is "enforceable under § 1983," Congress must have created the right "in clear and unambiguous terms." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2002). Here, NSSF identifies no such federal right. In fact, its attempt to construe PLCAA as creating the remedy sought by NSSF is directly contradicted by PLCAA's plain language stating that "no provision of this chapter shall be construed to create a public or private cause of action or remedy." 15 U.S.C. § 7903.[5]

## 2.   The Act is consistent with PLCAA.

Even if the Court were to consider the substantive interplay between state and federal law here (it need not), NSSF's challenge to FIRA will fail because FIRA is consistent with PLCAA.

To meet its burden to show PLCAA preempts FIRA, NSSF must show a "clear indication" in the federal statute to intrude on an area of traditional state authority. *Bond v. United States*, 572 U.S. 44, 859–60 (2014). "'It is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides' the 'usual constitutional balance of federal and state powers.'" *Id.* at 857 (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)). NSSF must show Congress intended to "alter the usual constitutional balance between the States and the Federal Government" through "unmistakably clear" language. *Gregory*, 501 U.S. at 460–61 (cleaned up).

---

[5] If in reply NSSF asks this Court to look to the *Ex Parte Young* doctrine to find a cause of action exists, the Court will quickly find that doctrine cannot be applied here. That doctrine cannot be used to "circumvent Congress's exclusion of private enforcement." *Armstrong*, 575 U.S at 327. In PLCAA, Congress explicitly stated it was not creating private rights of action. Instead, Congress created a scheme where PLCAA may be invoked *against* a liability action. NSSF cannot rely on an equitable doctrine to circumvent Congress's clear scheme.

NSSF identifies no such language and cannot meet the high burden required to upset the underlying system of dual sovereignty.

### a. FIRA is not preempted because Congress clearly intended to prohibit specific civil actions, not preempt state statutes.

The first reason PLCAA cannot be used to facially invalidate a state statute like FIRA is it says nothing about state statutes. Instead, Congress enacted PLCAA in response to a perceived "expansion of the common law" that threatened to impose novel forms of civil liability on firearms manufacturers and sellers for harms "solely caused by others." 15 U.S.C. §§ 7901(a)(6)–(a)(7). In response, PLCAA provides that a "qualified civil liability action" may not be brought in court, *id.* § 7902(a), and defines that term to include, subject to exceptions, any civil action brought against licensed manufacturers or sellers of firearms or ammunition "resulting from the criminal or unlawful misuse of a [firearm or ammunition] by the person or a third party." *Id.* § 7903(5)(A). PLCAA then achieves its goals with instructions to potential litigants to not bring prohibited actions, § 7902(a), and to courts to dismiss prohibited actions, § 7902(b). It provides no instructions to state legislatures. PLCAA thus stands in contrast to instances where state laws have been facially invalidated on preemption grounds. *See, e.g.*, *League of Women Voters of Ind. v. Sullivan*, 5 F.4th 714, 723 (7th Cir. 2021) (federal election law facially preempted state election law based on federal law's direct instruction to states and as authorized by Congress's constitutional power to make or alter state election regulations).

### b. PLCAA will not prohibit all actions with FIRA claims.

While the preemption analysis should end with the clear text, NSSF seems to advocate for a novel form of implied preemption by arguing that FIRA authorizes actions prohibited by PLCAA. Even if such a new kind of implied preemption theory were tenable, NSSF would still not be able to prevail on this claim because FIRA authorizes a whole host of actions that are

11

expressly permitted by PLCAA. PLCAA could only facially preempt the entirety of FIRA if every conceivable action with a FIRA claim would be prohibited by PLCAA. *See Salerno*, 481 U.S. at 745. The following examples demonstrate that NSSF cannot satisfy that standard, in large part because PLCAA applies to cases involving a narrow set of conduct, entities, and products while FIRA applies more broadly.

First, FIRA regulates conduct untouched by PLCAA. Specifically, FIRA imposes liability for an industry member's *own conduct* while PLCAA prohibits suits based on *third-party conduct*. Section (b) of FIRA deems unlawful a firearm industry member's own practices in the "sale, manufacturing, importing, or marketing" of their products. Each section looks at the member's own conduct. FIRA does not impose vicarious liability. In contrast, PLCAA forecloses liability only "for the harm solely caused by the . . . misuse of firearms products . . . by others." 15 U.S.C. § 7901(b)(1). *See also id.* § 7903(5)(A) (defining qualified civil action as one "resulting from the . . . misuse of a qualified product by the [plaintiff] or a third party"). PLCAA intentionally did not foreclose claims against industry members for their own conduct. *See* 151 Cong. Rec. S9087, S9088 (July 27, 2005) (sponsor stating PLCAA "does not prevent [companies] from being sued for their own misconduct"). NSSF does not provide a basis for this Court to expand PLCAA to also prohibit claims against firearm industry members for their own conduct.

Second, FIRA regulates industry members who are excluded from PLCAA's definitions. FIRA's definition of a "firearm industry member" includes members who are not licensed. FIRA § (a). On the other hand, PLCAA provides a defense only to federally licensed manufacturers, importers, and dealers. 15 U.S.C. §§ 7903(2), (6). Thus, some FIRA defendants—including some NSSF members—will not have a defense under PLCAA. *See* PI Motion at 1 (describing only

"most" of NSSF members as licensed). NSSF provides no basis to expand PLCAA to prohibit claims against unlicensed and other firearm industry members not identified in PLCAA.

Third, FIRA regulates conduct about products that fall outside PLCAA's scope. For example, FIRA applies to the sale and marketing of firearms accessories, while PLCAA's definition of "qualified products" does not include firearms accessories. *See* 15 U.S.C. § 7903(4). Again, because the scope of the two statutes does not align, NSSF cannot show that all actions under FIRA would be prohibited by PLCAA. Without such a showing, its request for facial invalidation fails. *Salerno,* 481 U.S. at 745.

Fourth, even actions that involve facts meeting the above-noted definitions in PLCAA are allowed if they fall within one of PLCAA's six exceptions allowing civil actions:

1. against someone convicted under section 924(h) of the U.S. criminal code, which makes it illegal to knowingly transfer a firearm or ammunition for use in a crime of violence;

2. against a seller or importer for negligent entrustment or negligence per se;

3. against a manufacturer or seller who knowingly violated a State or Federal statute applicable to the sale or marketing of a qualified product, if the violation was a proximate cause of the harm for which relief is sought;

4. for breach of contract or warranty;

5. for damage from a defect in design or manufacture, when the product is used as intended or in a reasonably foreseeable manner (except where the discharge of the product was caused by a volitional act that constituted a criminal offense); and

6. by the U.S. Attorney General.

15 U.S.C. § 7903(5)(A). Here, actions including FIRA claims could fall into the first, second, third, and fifth exceptions, depending on the conduct alleged. Specifically, claims under Section (b)(1) could be made in circumstances that fall under any of those four exceptions. Sections (b)(2) and (b)(3) claims could be made in actions that fall under the third exception. And Section (b)(4) claims also could be made in actions that fall under any of those four exceptions. Of course, a future court

13

will need to look at a particular pleading to see if the alleged conduct fits into a given statutory exception.

While it focuses on the third (predicate) exception, NSSF seems to acknowledge that FIRA authorizes claims that could fall within multiple exceptions. *See, e.g.*, Compl. ¶ 57 (arguing FIRA "does not confine liability" to the first, second, fourth, and fifth exceptions). This concession, alone, renders facial invalidation of FIRA inappropriate.

Overall, NSSF's confusion appears rooted in its incorrect assumption that FIRA survives preemption analysis only if every possible future action with a FIRA claim will fall within the predicate exception. This approach turns the facial invalidation rule upside down. It is NSSF's burden to show that all possible actions with FIRA claims are prohibited, which includes those against unlicensed industry members, relating to firearms accessories, and falling within an exception other than the predicate exception. It does not even attempt to satisfy this burden.

### 3. The Court should decline to issue the advisory opinion NSSF seeks regarding PLCAA's predicate exception.

Rather than analyze the relevant question of whether PLCAA explicitly or implicitly preempts the state statute, NSSF proceeds as if the exclusive question Count I raises is whether FIRA is a statute "applicable to the sale or marketing" of firearms products, as that phrase is used in PLCAA's third (predicate) exception. *See* Compl. ¶ 59; PI Motion at 8. As explained, that question will not arise in this lawsuit because unlike the cases NSSF relies on, *Ileto* and *Beretta*, there is no civil action to analyze. But even if the Court considers this question of statutory interpretation, it will find that FIRA is plainly a state statute "applicable to the sale or marketing" of firearms products. 15 U.S.C. § 7903(5)(A)(iii).

That FIRA applies to firearms sales and marketing is obvious from its text. FIRA adds a section to the Consumer Act titled "sale and marketing of firearms" and discusses the sale and

marketing of firearms throughout its body. FIRA's clear statutory text does not require interpretation in the way that the generally applicable criminal nuisance statute in *Beretta* or the negligence and nuisance claims in *Ileto* required. *See also NSSF v. James*, 604 F. Supp. 3d 48, 59 (N.D.N.Y. 2022) ("No reasonable interpretation of 'applicable to' can exclude a statute which imposes liability exclusively on gun manufacturers for the manner in which guns are manufactured, marketed, or sold.").

NSSF ignores FIRA's text to argue that FIRA does not meet the predicate exception's knowledge and proximate cause requirements. *See* PI Motion at 8–10. Yet again, its confusion stems from the fact that NSSF is looking at a *statute* and not an *action* as PLCAA intends. Of course, in a future action where the plaintiff hopes to satisfy the predicate exception to avoid dismissal, a plaintiff will show that the defendant knowingly violated a law and that the violation was a proximate cause of the harm that action seeks to remedy. But here this Court cannot analyze a defendant's knowledge or allegations regarding causation because NSSF seeks invalidation of a statute in a factual vacuum.

NSSF seems also to argue that FIRA does not apply to the sale and marketing of firearms because it incorporates a reasonableness standard, rather than a list of rules. *See* PI Motion at 7–9. But the text of PLCAA does not require predicate statutes to list all the applicable rules, nor does the larger context of how American law regulates conduct require such rules. The question of whether lawmakers should regulate conduct through specific rules or flexible standards is one of the foundational debates in American law. *See, e.g.*, *Gaylor v. Mnuchin*, 919 F.3d 420, 430 (7th Cir. 2019) (noting that rules can be overinclusive and underinclusive, while standards afford more discretion but sacrifice precision). While there are costs and benefits to either regulatory approach, both rules and standards are clearly "applicable to" a regulated entity. NSSF's assertion, without

15

authority, that predicate statutes must impose "concrete obligations" makes no sense. PLCAA itself uses the term "reasonable" or "reasonably" in three different exceptions—including the predicate exception. 15 U.S.C. §§ 7903(5)(A)(ii), (5)(A)(iii)(II), (5)(B).

While NSSF tries to use the predicate exception's illustrative examples to support its invented "concreteness" requirement, PI Motion at 8, they actually demonstrate how FIRA's regulation of the sale and marketing of firearm products is consistent with PLCAA. The predicate exception explains it covers actions "including" (1) cases to enforce a state or federal recordkeeping law or (2) cases to enforce a statute prohibiting firearms suppliers from aiding, abetting, or conspiring in straw purchases of their products. 15 U.S.C. § 7903(5)(A)(iii). Both example cases are premised on a statute rather than common law, enforce regulations specific to the firearms industry, and arise from industry-member conduct, rather than third-party conduct. Many actions premised on FIRA will share these characteristics. In fact, both FIRA Section (b)(1) and PLCAA's second example permit liability for facilitating straw purchases. In any event, PLCAA's two examples (which NSSF acknowledges are "illustrative") do not limit the predicate exception's scope, rendering a facial challenge to a potential predicate statute impossible to assess. *See United States v. Latham*, 754 F.2d 747, 750 (7th Cir. 1985) ("the word 'includes' is a term of enlargement not of limitation, and the reference to certain entities or categories is not intended to exclude all others").

Finally, NSSF is simply incorrect when it asserts that PLCAA would be "trivially easy to evade" without a concreteness requirement in the predicate exception. PI Motion at 11. Courts have dismissed claims pursuant to PLCAA, over the plaintiff's invocation of the predicate exception, without any reference to "concreteness." *See, e.g.*, *Ileto*, 565 F.3d at 1133–38 (negligence and public nuisance claim not subject to predicate exception); *Beretta*, 524 F.3d at

16

403–04 (criminal nuisance claim not subject to predicate exception). Meanwhile, courts have also found actions can proceed pursuant to the predicate exception without requiring "concreteness." *See, e.g.*, *Soto v. Bushmaster Firearms Int'l*, 202 A.3d 262, 321 (Conn. 2019) (finding Connecticut Unfair Trade Practices Act claims fall within the predicate exception); *Prescott*, 410 F. Supp. 3d at 1138–39 (finding same regarding Nevada's Deceptive Trade Practices Act). If NSSF wishes to add a new requirement to PLCAA, it must ask Congress to make that change. *See, e.g.*, *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1815 (2019) ("[C]ourts aren't free to rewrite clear statutes under the banner of our own policy concerns.").

### B.   The Act comports with the First Amendment.

NSSF does not and cannot show it is likely to succeed on the merits of its First Amendment claim in Count II because both of NSSF's First Amendment arguments misconstrue FIRA's text. First, NSSF argues that Sections (b)(2) (the militia provision) and (b)(3) (the minors provision) regulate speech about lawful activity and do not satisfy a "heightened scrutiny" standard. PI Motion at 11–13. This theory fails because it relies on misreading the sections: They exclusively concern speech encouraging unlawful activity. But, even if they did not, FIRA would satisfy heightened scrutiny. Second, NSSF argues the minors and militia provisions are unconstitutionally vague. *Id*. at 14–15. That claim will fail too because FIRA specifically identifies the speech it regulates.

### 1.   Sections (b)(2) and (b)(3) permissibly regulate speech concerning unlawful conduct.

Sections (b)(2) and (b)(3) each clearly state they prohibit only speech that encourages *unlawful* activity and as such, both lack First Amendment protection. *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 367 (2002) ("[W]e ask as a threshold matter whether the commercial speech concerns unlawful activity or is misleading. If so, then the speech is not protected by the First

17

Amendment."). Section (b)(2) prohibits the encouragement of "*unlawful* paramilitary or private militia activity in Illinois or unauthorized individuals . . . to use a firearm-related product for a military-related purpose in Illinois" (emphasis added). Section (b)(3) prohibits encouraging persons under 18 to "*unlawfully* purchase or possess or use firearm-related products in Illinois" (emphasis added).[6]

The restrictions in Section (b)(2) apply only to speech concerning paramilitary and private militia activity, which is expressly prohibited by state law. *See* Ill. Const., art. XII, § 2 ("The military shall be in strict subordination to the civil power."); 20 ILCS 1805/94, /95 (prohibiting "any body of men or women, other than the regularly organized militia of this State," the U.S. armed forces, and veterans' organizations, "to associate themselves together as a military company or organization, to drill or parade with arms in this State"). In light of these longstanding prohibitions, there can be no instance where commercial speech promoting "paramilitary or private militia activity" will include "lawful" conduct. Any doubt NSSF attempts to invent about (b)(2) is foreclosed by the clear statutory definition found in Section (a): "Unlawful paramilitary or private militia" is defined as "a group of armed individuals, organized privately, in violation of the Military Code of Illinois and Section 2 of Article XII of the Illinois Constitution."

Section (b)(3) similarly regulates only speech concerning unlawful activity. Under federal law, it is generally unlawful to sell firearms and ammunition to minors and for minors to possess

---

[6] At times, NSSF quotes other parts of FIRA in its First Amendment arguments, but it explains only how it believes FIRA's Sections (b)(2) and (b)(3) violate the First Amendment so those arguments are addressed herein. Because FIRA's sections are severable and Sections (b)(1)–(4) operate independently of each other, the Court must analyze FIRA's provisions separately and limit any injunction to only those provisions which NSSF shows it is highly likely to be able to show are unconstitutional. *See Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328–29 (2006) ("Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem . . . [by] sever[ing] its problematic portions while leaving the remainder intact.").

handguns. 18 U.S.C. § 922(b)(1), (c)(1); 18 U.S.C. § 922(x)(1), (x)(2), (5). Illinois law further prohibits carriage of firearms for those under 21 years of age, and generally prohibits those under 21 from purchasing or possessing firearms and ammunition. 720 ILCS 5/24-1(a)(4)(iv), (a)(10)(iv); 430 ILCS 66/25(1); 430 ILCS 65/2–4. FIRA simply prohibits marketing activity that encourages minors to engage in these unlawful activities.

NSSF is correct that in some contexts a minor may lawfully possess or use a firearm, but FIRA makes clear that it does not apply to speech regarding such activity. Section (b)(3) by its own terms only applies to the "unlawful" purchase, possession, or use of a firearm by a minor. Further, it expressly excludes speech regarding lawful recreational use. Specifically, it states it "does not apply to communications or promotional materials regarding lawful recreational activity with a firearm such as but not limited to, practice shooting at targets on established public or private target ranges or hunting, trapping, or fishing in accordance with the Wildlife Code or the Fish and Aquatic Life Code." FIRA § (b)(3)(B) (hereinafter, "Recreational Exemption"). The fact that Section (b)(3) exclusively regulates speech concerning *unlawful* activity distinguishes it from the regulation of speech concerning *lawful* firearm activity ruled unconstitutional in *Junior Sports Magazines Inc. v. Bonta*, 80 F.4th 1109 (9th Cir. 2023). Unlike the statute in *Junior Sports*, Section (b)(3)'s restriction on speech does not concern a single lawful activity. Nor is it relevant that the particular marketing means identified in FIRA Subsection (b)(3)(A), such as caricatures or brand names, are lawful in other contexts.[7] Those otherwise permissible activities lose First Amendment

---

[7] FIRA's inclusion of these factors is unsurprising given that when industries take steps to limit advertising to minors, they discourage the use of similar marketing methods, such as the use of cartoons and brand name merchandise for minors. *See* Declaration of Gregory T. Gundlach ¶¶ 129–143 (attached as Ex. 2). In any event, NSSF's attempt to facially attack certain examples in (b)(3)(A)(i)–(vi) defies the introductory instruction in (b)(3)(A) that "a court shall consider the totality of the circumstances." The (b)(3)(A)(i)–(vi) factors are a nonexhaustive list for a court to

protection when they are used to encourage *unlawful* activity. *See Thompson*, 535 U.S. at 367.

2. **Section (b)(3) directly advances and is not more extensive than necessary to serve the State's substantial interest.**

Even if NSSF were able to show speech encouraging minors' lawful recreational firearm use is impacted such that Section (b)(3) is not limited to speech concerning unlawful activity, the provision would still survive First Amendment scrutiny.

Section (b)(3)—as well as Sections (b)(2) and (b)(4)—clarify the Consumer Act, a well-established regulation of conduct in trade and commerce. The State's authority to regulate commercial conduct deemed harmful to the public includes the power to regulate speech. *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978) ("[T]he State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity."). Government burdens on commercial "speech are scrutinized more leniently than burdens on fully protected noncommercial speech." *Jordan v. Jewel Food Stores*, 743 F.3d 509, 515 (7th Cir. 2014). Under the *Central Hudson* standard for assessing the constitutionality of a commercial-speech regulation, the State need only show that (1) the State's interest in the regulation is substantial, (2) the regulation directly advances that interest, and (3) the regulation is not more extensive than necessary to serve that interest. *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 563 (1980). Section (b)(3) satisfies each element.

As to the first *Central Hudson* factor, it is well established that the State has a substantial interest in regulating minors' purchase, possession, and use of firearms. *E.g.*, *Horsley v. Trame*, 808 F.3d 1126, 1132 (7th Cir. 2015) (upholding Illinois firearm restriction on persons under 21 noting the State has an "important and compelling interest in its citizens' safety"); *People v.*

---

consider when deciding whether an advertising promotion "reasonably appears" to encourage minors to unlawfully purchase, possess, or use firearms.

*Mosley*, 33 N.E.3d 137, 157 (Ill. 2015) ("[I]t is clear that an extensive relationship exists between reasonable restrictions on the use of firearms by persons under the age of 21 and the state's interest in protecting the public and police."). Indeed, "laws banning the juvenile possession of firearms have been commonplace for almost 150 years." *People v. Aguilar*, 2 N.E.3d 321, 329 (Ill. 2013) (cleaned up). The State's interest in regulating minors' firearm access has only increased recently. As of 2020, the leading cause of death in minors is firearm-related injuries. Jason E. Goldstick et al., *Current Causes of Death in Children and Adolescents in the United States*, 386 New Eng. J. Med. 1955, 1955–56 (2022) (attached here to Ex. 1, Elizabeth B. Scott Declaration, as Ex. 1-A). Since 2015, there have been at least 132 unintentional shootings by children in Illinois alone. Everytown Research & Policy, #NotAnAccident Index, https://everytownresearch.org/maps/notanaccident (attached as Ex. 1-B).

As to the second *Central Hudson* factor, Section (b)(3) directly advances the State's interest by dampening minors' demand for unlawful purchase, possession, and use. *United States v. Edge Broad. Co.*, 509 U.S. 418, 434 (1993) ("If there is an immediate connection between advertising and demand, and the federal regulation decreases advertising, it stands to reason that the policy of decreasing demand for gambling is correspondingly advanced."). Studies and Illinois-specific data show that Section (b)(3) would dampen such demand, which is more than sufficient to justify this regulation on commercial speech.

Minors are known to be particularly susceptible to advertising, which makes it more likely that minors will engage with any given advertised product. *See, e.g.*, Cornelia Pechmann et al., *Impulsive and Self-Conscious: Adolescents' Vulnerability to Advertising and Promotion*, 24 J. Pub. Policy & Mktg. 202 (2005) (attached as Ex. 1-C); Matthew A. Lapierre et al., *The Effect of Advertising on Children and Adolescents*, 140 PEDIATRICS S152 (2017) (presenting research

21

showing alcohol advertising increases the likelihood that adolescents will start to use alcohol) (attached as Ex. 1-D). The firearms industry acknowledges this connection by extensively engaging in marketing to minors. *See, e.g.*, Violence Policy Center, *"Start Them Young" How the Firearms Industry and Gun Lobby Are Targeting Your Children* (Feb. 2016), https://vpc.org/studies/startthemyoung.pdf, at p. 34–35 (quoting NSSF advice on using social media to communicate with youth and how to market to youth 12 years old and younger) (attached as Ex. 1-E). And numerous documented instances of unlawful possession and use of firearms by minors in Illinois show there is demand. *See, e.g.*, Mary Schenk, *5 Youths Arrested in Connection with Gunfire Near Champaign Elementary School*, The News-Gazette (Sept. 27, 2023), https://bit.ly/3Fh8eOd (reporting on two children aged 11 and 15 found unlawfully possessing handguns and ammunition) (attached as Ex. 1-F); *In re N.R.*, 2021 IL App (1st) 200378-U (affirming adjudication of minor as delinquent for unlawful possession of a firearm); Firearms Trace Data: Illinois 2021, Bureau of Alcohol Tobacco, Firearms & Explosives, www.atf.gov/resource-center/firearms-trace-data-illinois-2021 (showing 464 firearms were recovered in Illinois from minors in 2021). In light of the foregoing, FIRA's restrictions on advertising in a manner that promotes such unlawful use will necessarily dampen minors' demand for unlawful products. *See Disc. Tobacco City & Lottery v. United States*, 674 F.3d 509, 540 (6th Cir. 2012) ("Though Plaintiffs would have us believe that there is no causal connection between product advertising and the consumer behavior of children, such a claim stretches the bounds of credulity.").

FIRA satisfies the third and final *Central Hudson* factor too because it is appropriately tailored to serve the State's interest. *F.T.C. v. Trudeau*, 662 F.3d 947, 953 (7th Cir. 2011) ("[C]ommensurate with the subordinate position of commercial speech in the scale of First

Amendment values, the fit needn't be perfect [and] not necessarily the single best disposition but one whose scope is in proportion to the interest served.") (cleaned up). As discussed above, Section (b)(3) restricts encouragement of *unlawful* purchase, possession, and use. Section (b)(3) is thus appropriately tailored by not regulating advertising promoting "lawful" conduct, and by providing further reassurance and clarity in its Recreational Exemption.[8]

Section (b)(3) thus satisfies *Central Hudson* and permissibly regulates commercial speech.

### 3.     Sections (b)(2) and (b)(3) are not unconstitutionally vague.

NSSF's vagueness argument ignores that FIRA clearly identifies—supported by examples—the commercial speech it prohibits. In a vagueness challenge, "even if there are marginal applications in which a statute would infringe on First Amendment values, facial invalidation is inappropriate if the remainder of the statute covers a whole range of easily identifiable and constitutionally proscribable conduct." *United States v. Marzook*, 383 F. Supp. 2d 1056, 1065 (N.D. Ill. 2005) (cleaned up); *see also Hansen*, 599 U.S. at 770 (in a First Amendment overbreadth challenge, plaintiff must demonstrate "that the statute prohibits a substantial amount of protected speech relative to its plainly legitimate sweep" for a court to find the "law facially invalid") (cleaned up).

FIRA's militia and minors provisions encompass "easily identifiable and constitutionally proscribable conduct." *Id*. Sections (b)(2) and (b)(3) lay out what specific conduct cannot be encouraged in the marketing of firearm-related products: unlawful paramilitary and private militia

---

[8] NSSF's argument that the State must also use other means of addressing firearm misuse here—such as regulation of other industries—is a red herring. PI Motion at 12. Nothing requires the State to "address all aspects of a problem in one fell swoop." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 450 (2015).

activity and unlawful purchase, possession, and use by minors. The Subsection (b)(3)(A) factors further identify specific indicia of marketing targeting minors. NSSF cannot claim these regulations provide it no guidance, especially given that "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). And NSSF cannot distract from the clear core of conduct prohibited by FIRA with reference to speculative hypotheticals. *Hill v. Colorado*, 530 U.S. 703, 733 (2000) ("[S]peculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications.") (cleaned up). Nor can NSSF support its theory that FIRA impermissibly "chills" speech. Even in the First Amendment context, "the potential chilling effect on protected expression must be both 'real and substantial' to invalidate a statute as void for vagueness in a facial challenge." *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 479 (7th Cir. 2012). NSSF identifies no such substantial chilling effect.

### C.    The Act comports with due process.

NSSF also cannot succeed on the merits of Count III (challenging Section (b)(1) as unconstitutionally vague under the Due Process Clause) for the same reason NSSF's First Amendment vagueness challenge to Sections (b)(2) and (b)(3) fails. FIRA uses well-known standards with clarifying terms to provide businesses with sufficient guidance, no different than countless other constitutional economic regulations.

A "statute is only unconstitutionally vague if it fails to define the offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and it fails to establish standards to permit enforcement in a nonarbitrary, nondiscriminatory manner." *Hegwood v. City of Eau Claire*, 676 F.3d 600, 603 (7th Cir. 2012) (cleaned up). The standard is higher in a facial

24

challenge where a plaintiff "must demonstrate that the law is impermissibly vague in all of its applications." *Id.* at 604. The State need only identify "a readily appreciable core of conduct that the statute reaches." *Cook*, 970 F.3d at 877. Further, courts presume that businesses can navigate economic regulation. *Vill. of Hoffman Ests. v. Flipside*, 455 U.S. 489, 498 (1982) ("[E]conomic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action."). Indeed, when the Illinois Supreme Court rejected a vagueness challenge to the Consumer Act—the law FIRA adds detail to—it explained the legislature is afforded greater leeway "in the context of regulatory statutes governing business activities." *Scott v. Ass'n for Childbirth at Home*, 430 N.E.2d 1012, 1017 (Ill. 1981).[9]

Section (b)(1) straightforwardly prohibits a firearm industry member from engaging in conduct that is "unlawful in itself" or "unreasonable under all circumstances." The term "unlawful in itself" refers to violations of preexisting regulations. *Grayned v. City of Rockford*, 408 U.S. 104, 112 (1972) (stating that a statute may "delineate[] its reach in words of common understanding"). The phrase "unreasonable under all circumstances" is explicated within FIRA as "failing to establish or utilize reasonable controls." Section (b)(1) then describes "reasonable controls" even further, as business practices designed to prevent certain unlawful activity or to comply with

---

[9] In an attempt to convince the Court to apply the "most protective vagueness standard" (without identifying what that is), NSSF grossly mischaracterizes FIRA to conclude it threatens "to inhibit the exercise of constitutionally protected rights" and imposes "'quasi-criminal' penalties." PI Motion at 15. But FIRA does not regulate speech protected by the First Amendment, *supra* Part I.B, or individuals' right to bear arms, *infra* Part I.D. Nor does it impose criminal penalties. As an amendment to the Consumer Act, FIRA regulates conduct in trade and commerce through civil penalties. *Scott*, 430 N.E.2d at 1017; *see also Consumer Fin. Prot. Bureau v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 900 n.18 (S.D. Ind. 2015) (noting when discussing the Consumer Financial Protection Act's civil penalties that "[t]he possibility of steep fines, by itself, does not render [the act] 'quasi-criminal.'"). Nonetheless, FIRA would survive even the closest scrutiny for the reasons discussed above.

preexisting laws regulating firearm-related products. FIRA § (b)(1)(A)–(C). This layered definition with clarifying subparts identifies the "readily appreciable core of conduct" necessary to survive a facial challenge. *Cook*, 970 F.3d at 877.

NSSF provides no support for its assertion that regulations must "identify concrete obligations with specificity." PI Motion at 15. Nor could it. The Constitution does not require such specificity. *Brown v. Chi. Bd. of Educ.*, 824 F.3d 713, 717 (7th Cir. 2016) ("A statute need not define every term to survive a vagueness challenge"); *Anderson v. Milwaukee County*, 433 F.3d 975, 978 (7th Cir. 2006) ("There are, of course, limits to how precise language can be in the context of a law, ordinance, or, for that matter, a bus system tariff."). Here, FIRA's combination of standards, with guiding examples, allows firearm industry members the flexibility to employ reasonable controls in a manner that is appropriate for their particular business.

Nor is the concept of "reasonable controls" anything new to NSSF and its members. Gundlach Decl. ¶¶ 44–65. They already have practices designed to prevent the harms identified in Subsections (b)(1)(A) and (B) and comply with (C). *Id.* Even without discovery, it is clear that NSSF promotes and some of its declarants use reasonable controls. *Id.* ¶¶ 53–65 (referencing Smith & Wesson's controls and NSSF's programs and materials); Ex. 1-H at PDF p. 122 (describing the same); ECF No. 27-4, Hood Decl. ¶ 5 (discussing security measures to prevent theft). NSSF's fear that its members will be penalized just because they "could have done more," PI Motion at 16, ignores the statute's unlawful-or-unreasonable limitation. Only a firearm industry member whose conduct is "unlawful in itself" or "unreasonable under all circumstances" is liable under Section (b)(1). In others words, to take seriously NSSF's due process claim that FIRA "brings with it the 'possibility of imposing liability on an entire industry'" one must believe that the "entire industry" is acting unlawfully or unreasonably under all the circumstances. Compl. ¶ 94. The State assumes

26

that is not so, and there certainly is no record before this Court to so conclude. In any event, reasonableness standards are well understood, conventional, and routinely deemed constitutional. *Sharkey's v. City of Waukesha*, 265 F. Supp. 2d 984, 993 (E.D. Wis. 2003) ("The Seventh Circuit has upheld similar 'reasonableness' standards against challenges based on vagueness."); *Trustees of Indiana Univ. v. Curry*, 918 F.3d 537, 540 (7th Cir. 2019) ("Even a protean word such as 'reasonable' has enough of a core to allow its use in situations where rights to speak are at issue."). Indeed, when rejecting NSSF's vagueness challenge to a New York statute with an unlawful-or-unreasonable limitation, the court observed that courts "regularly provide meaning to the term unreasonable." *NSSF v. James*, 604 F. Supp. 3d 48, 68 (N.D.N.Y. 2022).

### D.     The Act comports with the Second Amendment.

NSSF also does not and cannot make a strong showing that FIRA violates the Second Amendment. NSSF argues FIRA violates the Second Amendment by (1) Section (b)(3) operating as a "ban" on youth-model firearms, and (2) generally imposing burdens on commerce in arms. PI Motion at 16–17. The first theory fails because (b)(3) does not ban any class of firearms. The second theory fails because the Second Amendment does not prohibit regulations of commercial conduct. Both theories fail because NSSF does not have standing to bring a Second Amendment claim.

First, FIRA does not ban any firearm. Nor does it change when it is lawful for minors to possess and use firearms. Instead, Section (b)(3) bans the encouragement of the *already-unlawful* purchase, possession, or use of firearms by minors. The word "unlawfully" modifies all three verbs in "purchase or possess or use." FIRA Section § (b)(3)[10]; *United States v. Laraneta*, 700 F.3d 983,

---

[10] While preexisting federal and state laws make a minor's *purchase* of firearms and ammunition unlawful, a minor may *possess* or *use* certain firearm products when engaged in certain lawful activities such as hunting in accordance with the Illinois Wildlife Code. Inevitably, federal and

989 (7th Cir. 2012) ("a modifier at the beginning or end of a series of terms modifies all the terms"). NSSF's assertion that FIRA imposes a new ban on youth possession or use ignores basic rules of statutory construction.

The full text of FIRA further shows it is a regulation of commercial conduct, not a prohibition on any type of weapon. *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) ("In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole."). No part of the Act describes or lists *any* specific firearms. FIRA's statutory placement is also telling: It amends the Illinois Consumer Act—not the Illinois Criminal Code where the Illinois General Assembly otherwise prohibits the sale and manufacture of certain weapons. *See, e.g.*, 720 ILCS 5/24-1. The regulated conduct also reveals this is no ban: Section (b) of FIRA establishes civil liability for a business "practice" by a "firearm industry member" that occurs while a member sells, manufactures, imports, or markets "a firearm-related product." FIRA regulates business practices—not individuals' use of particular weapons.

Finally, FIRA *expressly permits* the precise activity NSSF argues it bans. NSSF claims FIRA bans the sale of firearms to adults who want to engage in lawful activities like hunting with their children. PI Motion at 17; *see also* ECF No. 27-3, Scannell Decl. ¶ 11 (wants to continue to sell "firearms to adults who want to introduce their children to hunting, shooting sports, and other lawful recreational activities"); Hood Decl. ¶ 8 (same). But FIRA unambiguously does not apply to marketing practices regarding "lawful recreational activity with a firearm such as, but not limited to, practice shooting at targets . . . or hunting, trapping, or fishing[.]" FIRA § (b)(3)(B).

---

state law may fluctuate regarding how and when it is lawful for a minor to possess or use firearm products, so the use of the word "unlawfully" in FIRA allows for such changes in a way that an inventoried list of currently lawful uses would not.

Industry members' sales of firearms to adults for them to introduce their children to shooting sports, hunting, and lawful recreational activities are not regulated by Section (b)(3). NSSF does not identify any other type of sale to an adult they wish to engage in and which they believe falls under Section (b)(3).

In sum, NSSF's first theory fails to state a claim that implicates the Second Amendment because it ignores the plain text of FIRA. But, incredibly, even if NSSF were correct to construe (b)(3) as a firearm ban, its claim *still* would not implicate the Second Amendment. Minors are not part of the "people" protected in the text of the Second Amendment, nor are firearms for youth recreation the kind of "arms" protected by the text. NSSF's first theory will fail.

NSSF's second theory—and the only one in its complaint—is that FIRA violates the Second Amendment by "imposing burdens on all manner of commerce in arms." PI Motion at 17. The Second Amendment, however, does not provide businesses a right to sell firearms free of regulation. "There is a longstanding distinction between the right to keep and bears arms and commercial regulation of firearm sales." *Morehouse Enterprises v. ATF*, No. 22-cv-116, 2022 WL 3597299, at *8 (D.N.D. Aug. 23, 2022) (finding Second Amendment claim unlikely to prevail on the merits), *aff'd*, 78 F.4th 1011 (8th Cir. 2023) (affirming denial of preliminary injunction). FIRA regulates the latter.

States have long regulated and investigated conduct under consumer protection statutes without interfering with the right to possess firearms for personal defense. *See, e.g.*, *Smith & Wesson Brands v. Grewal*, No. 20-cv-19047, 2022 WL 17959579, at *7 (D.N.J. Dec. 27, 2022) ("The State's CFA investigation is not, as S&W characterizes it, a *Bruen*-related 'firearm regulation.'"); *Def. Distributed v. Bonta*, No. 2:22-cv-6200, 2022 WL 15524977, at *4 (C.D. Cal. Oct. 21, 2022) (Second Amendment's plain text "quite-clearly" does not include any "implicit[]"

right to "manufacture firearms"), *adopted by* 2022 WL 15524983 (C.D. Cal. Oct. 24, 2022); *United States v. Tilotta*, No. 19-cr-4768, 2022 WL 3924282, at *6 (S.D. Cal. Aug. 30, 2022) (finding that regulations of the commercial sale of firearms do not fall within the plain text of the Second Amendment and thus *Bruen* did not require the government to provide historical evidence to support its regulation). FIRA has had *no* impact on any law-abiding person's ability to acquire a firearm for self-defense—the omissions in NSSF's declarations make that plain. Thus, FIRA does not trigger the plain text of the Second Amendment and it is not the type of regulation that *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) instructs courts to subject to historical scrutiny.[11]

NSSF identifies no authority expanding the Second Amendment's coverage from the individual self-defense rights recognized in *Heller* and discussed in *Bruen* to *all commerce* regarding firearms. Nor could it. Such an expansion is directly foreclosed by the Supreme Court's repeated acknowledgements that conditions may be set on the commercial sales of arms. *See District of Columbia v. Heller*, 554 U.S. 570, 626–27 (2008) ("[N]othing in [the Court's] opinion should be taken to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms."); *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (reiterating *Heller*'s approval for conditions on commercial sale) and *Bruen*, 142 S. Ct. at 2162 (same) (Kavanaugh, J., concurring).

---

[11] Even if a court were to conduct a historical inquiry, the State will be able to justify the regulation as consistent with the Nation's historical tradition of regulation as set out in *Bruen*. Since the colonial era, governments have exercised their authority to regulate the sales of firearms and ammunition. *See, e.g.*, *United States v. Libertad*, No. 22-cr-644, 2023 WL 4378863, at *7 (S.D.N.Y. July 7, 2023) (describing the "expansive authority exercised by colonial and early state legislatures as well as early congresses over the transfer of firearms between individuals and across borders").

Finally, even apart from whether NSSF presents a plausible constitutional theory (it has not), it is not a plaintiff that can bring this claim. NSSF alleges that it is a "trade association" that represents "approximately 10,000 manufacturers, distributors, and retailers of firearms," Compl. ¶ 8, and those members wish to engage in firearms commerce with less state regulation, *see id.* ¶¶ 102–108. NSSF asserts no claim on behalf of individual customers or parents. It alleges no fact showing any member's Second Amendment right has been burdened and it cannot do so because the Second Amendment "confer[s] an individual right to keep and bear arms." *Heller*, 554 U.S. at 595. *See, e.g.*, *Gazzola v. Hochul*, 645 F. Supp. 3d 37, 64 (N.D.N.Y. 2022) ("Plaintiffs fail to present any support for their contention that the individual right secured by the Second Amendment applies to corporations or any other business organizations. It does not."); *Drummond v. Robinson Twp.*, 9 F.4th 217, 230 (3d Cir. 2021) ("We know of no court, modern or otherwise, to hold that the Second Amendment secures a standalone right to *sell* guns." (emphasis in original)). Nor can NSSF derive standing from its corporate members, who do not have a Second Amendment right untethered to their customers. *See Leo Combat v. U.S. Dep't of State*, No. 15-cv-2323, 2016 WL 6436653, at *8–10 (D. Colo. Aug. 29, 2016) (corporate entity lacked Second Amendment standing because "the text and historical context of the Second Amendment shows that it confers *individual* rights, and that any rights extended to a corporation under the Second Amendment are dependent upon the entity's ability to assert *individual* rights of third-parties on their behalf" (emphasis in original)). Indeed, the very authority NSSF uses recognizes this principle. *See Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017) ("[T]he Second Amendment does not confer a freestanding right, wholly detached from any customer's ability to acquire firearms, upon a proprietor of a commercial establishment to sell firearms.") (cited at Compl. ¶ 103 and PI Motion at 17).

31

In sum, NSSF fails to even state a Second Amendment claim, so it has certainly not shown it is likely to succeed on this claim's merits.

E.      **The Act comports with the dormant Commerce Clause.**

NSSF does not and cannot show it is likely to succeed on the merits of Count V because FIRA does not violate the dormant Commerce Clause. To state a dormant Commerce Clause claim on the basis of extraterritoriality, as NSSF attempts to do, a plaintiff must identify a state law that is designed to benefit in-state economic interests by burdening out-of-state competitors. NSSF does not allege this. Instead, Count V relies on a constitutional theory that has been directly rejected by the Supreme Court and also is unsupported by factual allegations. *See* Compl. ¶¶ 109–34.

In *National Pork Producers Council v. Ross*, 598 U.S. 356 (2023), the Supreme Court rejected the notion that extraterritorial effects alone are sufficient to state a claim under the dormant Commerce Clause. The Court held the plaintiffs' challenge to a California law was not viable without an allegation "that California's law seeks to advantage in-state firms or disadvantage out-of-state rivals" because the "antidiscrimination principle" lies at the "very core of our dormant Commerce Clause jurisprudence." *Id.* at 369–70 (cleaned up). Subjecting a law to scrutiny on extraterritorial effects alone would "cast a shadow over laws long understood to represent valid exercises of the States' constitutionally reserved powers." *Id.* at 375. Indeed, as the Court recognized, we have an "interconnected national marketplace" where "many (maybe most) state laws have the practical effect of controlling extraterritorial behavior," such as state tax, environmental, securities, charitable registration, franchise, and tort law. *Id*. at 374 (cleaned up).

Nevertheless, NSSF proceeds on a theory based solely on extraterritorial effects. There is no allegation that the State is "us[ing] its laws to discriminate purposefully against out-of-state

32

economic interests." *Id*. at 364. The complaint fails to identify a single in-state business that is treated more favorably than out-of-state businesses. Instead, NSSF's motion and declarations show that it believes in-state and out-of-state businesses are equally subject to the law. *Compare* ECF No. 27-2, Cupero Decl. *with* ECF No. 27-5, Larson Decl. Under *Ross*, this claim cannot stand.[12]

Rather than engage with *Ross*, NSSF relies on *Legato Vapors v. Cook*, 847 F.3d 825 (7th Cir. 2017), a case that predates *Ross*, applies the now-rejected extraterritorial effects rule, and involves drastically different facts. The Seventh Circuit found an Indiana law unenforceable notwithstanding the fact "plaintiffs do not contend that the Indiana Act discriminates against interstate commerce." *Id*. at 830. *Ross* requires such a contention. 598 U.S. at 364. Furthermore, the issue with Indiana's law was its requirement that all out-of-state e-cigarette liquid manufacturers submit a permit application to Indiana, providing "astoundingly specific" details about their facilities' sinks and cleaning equipment and their third-party security firm contracts. *Legato Vapors*, 847 F.3d at 833. Only manufacturers who used Indiana's favored security providers, sinks, and other equipment received permit approval. *Id*. at 828. This detailed scheme created the "threat of inconsistent regulation[s]" between states, such as the possibility that one state requires "double-basin steel sinks" while another requires "single-basin porcelain sinks." *Id*. at 834–35. FIRA creates no comparable risk of inconsistency.[13] It imposes no permit scheme on

---

[12] NSSF also cannot use a *Pike* balancing theory under *Ross* to evade its failure to allege discriminatory purpose. "*Pike* balancing is triggered *only* when the challenged law *discriminates* against interstate commerce in practical application." *Park Pet Shop, Inc. v. City of Chicago*, 872 F.3d 495, 502 (7th Cir. 2017) (emphasis in original). Here, FIRA applies to in-state and out-of-state businesses "in exactly the same way." *Id.* at 503.

[13] Even before *Ross*, NSSF's claim would have failed for this reason. *See, e.g.*, *NSSF v. James*, 604 F. Supp. 3d 48, 65 (N.D.N.Y. 2022) (dismissing NSSF's dormant Commerce Clause claim prior to *Ross* and finding New York statute regulating firearm industry members "in no way differs from the extraterritorial effect of the myriad of safety state laws and regulations with which every industry must comply").

out-of-state manufacturers and imposes no "astoundingly specific" compliance requirements that may conflict with another state's firearms regulations.

Nor does FIRA impermissibly regulate conduct that lacks any Illinois connection, as NSSF suggests.[14] FIRA regulates only conduct regarding firearm-related products, which are defined as those (1) "sold, made, or distributed *in Illinois*," (2) "intended to be sold or distributed *in Illinois*," or (3) "possessed *in Illinois*, and it was reasonably foreseeable that the item would be possessed *in Illinois*." FIRA § (a) (emphasis added). NSSF cannot possibly meet the facial challenge standard of showing all possible applications of FIRA violate the dormant Commerce Clause.

### F.   NSSF does not have standing for injunctive relief.

NSSF cannot succeed on the merits of any of its claims because it does not have standing. *See, e.g.*, *Simic v. City of Chicago*, 851 F.3d 734, 737–38 (7th Cir. 2017) (affirming denial of preliminary injunction in part because the plaintiff "does not have standing to seek injunctive relief"). As explained in the State's concurrently filed motion to dismiss, NSSF's allegations and declarations are categorically insufficient to show standing. NSSF's "burden to demonstrate standing in the context of a preliminary injunction motion is at least as great as the burden of resisting a summary judgment motion," which means it "must set forth by affidavit or other evidence specific facts, rather than general factual allegations of injury." *Speech First v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020) (cleaned up). NSSF has not met that standard. *See* ECF No. 35.

---

[14] NSSF argues in its complaint that even after *Ross*, the direct regulation of out-of-state entities is impermissible. It bases this bold argument on a partial quote from a *Ross* footnote, where the Court explained it was not considering the constitutionality of "a law that directly regulated out-of-state transactions by those with no connection to the State." *Ross*, 598 U.S. at 376 n.1 (emphasis omitted). The California pork regulation was permissible because it applied only to products with a California connection. FIRA is permissible for the same reason.

## II.    NSSF has not shown it will suffer irreparable harm.

NSSF not only fails to make its required strong showing that it is likely to succeed on the merits, but it also fails to meet its burden of showing that any member will "likely" suffer irreparable harm absent an injunction. *Winter*, 555 U.S. at 22. The Court can deny the motion on this basis alone. NSSF fails because it shows only the possibility of future harm and fails to show the costs of FIRA compliance pose an existential risk to any NSSF member.

The mere "possibility" of a future harm is insufficient to justify a preliminary injunction. *Id.*; *see also E. St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 705–06 (7th Cir. 2005) ("[A] plaintiff cannot obtain a preliminary injunction by speculating about hypothetical future injuries."). Because FIRA has never been enforced against any NSSF member and NSSF identifies no credible threat of any pending enforcement, it points to only speculative harm that could result from a hypothetical future lawsuit. PI Motion at 20. The allegation that an NSSF member *may* one day face a lawsuit both brought under FIRA and prohibited by PLCAA cannot be seen "as anything but speculative—too much so to warrant the extraordinary remedy of preliminary injunctive relief." *Halczenko v. Ascension Health*, 37 F.4th 1321, 1325 (7th Cir. 2022). The rule against enjoining laws based on speculative possibilities is no different in the context of constitutional claims. *Orr*, 953 F.3d at 502–03 (plaintiffs asserting constitutional violations could not obtain preliminary injunction based on speculative harm).

Nor does NSSF identify any imminent costs or loss of revenue that risk irreparably harming any NSSF member's business. Economic loss is irreparable only where the injunction is necessary to "save [a] plaintiff's business." *Gateway E. Ry. Co. v. Terminal R.R. Ass'n*, 35 F.3d 1134, 1140

35

(7th Cir. 1994).[15] Here, some declarants suggest they may purchase new security equipment or modify marketing practices due to FIRA. But NSSF does not provide a single estimate about how any of its 10,000 members' revenues will be affected. FIRA does not appear to have put the declarants out of business, as all five continue to do business in Illinois.[16]

Rather, public information shows that firearm industry members have long had to endure the costs of litigation but are thriving nonetheless. For example, Smith & Wesson discloses that it has been under scrutiny from the FTC since 2020 and has been defending against a claim under a New York statute since January 2023, Cupero Decl. ¶¶ 13, 15, but publicly available information shows Smith & Wesson projecting a rosy financial picture during that time period. Smith & Wesson reported over $154 million in gross profits for the year ending April 30, 2023. Ex. 1-H (Smith & Wesson Annual Report) at F-6. Smith & Wesson earned these profits notwithstanding the company's need to defend against civil litigation, which includes a public nuisance class action

---

[15] NSSF asserts that the Eleventh Amendment turns its vague (and unsupported) allegation that FIRA caused a "constriction of the market" into a concrete irreparable injury. But the only case it cites for this principle, *Community Pharmacies of Indiana v. Indiana Family & Social Services*, 801 F. Supp. 2d 802 (S.D. Ind. 2011), involved state action that would "cause pharmacies to close, employees to be laid off, Medicaid services to cease, and, as a result of the latter, serious complications for Medicaid patients" who "constitute the poor, the elderly, the disabled and families with children, many of whom reside in rural areas with a dearth of other pharmacy options within close proximity." *Id*. at 806–807. NSSF identifies no comparable harm here. Furthermore, even in claims against state entities, the only irreparable economic injuries are those that are "certain, great and actual." *Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 52–53 (D.D.C. 2011). *See, e.g.*, *McHenry County v. Raoul*, No. 21-cv-50341, 2021 WL 8344241, at *2 (N.D. Ill. Dec. 27, 2021) (refusing to find irreparable harm sufficient to enjoin a state statute where affidavits regarding lost revenue showed only a "disruption in cash flow" that did not "threaten" plaintiffs' "existence").

[16] Recoil Armory, Hood's Guns & More, and Rock River Arms are all Illinois-based and continue to operate. Scannell Decl. ¶¶ 5–6; Hood Decl. ¶ 2; Larson Decl. ¶¶ 5, 7. Smith & Wesson's website directs customers to 120 Illinois dealers to purchase its products. *See* www.smith-wesson.com/dealer-locator (last visited Sept. 20, 2023). Henry Repeating Arms' website directs customers to 174 Illinois dealers to purchase its products. Ex. 1-G. And Rock River Arms' website directs customers to 4 Illinois dealers to purchase its products. Ex. 1-J.

in Canada, a public nuisance claim in California, and a case under the Massachusetts Consumer Protection Act. *See* Ex. 1-I (Smith & Wesson Form 10-Q) at 15–16. Smith & Wesson has brought in massive profits even while defending 12 lawsuits alleging its marketing practices violate the *precise law* FIRA amends, the Consumer Act. *See Roberts v. Smith & Wesson Brands*, No. 22-cv-6169, 2023 WL 6213654 (N.D. Ill. Sept. 25, 2023) (remanding 12 lawsuits with Consumer Act claims to state court). NSSF does not explain why FIRA will lead to litigation so different in kind from what its members already face that FIRA must be struck down to save them.

**III.     The equities and public interest weigh strongly against enjoining the Act.**

NSSF also fails to establish the final factors required to obtain a preliminary injunction. These factors—the equities and the public interest—are analyzed together when the government is the party opposing injunctive relief. *Nken v. Holder*, 556 U.S. 418, 435 (2009). In analyzing these factors, a plaintiff's alleged harm is "balanced against any harm to the 'non-moving party' and 'the public interest,' which refers to the interests of people and institutions that are not parties to the case." *Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021) (citation omitted). Because NSSF is unlikely to prevail on the merits of its claims as explained *supra* in Part I, it faces a heightened burden to show that the balance of equities warrants injunctive relief. *See GEFT Outdoors*, 922 F.3d at 364.

Here, the concrete harm created by an injunction far outweighs NSSF's speculative harm. FIRA ensures that firearm industry members sell and market their products only to those who can lawfully purchase, possess, and use them. Such controls are necessary and beneficial to the public interest, as NSSF and its members have repeatedly recognized. *See* Gundlach Decl. ¶¶ 53–90. Furthermore, it is well established that "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland*

*v. King*, 567 U.S. 1301, 1303 (2012) (cleaned up). NSSF's proposed injunctions would prevent the State from enforcing a duly enacted statute to address a substantial state interest. This request for extraordinary remedy, without any showing of impending harm, should be denied.

## CONCLUSION

For the foregoing reasons, the Attorney General requests that Plaintiff's Motion for Preliminary Injunction (ECF No. 27) be denied.

Dated: October 19, 2023

Respectfully submitted,

KWAME RAOUL
Attorney General for the State of Illinois

By: /s/ *Kathryn Hunt Muse*

Kathryn Hunt Muse, No. 6302614
Elizabeth B. Scott, No. 6333329
Michael M. Tresnowski, No. 6324767
Office of the Illinois Attorney General
100 W. Randolph St.
Chicago, Illinois 60601
Kathryn.Muse@ilag.gov
Elizabeth.Scott@ilag.gov
Michael.Tresnowski@ilag.gov
(312) 814-3000

*Counsel for Attorney General Raoul*

Exhibits to follow:

1.  Declaration of Elizabeth B. Scott
2.  Declaration of Gregory T. Gundlach