**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

---

National Shooting Sports Foundation, Inc.,

     *Plaintiff*,

       v.                 No. 3:23-cv-02791

Kwame Raoul,
Attorney General of the State of Illinois,

     *Defendant*.

---

**PLAINTIFF'S CONSOLIDATED RESPONSE TO DEFENDANT'S MOTION TO DISMISS
AND REPLY IN SUPPORT OF PLAINTIFF'S PRELIMINARY INJUNCTION MOTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 1

  I.   The Court Should Deny The AG's Motion To Dismiss ...................................... 1

    A.    NSSF Has Standing ....................................................................................... 1

      1.   NSSF has standing to bring its First Amendment challenge to HB 218's bans on marketing common arms ...................................................................... 3

      2.   NSSF has standing to bring its Second Amendment challenge to HB 218's bans on designing and selling common arms .............................................. 6

      3.   NSSF has standing to challenge the novel tort liability HB 218 imposes ................... 8

      4.   An order enjoining the AG from enforcing HB 218 against NSSF members would redress their injuries traceable to HB 218 ...........................................11

    B.    The AG's Three-Sentence Ripeness Argument Is Meritless....................................... 12

  II.   NSSF Is Likely To Succeed On The Merits Of Its Claims............................................. 13

    A.    HB 218 Authorizes State Action that the PLCAA Preempts ..................................... 14

      1.   The AG should be enjoined from bringing "qualified civil liability actions" against NSSF and its members ............................................................... 15

      2.   Section 1983 and *Ex parte Young* supply the cause of action for this claim ............. 18

    B.    HB 218 Violates the First Amendment........................................................................ 19

      1.   The AG has waived any defense of Section (b)(1)'s speech restrictions................... 19

      2.   The AG's attempted defense of HB 218's other speech restrictions fail ................... 20

    C.    HB 218 Is Void for Vagueness ..................................................................................... 25

    D.    HB 218 Violates the Second Amendment ................................................................... 27

      1.   HB 218's ban on common arms is unconstitutional ................................................... 27

      2.   HB 218's novel liability scheme violates the Second Amendment ............................ 30

    E.    HB 218 Exceeds Constitutional Limits on Extraterritorial State Regulation ............ 31

  III.   The Remaining Injunctive Factors Support Relief........................................................ 34

CONCLUSION................................................................................................................... 35

# TABLE OF AUTHORITIES

**Cases**

*44 Liquormart, Inc. v. Rhode Island*,
  517 U.S. 484 (1996)......................................................................................... 23

*ACLU of Ill. v. Alvarez*,
  679 F.3d 583 (7th Cir. 2012)............................................................................ 35

*Albert v. Oshkosh Corp.*,
  47 F.4th 570 (7th Cir. 2022)............................................................................... 1

*Ams. for Prosperity Found. v. Bonta*,
  141 S.Ct. 2373 (2021)...................................................................................... 24

*Arizona v. Yellen*,
  34 F.4th 841 (9th Cir. 2022)..............................................................................11

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015)......................................................................................... 19

*Atkinson v. Garland*,
  70 F.4th 1018 (7th Cir. 2023)................................................................ 28, 29, 30

*Bevis v. City of Naperville*,
  --- F.4th ----, 2023 WL 7273709 (7th Cir. Nov. 3, 2023)................................ 30

*Black & Decker Inc. v. Robert Bosch Tool Corp.*,
  371 F.Supp.2d 965 (N.D. Ill. 2005) ........................................................... 20, 29

*Brown v. Kemp*,
  --- F.4th ----, 2023 WL 7489920 (7th Cir. Nov. 13, 2023).............................. 4, 9

*Camden Cnty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*,
  273 F.3d 536 (3d Cir. 2001)............................................................................. 31

*Carey v. Wis. Elections Comm'n*,
  624 F.Supp.3d 1020 (W.D. Wis. 2022) ............................................................. 6

*Christian Legal Soc'y v. Walker*,
  453 F.3d 853 (7th Cir. 2006)............................................................................ 35

*City of N.Y. v. Beretta U.S.A. Corp.*,
  524 F.3d 384 (2d Cir. 2008).......................................................................17, 18

*Coates v. Cincinnati*,
  402 U.S. 611 (1971)......................................................................................... 27

*Comptroller of Treasury of Md. v. Wynne*,
  575 U.S. 542 (2015)......................................................................................... 33

*Craig v. Boren*,
  429 U.S. 190 (1976).....................................................................................7, 34

*Daniels Sharpsmart, Inc. v. Smith*,
  889 F.3d 608 (9th Cir. 2018) ..................................................................... 32

*Dinerstein v. Google, LLC*,
  73 F.4th 502 (7th Cir. 2023) ....................................................................... 3

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ................................................................................... 31

*Echo, Inc. v. Timberland Machines & Irrigation, Inc.*,
  661 F.3d 959 (7th Cir. 2011) ..................................................................... 29

*Edgar v. MITE Corp.*,
  457 U.S. 624 (1982) ................................................................................... 32

*English v. Gen. Elec. Co.*,
  496 U.S. 72 (1990) ..................................................................................... 16

*Ezell v. City of Chicago*,
  651 F.3d 684 (7th Cir. 2011) ........................................................... 2, 3, 7, 8

*Health & Hosp. Corp. of Marion Cnty. v. Talevski*,
  143 S.Ct. 1444 (2023) ................................................................................ 18

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ..................................................................................... 1

*Ileto v. Glock, Inc.*,
  565 F.3d 1126 (9th Cir. 2009) ............................................................. *passim*

*In re Acad., Ltd.*,
  625 S.W.3d 19 (Tex. 2021) .................................................................. 18, 34

*In re Coleman*,
  560 F.3d 1000 (9th Cir. 2009) ................................................................... 13

*Isaacson v. Horne*,
  716 F.3d 1213 (9th Cir. 2013) ................................................................... 14

*Johnson v. United States*,
  576 U.S. 591 (2015) .............................................................................. 26, 27

*Junior Sports Mags. Inc. v. Bonta*,
  80 F.4th 1109 (9th Cir. 2023) ........................................................ 21, 22, 23

*Kole v. Village of Norridge*,
  2017 WL 5128989 (N.D. Ill. 2017) ........................................................... 14

*Kramer v. Banc of Am. Secs., LLC*,
  355 F.3d 961 (7th Cir. 2004) ..................................................................... 29

*Legato Vapors, LLC v. Cook*,
  847 F.3d 825 (7th Cir. 2017) ............................................................... 32, 33

iii

*Marie O. v. Edgar*,
    131 F.3d 610 (7th Cir. 1997) ................................................................................ 19

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
    142 S.Ct. 2111 (2022) ....................................................................... 28, 30, 31

*National Pork Producers Council v. Ross*,
    598 U.S. 356 (2023) ................................................................................ 32, 33

*NSSF v. Jennings*,
    No. 22-cv-1499, 2023 WL 5835812 (D. Del. Sept. 8, 2023) .......................... 9

*NSSF v. New Jersey*,
    80 F.4th 215 (3d Cir. 2023) .......................................................................9, 11

*NSSF v. Platkin*,
    2023 WL 1380388 (D.N.J. Jan. 31, 2023) .............................................. 16, 17

*Prairie Rivers Network v. Dynegy Midwest Generation, LLC*,
    2 F.4th 1002 (7th Cir. 2021) ............................................................................ 1

*Reno v. Cath. Soc. Servs., Inc.*,
    509 U.S. 43 (1993) .......................................................................................... 13

*Rocky Mountain Farmers Union v. Corey*,
    730 F.3d 1070 (9th Cir. 2013) ........................................................................ 32

*Second Amend. Arms v. City of Chicago*,
    135 F.Supp.3d 743 (N.D. Ill. 2015) ................................................................. 8

*Six Star Holdings, LLC. v. City of Milwaukee*,
    821 F.3d 795 (7th Cir. 2016) .......................................................................... 14

*Speech First, Inc. v. Killeen*,
    968 F.3d 628 (7th Cir. 2020) ............................................................................ 5

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) .......................................................................................... 1

*State Farm Life Ins. Co. v. Jonas*,
    775 F.3d 867 (7th Cir. 2014) ...........................................................................11

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) .......................................................................................9, 11

*Sweeny v. Raoul*,
    990 F.3d 555 (7th Cir. 2021) ....................................................................... 9, 12

*Teixeira v. Cnty. of Alameda*,
    873 F.3d 670 (9th Cir. 2017) ................................................................ 7, 8, 29

*Tingley v. Ferguson*,
    47 F.4th 1055 (9th Cir. 2022) ......................................................................... 12

*TransUnion LLC v. Ramirez,*
    141 S.Ct. 2190 (2021) .................................................................................................. 3

*United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.,*
    517 U.S. 544 (1996) ..................................................................................................... 1

*United States v. Berkowitz,*
    927 F.2d 1376 (7th Cir. 1991) ................................................................................... 29

*United States v. L. Cohen Grocery Co.,*
    255 U.S. 81 (1921) ..................................................................................................... 26

*United States v. Salerno,*
    481 U.S. 739 (1987) ................................................................................................... 14

*Uzuegbunam v. Preczewski,*
    141 S.Ct. 792 (2021) .................................................................................................. 12

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
    455 U.S. 489 (1982) ................................................................................................... 25

*Vill. of Rosemont v. Priceline.com Inc.,*
    2011 WL 4913262 (N.D. Ill. 2011) ........................................................................... 11

*VIP of Berlin, LLC v. Town of Berlin,*
    593 F.3d 179 (2d Cir. 2010) ...................................................................................... 25

*Virginia v. Am. Booksellers Ass'n,*
    484 U.S. 383 (1988) ..................................................................................................... 4

*Warth v. Seldin,*
    422 U.S. 490 (1975) ..................................................................................................... 2

*Wolfson v. Brammer,*
    616 F.3d 1045 (9th Cir., 2010) .................................................................................. 13

**Constitutional Provision**

U.S. Const. amend. II ............................................................................................... 24, 29

**Statutes**

15 U.S.C. §7901(a)(6) ............................................................................................... 16, 25

15 U.S.C. §7901(a)(7) ......................................................................................... 16, 30, 31

15 U.S.C. §7902(a) ............................................................................................. 15, 19, 34

15 U.S.C. §7902(b) ........................................................................................................ 19

15 U.S.C. §7903(5)(A) ............................................................................................... 15, 17

15 U.S.C. §7903(5)(C) ................................................................................................... 19

42 U.S.C. §1983 ............................................................................................................ 18

720 ILCS 5/24-1.9-10 ................................................................................................. 10

815 ICLS 505/7a(a) ..................................................................................................... 8

815 ILCS 505/2BBBB-(a) .................................................................................... 3, 9, 24

815 ILCS 505/2BBBB-(b)(1) ................................................................................ *passim*

815 ILCS 505/2BBBB-(b)(2) ................................................................................... 5, 24

815 ILCS 505/2BBBB-(b)(3) ................................................................................ *passim*

815 ILCS 505/2BBBB-(b)(4) ........................................................................................ 8

Cal. Bus. & Prof. Code §22949.80(a)(1) ................................................................... 21

**Rule**

Fed. R. Civ. P. 15(a)(2) ............................................................................................... 2

**Other Authority**

Compl., *City of Buffalo v. Smith & Wesson Brands, Inc.*, No. 1:23-cv-00066
    (W.D.N.Y. Jan. 23, 2023) .................................................................................... 10

## INTRODUCTION

In trying to defend Illinois House Bill 218 on the merits, the Attorney General mischaracterizes NSSF's claims and fails to respond to several of NSSF's arguments. Worse, in trying to pretermit any inquiry into the merits by claiming that NSSF lacks Article III standing to sue, the AG simply ignores the sworn declarations NSSF submitted along with its pleadings, which detail in stark terms the concrete injuries that NSSF's members have already suffered as a direct result of HB 218 and will continue to suffer absent an injunction. The AG may be content to pretend that there is nothing to see here, but NSSF's members have no such luxury. The Court should deny the AG's motion to dismiss and enjoin enforcement of the statute.

## ARGUMENT

### I.    The Court Should Deny The AG's Motion To Dismiss.

#### A.    NSSF Has Standing.

"The 'irreducible constitutional minimum' of standing requires" "'an injury in fact, [] that is fairly traceable to the challenged conduct of the defendant'" and "'likely to be redressed by a favorable judicial decision.'" *Albert v. Oshkosh Corp.*, 47 F.4th 570, 577 (7th Cir. 2022) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). When an association sues in a representative capacity, it must show that "at least one of its members would 'have standing to sue in their own right,'" i.e., that at least one of its members satisfies the irreducible constitutional minimum. *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1008 (7th Cir. 2021) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)); *see also id.* ("Associational standing allows an organization to sue on behalf of its members 'even without a showing of injury to the association itself.'" (quoting *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 552 (1996))). NSSF has satisfied that standard here, and then some. In arguing to the contrary, the AG makes (at least) two critical errors.

First, the AG ignores the declarations NSSF submitted with its preliminary injunction motion.  *See* Dkt.35 ("MTD.Br.") at 4-12.  The AG asserts that "declarations are irrelevant" when a defendant levels "a facial challenge" to Article III standing.  MTD.Br.12.  That is incorrect.  The difference between "facial" and "factual" challenges to Article III standing matters in terms of what evidence *submitted by the defendant* courts will consider.  But because a defendant cannot deprive a plaintiff of its day in court by asking the court to ignore facts *submitted by the plaintiff* that establish jurisdiction, federal courts may look to all pleadings a plaintiff submits—including, most notably, sworn declarations—to resolve a motion to dismiss.  This is true even when a defendant makes a "facial" standing challenge.  Indeed, not only may courts look to "all materials of record" that a plaintiff submits to make that determination, but "it is within the trial court's power to allow or require the plaintiff to supply, by amendment to the complaint *or by affidavits*, further particularized allegations of fact deemed supportive of standing."  *Warth v. Seldin*, 422 U.S. 490, 501-02 (1975) (emphasis added).  A court obviously can consider those same materials when a plaintiff supplies them on its own motion rather than in response to a court order.  And here, the sworn declarations NSSF submitted confirm that Article III is satisfied, as discussed below.[1]

That suffices to defeat the AG's "puzzling" (and half-hearted) objection to NSSF's standing to sue on its members' behalf.  *See Ezell v. City of Chicago*, 651 F.3d 684, 696 n.7 (7th Cir. 2011).  *Contra* MTD.Br.4-5, NSSF *has* identified its members, *see, e.g.*, Dkt.27-1 (Declaration of Anthony Imperato on behalf of Henry Repeating Arms) ¶3; Dkt.27-2 (Declaration of Susan Cupero on behalf of Smith & Wesson) ¶5; (Declaration of Michael Scannell on behalf of Recoil Armory) ¶4,

---

[1] To the extent the Court believes that it cannot look to the declarations NSSF attached to its Motion for Preliminary Injunction in addressing the AG's standing objection, and believes that the Complaint lacks sufficient factual allegations to satisfy Article III, NSSF respectfully requests leave to amend the complaint with the material set out in the declarations.  *See* Fed. R. Civ. P. 15(a)(2) (district courts "should freely give leave when justice so requires").

and those members' sworn declarations make crystal clear that they and other NSSF members have *already* suffered injury-in-fact as a direct result of HB 218.  Nothing more is required.[2]

Second, the AG addresses standing at a wholesale level, even though NSSF has five claims challenging HB 218.  But "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek."  *Dinerstein v. Google, LLC*, 73 F.4th 502, 511 (7th Cir. 2023) (quoting *TransUnion LLC v. Ramirez*, 141 S.Ct. 2190, 2208 (2021)).  NSSF therefore addresses its standing to seek relief on "each claim" in turn.[3]

### 1. NSSF has standing to bring its First Amendment challenge to HB 218's bans on marketing common arms.

HB 218 makes it "unlawful" for a "firearm industry member" to "advertise, market, [or] promote … any firearm-related product in a manner that reasonably appears to support, recommend, or encourage minors to unlawfully purchase or possess or use a firearm-related product in Illinois."[4]  815 ILCS 505/2BBBB-(b)(3).  The idea that NSSF lacks standing to challenge that provision on First Amendment grounds blinks reality.  Indeed, the AG argues otherwise only by ignoring the evidence NSSF submitted.  Across the two briefs he filed in response to NSSF's preliminary injunction motion, the AG never once mentions the sworn declaration submitted by Michael Scannell on behalf of Recoil Armory.  *See* Dkt.27-3.  That oversight is telling, as Scannell's declaration explains in detail the injuries that the ban on

---

[2] The AG complains that a few of the declarations do not explicitly state that the industry member is an NSSF member.  MTD.Br.12.  Each of the declarations is from an NSSF member.  In any event, the declarations that do explicitly state that they are filed on behalf of NSSF members more than suffice to establish standing, so there is no need to look behind the veil.  *See Ezell*, 651 F.3d at 696 n.7 ("Where at least one plaintiff has standing, jurisdiction is secure and the court will adjudicate the case whether the additional plaintiffs have standing or not.").

[3] That approach is especially appropriate given that—as the AG himself notes—when a statute contains a severability clause, courts analyze each component "separately."  PI.Opp.4.

[4] *See* 815 ILCS 505/2BBBB-(a) (defining "firearm industry member," "firearm-related product").

marketing common arms has already visited upon his business and constitutional rights.

"Recoil Armory is a member of the National Shooting Sports Foundation" and a federally licensed firearm retailer located in Granite City, Illinois. *Id.* ¶¶3, 5-6. "Recoil Armory has long sponsored the Southern Illinois Ice Hawks, a youth hockey organization in Illinois." *Id.* ¶8. As part of that promotional sponsorship, Recoil Armory has promoted its business—and, by extension, the firearm-related products it sells—by "emblazon[ing]" "the Recoil Armory logo" "on the team flags that are hung behind each bench during [youth hockey] games, as well as on the t-shirts given out to those who work at the organization's annual fundraiser." *Id.* This "does not market anything to children, but it does help get the word out *to adults* about the store." *Id.*

Recoil Armory would like to continue this sort of marketing. *Id.* ¶9. "However, in light of HB 218, Recoil Armory has made the difficult decision to cease its partnership with and sponsorship of the Southern Illinois Ice Hawks." *Id.* ¶8. That plainly suffices to establish standing to bring a pre-enforcement First Amendment challenge to Section (b)(3). After all, it is black-letter law that "reasonable self-censorship can support standing for pre-enforcement challenge under First Amendment." *Brown v. Kemp*, --- F.4th ----, 2023 WL 7489920, at *12 (7th Cir. Nov. 13, 2023) (citing *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988)). And there is no question about the "reasonableness" of Recoil Armory's "self-censorship." The AG does not deny that marketing firearm-related products in places where minors may lawfully be present falls within the ambit of Section (b)(3) *even if the marketing is directed toward adult parents* who may want to introduce their children to (lawful) hunting or (lawful) sport shooting. Nor could he. The whole theory underlying HB 218's marketing prohibitions is that marketing stimulates demand. Indeed, the AG argues that "Section (b)(3) directly advances the State's interest by dampening minors' demand for unlawful purchase, possession, and use." Dkt.36 ("PI.Opp.") at 21. And as

the AG all but admits, one way to "dampen[] minors' demand" for a product is to prohibit advertising of that product anywhere a minor may come across it—which includes retailers' stores, online, and at public events where minors are likely to be present.

That readily distinguishes this case from *Speech First, Inc. v. Killeen*, 968 F.3d 628 (7th Cir. 2020), on which the AG relies, *see* MTD.Br.6-7.  In *Speech First*, the plaintiffs were held to lack standing because they did "not describe[] any statements they wish[ed] to make with particularity."  968 F.3d at 639-40.  This case could not be more different.  NSSF member Henry Repeating Arms "maintain[s] … partnerships with the Boy Scouts of America, National 4-H, Kids & Clays, American Legion Junior Shooting Sports, and the Youth Shooting Sports Alliance, not to mention USA Shooting," and does so specifically "with the intent to appeal to minors."  Dkt.27-1 (Imperato Decl.) ¶18.  Likewise, NSSF member Rock River Arms, Inc., "has at times promoted its firearms via arrangements with local youth sporting organizations."  Dkt.27-5 (Declaration of Sarah Larson on behalf of Rock River Arms, Inc.) ¶11; *see id.* ¶¶12-13 (describing what that has entailed).  HB 218 makes "unlawful" all of that long-lawful commercial speech.  815 ILCS 505/2BBBB-(b)(3).  And absolutely nothing in the AG's briefs casts any doubt on the AG's intention to enforce Section (b)(3)'s speech restrictions to the fullest.  Indeed, the very fact that the AG conspicuously refused to discuss NSSF members' allegations confirms that he does.

The analysis is similar with respect to Section (b)(2), which makes it "unlawful" to "[a]dvertise, market, or promote a firearm-related product in a manner that reasonably appears to … encourage individuals" who are not in "any duly authorized military" to "use a firearm-related product for a military-related purpose."  815 ILCS 505/2BBBB-(b)(2).  The AG does not deny that, under Section (b)(2), something as ubiquitous in the firearm industry as camouflage could be deemed to "encourage" civilians to use a firearm-related product "for a military-related purpose."

Nor does he deny that Section (b)(2) "may make it unlawful for a manufacturer to run an advertisement" for a firearm "that says, 'If it's good enough for the Army, it's good enough for you.'" Dkt.27 ("PI.Br.") at 13. That silence is not just deafening, but dispositive of the standing inquiry. It is hornbook "Seventh Circuit law that there is a credible threat of enforcement when the defendants don't expressly disavow enforcement of a law that clearly applies to the plaintiffs." *Carey v. Wis. Elections Comm'n*, 624 F.Supp.3d 1020, 1030-31 (W.D. Wis. 2022) (citing cases). And there is no dispute that HB 218 applies to NSSF's members. NSSF easily clears the Article III standing hurdle for its First Amendment challenge to this provision too.

### 2. NSSF has standing to bring its Second Amendment challenge to HB 218's bans on designing and selling common arms.

NSSF has standing to challenge HB 218 under the Second Amendment too. In addition to banning long-lawful "advertis[ing], market[ing], [and] promot[ing]," Section (b)(3) prohibits "design[ing]" and "sell[ing]" "any firearm-related product in a manner that reasonably appears to support, recommend, or encourage persons under 18 years of age to unlawfully purchase or possess or use a firearm-related product in Illinois." 815 ILCS 505/2BBBB-(b)(3). In other words, Section (b)(3) effectively bans the manufacture and sale of firearms specifically designed to make them safer for minors to use. Indeed, HB 218 is explicit that, "[i]n determining whether" conduct violates Section (b)(3)'s prohibition, courts "shall consider" whether the industry member "offers firearm-related products in sizes, colors, or designs that are specifically designed to be used by, or appeal to, minors." *Id.* 505/2BBBB-(b)(3)(A)(iii).

As NSSF's declarations explain in painstaking detail, many NSSF members design, manufacture, and sell many models of firearms that are specifically designed to be used by minors. *See* PI.Br.17. For instance, "Recoil Armory currently offers for retail sale dozens of shotguns and rifles that are … denominated by the manufacturer as 'Youth' models" precisely because they are

"specifically designed to be safer for minors and other smaller-statured people to use." Dkt.27-3 (Scannell Decl.) ¶10; *see also id.* ("these models can be found on our website"). Smith & Wesson manufactures and sells firearms that come standard with "smaller calibers, smaller overall size, and lighter weights." Dkt.27-2 (Cupero Decl.) ¶14. Another NSSF member, Henry Repeating Arms, "also manufactures, markets, and sells long guns specifically designed for use by minors." Dkt.27-1 (Imperato Decl.) ¶12. And one of those Henry youth models, the Mini Bolt Youth, "is available in multiple colorways, including 'colorful Muddy Girl camo.'" *Id.* ¶13. All of that conduct now appears to be "unlawful" under Section (b)(3). 815 ICLS 505/2BBBB-(b)(3).

That easily suffices to give NSSF's members standing to challenge Section (b)(3)'s ban on common arms. Courts nationwide—including both the Supreme Court and the Seventh Circuit—have long held that manufacturers and sellers have standing to challenge laws that ban the products they make and sell. *See Craig v. Boren*, 429 U.S. 190, 195 (1976) (beer vendor had standing to challenge alcohol regulation); *Ezell v. City of Chicago*, 651 F.3d 684, 696 (7th Cir. 2011) (firing-range facilities supplier had standing to sue as an "advocate[] … of the rights of third parties who seek access to its services"); *Teixeira v. Cnty. of Alameda*, 873 F.3d 670 (9th Cir. 2017) (en banc) ("would-be operator of a gun store" had standing to challenge zoning ordinance on same theory).

Rather than confront either NSSF's allegations or all of that settled law, the AG argues that NSSF "is not a plaintiff that can bring this claim" because NSSF's members are manufacturers, distributors, and retailers of firearms, not "individual customers or parents" who would like to buy them. PI.Opp.31. But the very authority on which he relies for that argument refutes it. The AG claims that *Teixeira* (a Ninth Circuit case) precludes NSSF from bringing this suit because there is no right to sell arms, PI.Opp.31, but *Teixeira* squarely held that "a gun store … has derivative standing to assert the subsidiary right to acquire arms on behalf of his potential customers." 873

7

F.3d at 678.  And there is no need to look to the Ninth Circuit anyway, as binding *Seventh Circuit* law forecloses the AG's argument:  The Seventh Circuit held in *Ezell* that "a supplier of firing-range facilities" had standing to sue "'as [an] advocate[] of the rights of third parties who seek access to' its services."  651 F.3d at 696 (alterations in original) (quoting *Craig*, 429 U.S. at 195). In short, "the Seventh Circuit has cleared the way for firearms retailers to sue on behalf of their potential customers via … 'derivative standing.'"  *Second Amend. Arms v. City of Chicago*, 135 F.Supp.3d 743, 751 (N.D. Ill. 2015).  That is precisely what NSSF's members have done here.

### 3.  NSSF has standing to challenge the novel tort liability HB 218 imposes.

NSSF's members also plainly have standing to challenge the novel tort-style liability to which HB 218 subjects them.  In addition to making it "unlawful" to manufacture, sell, or market common arms, HB 218 makes it "unlawful" for industry members to "[k]nowingly … contribute," "through the sale, manufacturing, … or marketing of a firearm-related product" and "by conduct either unlawful in itself or unreasonable under all circumstances," "to a condition in Illinois that endangers the safety or health of the public."  815 ILCS 505/2BBBB-(b)(1).  Section (b)(1) also makes it "unlawful" for industry members to "fail[] to establish or utilize reasonable controls" in the "sale, manufacturing, … or marketing of a firearm-related product."  *Id.*  And, in a final catchall, Section (b)(4) makes it "unlawful" for industry members to "[o]therwise engage in unfair methods of competition or unfair or deceptive practices" through "sale[s], manufacturing, … or marketing."  *Id.* 505/2BBBB-(b)(4).  Illinois law then authorizes the AG to bring civil actions for alleged violations of any of its new prohibitions; and in those civil actions, courts may "award actual economic damages or any other relief which the court deems proper."  815 ICLS 505/7a(a).

NSSF easily satisfies the low bar to bring its preemption and other constitutional challenges to those provisions.  *See Ezell*, 651 F.3d at 695 (it "is well-established that pre-enforcement challenges are within Article III").  "Because it would be both foolhardy and unfair" to force a

plaintiff to actually break a law in order to challenge it, "the Supreme Court has outlined circumstances in which a party may advance a pre-enforcement challenge before suffering an injury." *Sweeny v. Raoul*, 990 F.3d 555, 559 (7th Cir. 2021); *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014). Article III is satisfied when plaintiffs "inten[d] to engage in a course of conduct arguably affected with a constitutional interest" that is "arguably … proscribed by [the] statute," and their fear of enforcement is "not imaginary or wholly speculative." *Driehaus*, 573 U.S. at 160-61; *see Brown*, --- F.4th ----, 2023 WL 7489920, at *8. The AG does not contest the first two elements. Instead, he complains that NSSF has not alleged any specific "course of conduct in which its members intend to engage" that could lead to liability under HB 218. MTD.Br.7. Once again, that ignores both NSSF's well-pled allegations and NSSF's declarations.

There is no dispute that NSSF's members sell, manufacture, and/or market products that come within HB 218's definition of "firearm-related product." *See* 815 ILCS 505/2BBBB-(a). Nor, upon reading their declarations, can there be any dispute that they face a very real risk of being subjected to such lawsuits for engaging in that lawful commerce. For one thing, as explained above, NSSF's members manufacture, market, and sell firearms that are now "unlawful" to "design," "market," or "sell" under HB 218. *See id.* 505/2BBBB-(b)(3). That alone suffices to distinguishes this case from *NSSF v. New Jersey*, 80 F.4th 215 (3d Cir. 2023), and *NSSF v. Jennings*, No. 22-cv-1499, 2023 WL 5835812 (D. Del. Sept. 8, 2023). *See* MTD.Br.9 (discussing those cases). The AG suggests that HB 218 is a carbon-copy of the laws in those cases. But neither New Jersey's nor Delaware's law had an analogue to Sections (b)(2) and (b)(3). Neither prohibited the sale of any class of arms or any particular kind of marketing. As a result, neither featured allegations or declarations attesting to marketing or sales that either statute prohibited.

There is also no dispute that Illinois already bans dozens of *other* models of firearms that

NSSF members manufacture and sell in other states where they are perfectly lawful. *See* 720 ILCS 5/24-1.9-10. HB 218 plainly covers all such arms, which means that NSSF's members now could face liability for that wholly out-of-state conduct if, for instance, someone brought one of those arms into Illinois, on the theory that the member did not establish sufficiently "reasonable controls" to prevent it. *See* 815 ILCS 505/2BBBB-(b)(1); PI.Br.18.

Making matters worse, not even *actual compliance* with all other laws is enough to satisfy HB 218. Under Section (b)(1), industry members can be held in violation "of this Act" through their "marketing of a firearm-related product," *even if none of their marketing is unlawful*. *See* 815 ILCS 505/2BBBB-(b)(1) (authorizing liability for "conduct *either* unlawful in itself *or* unreasonable under all circumstances" (emphases added)). Section (b)(1) also requires industry members to "establish or utilize reasonable controls," which are defined as "reasonable procedures, safeguards, and business practices that are designed to," *inter alia*, "comply with all provisions of applicable local, State, and federal law"—suggesting that *actual* compliance with all other provisions of law is not enough. Given the breadth (and vagueness) of that prohibition, NSSF's members—whose entire business is licensed commerce in arms, *see* Dkt.1 (Complaint) ¶8; *see also, e.g.*, Dkt.27-2 (Cupero Decl.) ¶¶8-10—face a very real threat of being sued simply for continuing to operate in ways the AG does not like, *even if they are not otherwise unlawful*.

That concern is not hypothetical. Multiple NSSF members are already facing exactly the kinds of suits under similar state laws that they fear the AG will use HB 218 to bring, resting on theories like it being "unreasonable" to market firearms based on common (lawful) features like their "capacity or ease of concealment" or to manufacture "more firearms" than a plaintiff believes "the legitimate market" should bear. *See, e.g.*, Compl. ¶¶1, 32, 517, *City of Buffalo v. Smith & Wesson Brands, Inc.*, No. 1:23-cv-00066 (W.D.N.Y. Jan. 23, 2023), Dkt.1-1. The declarations

NSSF submitted explain all of this.  *See, e.g.*, Dkt.27-2 (Cupero Decl.) ¶¶11-12.  Yet the AG has conspicuously declined to disavow his intention to bring the very same kinds of suits.  That once again distinguishes this case from the *New Jersey* case, where the state "disavowed" any intent of enforcing the challenged statute against NSSF members for conduct that was not already unlawful under some other statute.  80 F.4th at 221.  Absent a comparable promise that the state will not enforce the law in ways that NSSF's members fear, all that is required is a "credible threat *of liability*," *State Farm Life Ins. Co. v. Jonas*, 775 F.3d 867, 870 (7th Cir. 2014) (emphasis added), i.e., a credible allegation that the conduct in which they wish to engage is "arguably … proscribed by [the challenged] statute," *Driehaus*, 573 U.S. at 160.  Because HB 218 clearly covers conduct in which plaintiffs wish to engage, and the AG has not made any promise not to sue them for that conduct, this is a paradigm case for pre-enforcement review.[5]

### 4.   An order enjoining the AG from enforcing HB 218 against NSSF members would redress their injuries traceable to HB 218.

Injury aside, the AG argues that NSSF lacks standing because this Court could not enjoin private parties from enforcing HB 218 in this lawsuit against the AG.  *See* MTD.Br.11 & n.2.  That argument makes no sense.  An order enjoining the AG from enforcing HB 218 against NSSF members in an unconstitutional or preempted manner will plainly redress the threat of injury *from the AG* that NSSF members face.  *See* Dkt.1 (Complaint) at 56 (requesting that the AG and his "officers, agents, and employees subject to his supervision" be enjoined from "enforcing" HB 218 "against NSSF's members").  To be sure, such an injunction would not directly operate on private

---

[5] The AG has not yet enforced HB 218, which took effect immediately upon being signed on August 12, 2023.  But "[w]here the challenged statute is new, as here, the history of past enforcement carries little, if any weight."  *Arizona v. Yellen*, 34 F.4th 841, 850 (9th Cir. 2022).  "Thus, there is no need to consider [HB 218's] enforcement history."  *Vill. of Rosemont v. Priceline.com Inc.*, 2011 WL 4913262, *4 (N.D. Ill. 2011).

parties empowered to sue under HB 218.  But that makes no difference, as even "partial" relief suffices for redressability.  *Uzuegbunam v. Preczewski*, 141 S.Ct. 792, 801 (2021).  And, of course, a final court order declaring HB 218 unconstitutional and preempted would obviously have precedential force in any subsequent action in which a private party tried to sue an NSSF member under HB 218.  Because granting NSSF's requested relief will indisputably (indeed, undisputedly) do at least that, and because NSSF's members have suffered and stand to suffer injury-in-fact that is directly (indeed, entirely) traceable to HB 218, Article III standing is satisfied here.[6]

### B.    The AG's Three-Sentence Ripeness Argument Is Meritless.

There is a reason the AG treats ripeness as an afterthought:  In a pre-enforcement setting, the ripeness inquiry is indistinguishable from the standing inquiry.  *Sweeny*, 990 F.3d at 559-60. The AG claims that adjudication would be premature because NSSF purportedly relies on "hypothetical questions instead of particularized facts."  MTD.Br.12.  But, again, the AG can make that claim only by turning a blind eye to NSSF's actual allegations and declarations, which detail precisely what kinds of lawsuits members fear they will face, based on actual conduct in which they wish to engage (and, in some cases, are currently engaged in).  The AG's threshold objections fare no better under the rubric of ripeness than under the rubric of standing.

In all events, this case is fit "for judicial decision," and NSSF members will suffer "hardship" from "with[eld] court consideration."  *Tingley v. Ferguson*, 47 F.4th 1055, 1070 (9th Cir. 2022).  On the fitness prong, the AG does not (and cannot) deny that the issues are purely legal or that HB 218 is final.  Instead, he argues that more facts are needed to resolve NSSF's claims.

---

[6] The AG makes a passing reference to the traceability requirement, but he makes no argument that NSSF flunks that requirement if NSSF has indeed established Article III injury.  *See* MTD.Br.11. That is likely because self-censorship caused by the passage of a new statute is obviously traceable to that statute, as are deprivations of other constitutional rights and lost sales stemming from the statute's ban on common arms, not to mention the loss of federal immunity, *see* pp.18, 34, *infra*.

But those facts are supplied in detail in the declarations NSSF submitted.  In reality, "further factual development … would do little to aid the court's decision" on whether Illinois can ban common arms, prohibit truthful advertising, and subject industry members to exactly the kinds of lawsuits that Congress has proscribed. *In re Coleman*, 560 F.3d 1000, 1009 (9th Cir. 2009).  As for hardship, HB 218 puts NSFF members to "the immediate dilemma to choose between complying with newly imposed, disadvantageous restrictions and risking serious penalties for violation." *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 57 (1993).  In fact, denying review would force NSSF members to choose to either refrain from constitutionally protected activity or risk proceedings from which they are immune as a matter of law under the PLCAA.  *See Ileto v. Glock, Inc.*, 565 F.3d 1126, 1142 (9th Cir. 2009).  That is an immediate hardship that warrants immediate review.

Ultimately, the AG's position boils down to an argument that challenges to HB 218 will not be fit for judicial review until an NSSF member is actually sued for violating its terms.  That is not the law.  Indeed, that radical view of ripeness would "turn respect for the law on its head." *Wolfson v. Brammer*, 616 F.3d 1045, 1059 (9th Cir., 2010).  It is also exactly backwards.  The only thing that would make NSSF's claims *un*ripe would be if the AG promised not to enforce HB 218 against NSSF's members for manufacturing, selling, importing, or marketing their lawful products in perfectly lawful ways that he finds "unreasonable" or for failing to implement "reasonable controls" on that lawful and constitutionally protected conduct.  Unless and until that happens, NSSF's purely legal claims are fit for judicial decision.

## II.     NSSF Is Likely To Succeed On The Merits Of Its Claims.

The AG repeatedly characterizes all of NSSF's claims against HB 218 as blunderbuss "facial" challenges to the entirety of HB 218, *see, e.g.*, Pl.Opp.1, 5, 6, 11, 12, 13, 14, 16, 19, 23, 24, 26, 34, and charges NSSF with needing to "establish that no set of circumstances exists under which the [statute]" could *ever* validly be applied.  Pl.Opp.5 (citing *United States v. Salerno*, 481

U.S. 739, 745 (1987)).  The AG either misunderstands NSSF's claims or misunderstands what it means for a law to be invalid "on its face"—or perhaps both.

Indeed, the AG cannot seem to make his mind up about NSSF's claims.  He correctly notes at the outset that the Court must analyze each challenged component of the statute separately. PI.Opp.4.  But, shortly after that, he claims that NSSF's challenges all are necessarily "[f]acial challenges" to the entirety of HB 218 simply because NSSF "seeks pre-enforcement" review. PI.Opp.5. That is a category mistake.  While this is indeed a pre-enforcement challenge, not every pre-enforcement suit is a "facial" challenge to the entirety of the statute, or even the entirety of a particular provision.  Plaintiffs routinely bring (and win) pre-enforcement challenges to a law as, on its face, it would apply to their own anticipated conduct.  *See Kole v. Village of Norridge*, 2017 WL 5128989 at \*15 (N.D. Ill. 2017) (noting that the Seventh Circuit has found that a "plaintiff could bring an as-applied, 'pre-enforcement challenge'" where the plaintiff "'suffer[ed] an injury from the unconstitutional ordinances'" because it "'refrained from protected [conduct]'" (quoting *Six Star Holdings, LLC. v. City of Milwaukee*, 821 F.3d 795, 801-02 (7th Cir. 2016))).  This is black-letter law.  Like the plaintiffs in those (and myriad other) cases, NSSF alleges that a statute cannot lawfully be applied to hold its members liable for specific conduct the statute proscribes. "If [NSSF] can show that [HB 218] is unconstitutional as to the [members] on whose behalf [it] sue[s], then [NSSF] ha[s] met [its] burden for an as-applied challenge."  *Isaacson v. Horne*, 716 F.3d 1213, 1230 n.15 (9th Cir. 2013).

### A.    HB 218 Authorizes State Action that the PLCAA Preempts.

The AG's response to NSSF's preemption challenge attacks a strawman.  NSSF has not brought a facial preemption challenge seeking to enjoin the AG from enforcing HB 218 "as a whole" in all instances. *Contra* PI.Opp.7-8. All NSSF is seeking on its preemption claim (putting aside NSSF's other claims) is an injunction precluding the AG from invoking HB 218 to bring

"qualified civil liability action[s]" against NSSF and its members that are predicated on a violation of HB 218 itself.  *See* 15 U.S.C. §7902(a) ("A qualified civil liability action may not be brought in any Federal or State court."); *id.* §7903(5)(A) (defining "qualified civil liability action").  The AG does not deny that HB 218 authorizes civil actions that fit that bill.  Instead, he argues that *some* of the actions HB 218 creates fit within the so-called predicate exception, PI.Opp.14-17, and that NSSF lacks a cause of action, PI.Opp.7-10.  The former point is irrelevant, and the latter is wrong.

### 1. The AG should be enjoined from bringing "qualified civil liability actions" against NSSF and its members.

The AG does not dispute that HB 218 authorizes "actions prohibited by PLCAA." PI.Opp.11.  Instead, he just meekly argues that not *every* action HB 218 authorizes is preempted. PI.Op.11-12.  But NSSF's preemption claim does not ask this Court "to facially invalidate" HB 218.  *Contra* PI.Opp.11.  All NSSF seeks on this claim is to enjoin the AG from using HB 218 to bring actions prohibited by the PLCAA.  Because he does not and cannot deny that HB 218 authorizes him to bring such actions against NSSF and its members, the AG should have no objection to an injunction prohibiting him from doing so.

Implicitly recognizing as much, the AG tries to narrow the universe of suits authorized by HB 218 that are preempted by the PLCAA to the infinitely small, insisting that HB 218 is itself a "predicate statute" exempted from the reach of the PLCAA because it enshrines novel tort-law theories into statute.  *See* PI.Opp.15-16.  As the Ninth Circuit recognized in *Ileto*, that argument would effectively nullify the PLCAA.  The plaintiffs in *Ileto* sought to hold licensed manufacturers and sellers liable under a state nuisance statute for "foreseeably and proximately causing injury" wrought by criminals who misused firearms, simply by virtue of having made, sold, and marketed their products in large numbers.  565 F.3d at 1130.  The Ninth Circuit rejected that effort, concluding that "an examination of the text and purpose of the PLCAA shows that Congress

intended to preempt *general tort theories of liability*," regardless of whether they are advanced through common-law or statutory causes of action. 565 F.3d at 1136 (emphasis added). The court thus refused to allow the plaintiffs to bring "exactly" the sort of sweeping tort claim the PLCAA was designed to "eliminate" simply because the state "codified" such theories "in its civil code." *Id.* at 1137-38. So too here. To be sure, the statute in *Ileto* did not specifically or exclusively regulate the firearms industry. But the idea that the PLCAA is *more* receptive to laws that subject *only* firearm industry members to the same suits Congress declared "an abuse of the legal system," 15 U.S.C. §7901(a)(6), is nonsensical. The point of the PLCAA is to protect firearm industry members—*and them alone*—from sweeping tort suits "based on theories without foundation in hundreds of years of the common law." *Id.* §7901(a)(7). Indeed, *Ileto* went out of its way to *reject* the argument that the statute there was insufficiently "applicable" to the firearms industry. 565 F.3d at 1136. Just like in *Ileto*, then, HB 218 does not qualify as a predicate statute, as it too simply codifies, and in some cases expands, the exact type of tort-law theories Congress set out to inter.

The AG's arguments about the PLCAA's "knowingly" and "proximate cause" requirements do not move the needle. The AG does not deny that, if an industry member is deemed to have "fail[ed] to establish or utilize reasonable controls," then it violates state law even if it did not *know* that its conduct was "unreasonable." Yet the predicate exception "[b]y its terms … only exempts civil actions that require proof that the defendant knowingly violated the relevant statute." *NSSF v. Platkin*, 2023 WL 1380388, at *6 (D.N.J. Jan. 31, 2023), *vacated on other grounds*, 80 F.4th 215 (3d Cir. 2023). The AG thus cannot deny that HB 218 directly conflicts with—and "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of"—the PLCAA. *Id.* at *4 (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990)).

The AG instead contends that NSSF's members must wait until a "future action" is brought

to challenge HB 218's failure to require a "knowing[] violat[ion]" of the law.  PI.Opp.15.  That is a non-sequitur.  NSSF has asked this Court to enjoin the state from bringing specific actions under HB 218, not to wipe HB 218 off the books.  The question thus is whether HB 218 allows the AG to bring actions that fail to satisfy the PLCAA's "knowingly" and "proximate cause" requirements. It plainly does.  For one thing, only Section (b)(1) even requires knowing *conduct*, *see* 815 ILCS 505/2BBBB-(b)(1); the other substantive provisions contain no mens rea requirement *at all*.  And even putting that aside, nothing in HB 218 requires a knowing *violation* of federal or state law— and it is the latter that the predicate exception demands.  *See* 15 U.S.C. §7903(5)(A)(iii); *Platkin*, 2023 WL 1380388, at *6.  NSSF's members should not have to wait until the AG brings the very suits against which the PLCAA protects them to invoke the immunity that federal law affords.

Finally, the AG claims that HB 218 imposes liability "for an industry member's" conduct, while the PLCAA "prohibits suits" only when they are based on third-party conduct.  PI.Opp.12. That is precisely the argument that was repeatedly made—and repeatedly rejected—by states and localities trying to evade the PLCAA when it was first enacted.  In *Ileto*, the primary conduct at issue was the manufacturers' alleged marketing tactics and scheme to flood the market with firearms.  Yet the suit was preempted all the same.  565 F.3d at 1130.  So too in *Beretta*, where New York City alleged that Beretta's marketing and distribution practices contributed to a public nuisance, and that the firearm manufacturer could, but did not, regulate downstream transactions. *City of N.Y. v. Beretta U.S.A. Corp.*, 524 F.3d 384, 390-91 (2d Cir. 2008).  By arguing that the PLCAA has no bearing on suits that seek to hold an industry member liable for harms caused by a third party based on (lawful) things that the industry member itself did or did not do, the AG effectively argues that every court to interpret the PLCAA—even in the defensive litigation posture that the AG wrongly demands—is wrong.

17

**2.  Section 1983 and *Ex parte Young* supply the cause of action for this claim.**

With no viable argument on the merits, the AG tries again to persuade the Court not to reach them.  But his arguments that NSSF lacks a cause of action fare no better than his challenges to NSSF's standing.  NSSF has not just one cause of action for its preemption claim, but two.

Section 1983 creates a cause of action to enforce against state actors, *inter alia*, "immunities secured by the Constitution and [federal] laws." 42 U.S.C. §1983.  Section 1983's "unqualified reference to 'laws'" sweeps in all federal laws.  *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 143 S.Ct. 1444, 1450 (2023).  So, the question is whether the PLCAA provides industry members an "immunit[y]."  The answer is plainly yes.  "[T]he PLCAA does not impose a procedural limitation; rather, it creates a substantive rule of law granting *immunity* to certain parties" (licensed sellers and manufacturers of firearms and related products) "against certain types of claims" (qualified civil liability actions).  *Ileto*, 565 F.3d at 1142 (emphasis added); *accord Beretta*, 524 F.3d at 398 (likewise recognizing that the PLCAA "immunizes a specific type of defendant from a specific type of suit"); *see also In re Acad., Ltd.*, 625 S.W.3d 19, 33-34 (Tex. 2021) ("requiring [a firearm industry member] to 'proceed[] to trial—regardless of the outcome— would defeat the substantive right' granted by the PLCAA" (first alteration added)).  A state actor who plans to bring a suit in violation of that provision thus plans to deprive industry members of the substantive federal immunity that the PLCAA grants them.  That is precisely the kind of state action Section 1983 exists to prevent.

Section 7903(5)(C) of the PLCAA does not undermine that conclusion in the slightest.  *Contra* PI.Opp.7.  The obvious import of that provision is to make clear that the PLCAA does not create a cause of action to *sue* industry members.  That is clear from the fact that it immediately follows the enumeration of *exceptions* to the PLCAA's prohibition on bringing qualified civil liability actions, providing a "rule of construction" as to how those exceptions should be

18

interpreted. *See* 15 U.S.C. §7903(5)(C). It would be bizarre to read into that rule of construction, which *protects* industry members, an implicit abrogation of their rights under Section 1983.

Section 1983 aside, federal courts have inherent equitable power to enjoin enforcement of state statutes that violate the Constitution or conflict with other federal laws. Only "where Congress has prescribed a detailed remedial scheme" can a statute "circumscribe[] the scope of *Ex parte Young*." *Marie O. v. Edgar*, 131 F.3d 610, 615 (7th Cir. 1997). The PLCAA does not fit that bill. The PLCAA does not create a remedy *at all*; it provides only a prohibition: "A qualified civil liability action may not be brought in any Federal or State court." 15 U.S.C. §7902(a). And *contra* PI.Opp.10 n.5, nothing in the PLCAA even hints that this prohibition may be enforced only defensively. Indeed, the PLCAA directed courts to "immediately dismiss[]" *sua sponte* any "qualified civil liability action that [was] pending" on the date it took effect, not to wait for affirmative defenses to be filed before making good on the statute's promised immunity. 15 U.S.C. §7902(b). Nothing about that command is "judicially unadministrable." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 328 (2015). Courts enforce it all the time in the defensive context, and they are every bit as capable of doing so in the offensive context. NSSF thus has not one, but two independent bases to sue for the injunctive relief to which it is entitled on its preemption claim.

**B.     HB 218 Violates the First Amendment.**

**1.   The AG has waived any defense of Section (b)(1)'s speech restrictions.**

Under Section (b)(1), entirely accurate marketing materials showing lawful products and lawful activities may be the basis for civil liability if, after the fact, they are deemed to be "unreasonable"—even if the marketed products are lawful and the marketing materials do not promote unlawful activity. 815 ILCS 505/2BBBB-(b)(1) (authorizing liability for "marketing" that is "*either* unlawful in itself *or* unreasonable under all circumstances" (emphases added)). It is difficult to imagine a valid defense of such a sweeping restriction on lawful commercial speech.

That may explain why the AG does not offer any defense of Section (b)(1)'s speech restrictions.

The AG's failure to defend Section (b)(1)'s speech restrictions is no excusable oversight. NSSF could not have made clearer that Section (b)(1) is among the provisions of HB 218 that raise severe free-speech problems and must be enjoined.  NSSF started off the argument section of its preliminary injunction brief titled "HB 218 Violates the First Amendment" by explaining that Section (b)(1) "subjects industry members to liability if their 'marketing' is deemed to have 'contribute[d] to a condition in Illinois that endangers the safety or health of the public.'"  PI.Br.11 (alteration in original).  NSSF went on to argue that Section (b)(1) unconstitutionally authorizes liability for "[m]arketing materials with accurate specifications of lawful products," even calling out Section (b)(1) by name.  PI.Br.12.  And NSSF argued that (and explained why) that broad imposition on protected speech violates the First Amendment.  *See* PI.Br.12-13.

Yet the AG completely ignores Section (b)(1) in his First Amendment discussion.  Not once in the seven pages he devotes to defending HB 218's speech restrictions does he even discuss Section (b)(1), let alone defend it.  *See* PI.Opp.17-24.  He instead inexplicably claims that all NSSF challenged under the First Amendment are "Sections (b)(2) (the militia provision) and (b)(3) (the minors provision)."  PI.Opp.17.  Perhaps the AG said nothing about NSSF's First Amendment challenge to Section (b)(1) because there is nothing to say.  But whatever the reason, "[f]ailure to develop an argument constitutes a waiver," *Black & Decker Inc. v. Robert Bosch Tool Corp.*, 371 F.Supp.2d 965, 970 (N.D. Ill. 2005) (St. Eve., J.); failure even to *make* an argument is waiver *a fortiori*.  The AG has waived any argument that Section (b)(1)'s speech restrictions are consistent with the First Amendment—and, as explained in NSSF's opening brief, they emphatically are not.

### 2.   The AG's attempted defense of HB 218's other speech restrictions fail.

HB 218 contains two more speech restrictions apart from Section (b)(1)'s authorization of liability for truthful "marketing" of lawful products that a state court deems "unreasonable under

all circumstances." *See* 815 ILCS 505/2BBBB-(b)(1).  Both violate the First Amendment.

***Section (b)(3).***  Section (b)(3) makes it "unlawful" to "advertise, market, [or] promote …
any firearm-related product in a manner that reasonably appears to support, recommend, or
encourage persons under 18 years of age to unlawfully purchase or possess or use a firearm-related
product in Illinois." *Id.* 505/2BBBB-(b)(3).  The devil with that provision is in the details.  To be
sure, the First Amendment does not prevent states from punishing speakers for promoting unlawful
conduct.  So, if all Section (b)(3) did was provide a cause of action to sue industry members for
"encourag[ing] persons … to unlawfully purchase or [unlawfully] possess or [unlawfully] use a
firearm-related product," NSSF likely would not be challenging it under the First Amendment.
But *contra* PI.Opp.18-20, that is decidedly not what Section (b)(3) does.  Section (b)(3) renders
presumptively unlawful all sorts of marketing that does *not* promote any unlawful conduct at all.

For instance, marketing "firearm-related products" that come in "sizes … or designs that
are specifically designed to be used by … minors" is specifically called out for opprobrium.  815
ILCS 505/2BBBB-(b)(3)(A)(iii).   Section (b)(3) also treats as presumptively unlawful all
marketing that "uses images or depictions of minors … to depict the use of firearm-related
products." *Id.* 505/2BBBB-(b)(3)(A)(v).  But as NSSF has explained, it is not unlawful for minors
to use firearms in Illinois under parental supervision—and it is an affirmatively good thing for
industry members to tell parents which firearms are specifically designed to be safer for minors to
use.  Section (b)(3) thus "facially regulates speech whose content concerns lawful activities and is
not misleading," "encompass[ing]" not only "messages about legal use of guns by minors," but
also truthful marketing "directed at adults."  *Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109,
1116-17 (9th Cir. 2023).  As the Ninth Circuit just held in invalidating a similar restriction on
firearm-related marketing, *see* Cal. Bus. & Prof. Code §22949.80(a)(1), such a restriction on lawful

21

speech is unconstitutional even under *Central Hudson*. *Junior Sports*, 80 F.4th at 1116.

The AG asserts that Section (b)(3) "regulates only speech concerning unlawful activity." PI.Opp.18. But he can make that assertion only by ignoring the text of the statute, which makes clear beyond cavil that Section (b)(3) renders presumptively unlawful the marketing of *lawful* products (such as those designed to be used by minors) and the promotion of *lawful* firearm-related activities (such as lawful youth shooting sports events). Rather than discuss those provisions, the AG pivots to Section (b)(3)(B), which carves out "promotional materials regarding lawful recreational activity with a firearm." *See* PI.Opp.19-20. But if the AG really believed that that carve-out took "ads that encourage adults to buy firearms that are lawful and safer for minors to (lawfully) use" outside the scope of Section (b)(3)'s prohibition, presumably he would have said so. *See* PI.Br.13 (making this argument); PI.Opp.19-20 (not responding to it).

The AG must therefore defend Section (b)(3)'s speech restrictions on the merits. His efforts come nowhere close to justifying the statute's intrusion on protected First Amendment activity. Even "[u]nder *Central Hudson*, a state seeking to justify a restriction on commercial speech bears the burden to … provide evidence establishing 'that the harms it recites are real'" and "that its speech restriction will '*significantly*' alleviate those harms." *Junior Sports*, 80 F.4th. at 1117. But the AG has "provided no evidence … that minors are unlawfully using firearms because of advertisements for guns by the firearm industry." *Id.* at 1119; *see also id.* at 1118-19 & n.2. While the AG cites various sources showing that "there is demand" among minors for firearms and that industry members promote the *lawful* use of firearms by minors, PI.Opp.22, all those sources reflect is that minors may lawfully use firearms in Illinois, as the AG begrudgingly admits, *see* PI.Opp.27 n.10. Nothing the AG points to suggests that marketing lawful products to adults who want to introduce their children to lawful activities has created a scourge of unlawful activity.

The AG cannot just *ipse dixit* his way around the lack of evidentiary support for the statute's speech restriction. The AG declares it common sense that Section (b)(3)'s advertising restrictions will "dampen minors' demand for unlawful products." PI.Opp.22. But the Ninth Circuit rejected that very theory in *Junior Sports*. "[D]ampened demand for firearms among minors cannot itself be a substantial government interest" if a state allows "minors [to] use guns"—which means that a state "cannot merely gesture to 'common sense' to meet its burden of showing that the law will 'significantly' advance its goals." 80 F.4th at 1119 (quoting *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505 (1996) (plurality op.)). The AG has no response. "With no evidence connecting truthful and lawful firearm advertising to unlawful firearm possession or gun violence, [the AG] has not shown that [HB 218] directly advances its interests to a material degree." *Id.*

In all events, even if Section (b)(3) "significantly slashes gun violence and unlawful use of firearms among minors," it still "imposes an excessive burden on protected speech." *Id.* By its terms, Section (b)(3) "ban[s] advertisements promoting safer guns for minors—for example, a hunting rifle designed for young hunters that has less recoil or that comes with a more secure trigger safety—if they are directed at minors and their parents." *Id.* at 1120. "A speech restriction of that scope is not constitutionally sound under any standard of review." *Id.* And Section (b)(3) is even broader than that, as it incorporates a "totality of the circumstances" inquiry. 815 ILCS 505/2BBB-(b)(3)(A). The AG leans on this feature, *see* PI.Opp.19, n.7, but directing a court to consider the totality of the circumstances is affirmatively unhelpful to his cause, as all it means is that speakers cannot be sure whether their seemingly lawful speech will be the basis for the liability after the fact. If everything reduces to a post-hoc totality test of what speech "reasonably appears" to encourage minors to use firearms, then there is only one reasonable response. *See, e.g.*, Dkt.27-3 (Scannell Decl.) ¶8 (making the "difficult decision" to cease sponsorship "in light of HB 218").

HB 218's speech restrictions thus fail even *Central Hudson*'s tailoring requirement, which renders them facially unconstitutional.  After all, "[t]he lack of tailoring … is categorical—present in every case."  *Ams. for Prosperity Found. v. Bonta*, 141 S.Ct. 2373, 2387 (2021).  That is why the *Junior Sports* court vindicated the plaintiffs' facial challenge even though §22949.80 covers *some* speech that falls outside the First Amendment (e.g., ads that actually encourage unlawful acts).  And that dooms the AG's argument that it need not use other means of addressing firearm misuse all in "one fell swoop," PI.Opp.23 n.8, as the state's "lack of tailoring" cannot be redeemed.

***Section (b)(2).***   The problems with Section (b)(2)'s prohibition on "market[ing] or promot[ing] a firearm-related product in a manner that reasonably appears to support, recommend, or encourage individuals to engage in unlawful paramilitary or private militia activity in Illinois," 815 ILCS 505/2BBBB-(b)(2), are similar but distinct.  HB 218 does not provide any guidance on what it means to "market in a manner that reasonably appears to … encourage" private citizens to engage in unlawful "militia" or quasi-military activity.  That is a serious problem that creates a serious chilling effect, particularly given the inextricable link between firearms and militaries— and, of course, "militias," *see* U.S. Const. amend. II ("A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.").

The AG's only response to the vagueness that pervades Section (b)(2) is to rewrite the statute.  In the AG's telling, Section (b)(2) "lay[s] out what specific conduct cannot be encouraged in the marketing of firearm-related products: unlawful paramilitary and private militia activity." PI.Opp.23-24.  That is not so much an argument as an admission.  To be sure, HB 218 defines "[u]nlawful paramilitary or private militia." PI.Opp.18; *see* 815 ICLS 505/2BBBB-(a).  But it says nothing about how to draw the line between ads that reasonably appear to encourage unlawful private military activities and ads that reasonably appear to encourage people to buy and lawfully

use lawful arms used by the military. May industry members still promote perfectly lawful products by noting that they have the seal of approval of the military? Or that they are the weapons to which law enforcement officers turn when their lives are on the line? NSSF asked these questions in its opening brief. The AG supplies no answers—thus confirming that regulated parties have no reasonable choice but to refrain from exercising their First Amendment rights to promote lawful products that the Second Amendment protects.

### C. HB 218 Is Void for Vagueness.

HB 218 is also unconstitutionally vague as to all other conduct it polices. Remarkably, the AG defends HB 218 only under the "less strict vagueness test" that applies to laws that do not implicate constitutional rights. PI.Opp.25. But while economic regulations are typically "subject to a relaxed vagueness test, … laws that might infringe constitutional rights [are subject] to the strictest of all." *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 186 (2d Cir. 2010). The "most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982). And whatever room for debate there may be about whether HB 218 *violates* the First or Second Amendment, no one can seriously deny that it at the very least *implicates* both (although the AG tries, *see* PI.Opp.29). Indeed, HB 218 threatens to "impos[e] liability on an entire industry" that enables the exercise "of a basic constitutional right" (the right to keep and bear arms). 15 U.S.C §7901(a)(6). The most "stringent vagueness test" known to law thus applies to NSSF's vagueness challenge, even setting aside the statute's speech restrictions. *Hoffman Ests.*, 455 U.S. at 499. And HB 218 flunks that test, for the reasons explained in NSSF's opening brief in support of its motion for a preliminary injunction (at 15-16).

The AG tries to rebuff NSSF's arguments only by caricaturing them. For instance, the problem with HB 218's "reasonable controls" requirement is not that the term "reasonable" is an

empty vessel.  *Contra* PI.Opp.26-27.  The problem is that the way HB 218 defines "reasonable controls" makes it impossible to know where the line is.  Under Section (b)(1)(C), "compl[ying] with all provisions of applicable local, State, and federal law" that impose concrete obligations on members of the firearm industry *is not enough* to fall on the right side of the line.  815 ILCS 505/2BBBB-(b)(1)(C).  What *is* remains anyone's guess—leaving the AG with nearly boundless discretion.  That is the definition of a law "so standardless that it invites arbitrary enforcement."  *Johnson v. United States*, 576 U.S. 591, 595 (2015); *see* PI.Br.15-16.

Section (b)(1)'s other substantive provision is arguably even worse.  As explained, Section (b)(1) authorizes courts to impose liability for "contribut[ing]," "through the sale, manufacturing, [or] importing … of a firearm-related product," "to a condition in Illinois that endangers the safety or health of the public by conduct *either* unlawful in itself *or* unreasonable under all circumstances."  815 ICLS 505/2BBBB-(b)(1) (emphases added).  Under the plain text of that provision, manufacturing or selling a *lawful* firearm can be the basis of severe civil liability *even if there is nothing unlawful about the manufacture or sale*.  That—not the statute's use of the word "unreasonable," *contra* PI.Opp.26-27—is the basic problem.

Nor does it matter that there might be conduct that everyone agrees is unreasonable.  The Supreme Court made that clear in *Johnson*, explaining that "although statements in some of our opinions could be read to suggest otherwise, our *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp."  576 U.S. at 602.  For instance, the Court has "deemed a law prohibiting grocers from charging an 'unjust or unreasonable rate' void for vagueness—even though charging someone a thousand dollars for a pound of sugar would surely be unjust and unreasonable."  *Id.* (discussing *United States v. L. Cohen Grocery Co.*, 255 U.S. 81 (1921)).  The Court has "similarly

26

deemed void for vagueness a law prohibiting people on sidewalks from 'conduct[ing] themselves in a manner annoying to persons passing by'—even though spitting in someone's face would surely be annoying." *Id.* at 603 (alteration in original) (discussing *Coates v. Cincinnati*, 402 U.S. 611 (1971)). "These decisions refute any suggestion that the existence of *some* obviously [unreasonable conduct] establishes [HB 218's] constitutionality." *Id.* And they confirm that the AG's paean to the limits of language's precision is insufficient to save HB 218.

### D.    HB 218 Violates the Second Amendment.

HB 218 violates the Second Amendment in two distinct ways. First, Section (b)(3) effectively bans the manufacture and sale of youth-model firearms. Second, the statute's liability scheme imposes unprecedented—and unconstitutional—burdens on lawful commerce in arms.

### 1.    HB 218's ban on common arms is unconstitutional.

The AG's insistence that HB 218 "does not ban any class of firearms," PI.Opp.27, cannot change what the statute says or be reconciled with the AG's own theory of how the statute works. Section (b)(3) makes it "unlawful" to "design[] or sell" "any firearm-related product in a manner that reasonably appears to support, recommend, or encourage persons under 18 years of age to unlawfully purchase or possess or use a firearm-related product in Illinois." 815 ILCS 505/2BBBB-(b)(3). It goes on to single out "offer[ing] firearm-related products in sizes, colors, or designs that are specifically designed to be used by, or appeal to, minors" as a presumptively verboten practice. *Id.* 505/2BBBB-(b)(3)(B)(iii). Given that clear text, the AG's claim that the statute does not actually ban youth-model firearms is inexplicable. If offering firearms "specifically designed to be used by minors" is itself evidence of "unlawful" activity, then it is difficult to fathom how members could continue to market and sell such products without putting themselves at risk of liability. Indeed, the AG himself has defended Section (b)(3)'s "restrictions on *advertising*" youth-model firearms by arguing that they "will necessarily dampen minors'

demand" for firearm-related products.  PI.Opp.22 (emphasis added).  Under the AG's own theory, then, manufacturing and selling firearms "that are specifically designed to be used by, or appeal to, minors" will *always* be deemed to "reasonably appear[] to … encourage" minors "to unlawfully purchase or possess or use a firearm-related product."  815 ILCS 505/2BBBB-(b)(3)(A)(iii).  The AG's theory thus confirms what the statute says in plain terms:  Manufacturing and selling firearms specifically designed for minors is now unlawful in Illinois, or at the very least presumptively so.

The AG's two-sentence defense of that radical restriction, *see* PI.Opp.29, does not pass the straight-face test, is insufficient to avoid waiver, and comes nowhere close to satisfying *Bruen*. "*Bruen* announced a new framework."  *Atkinson v. Garland*, 70 F.4th 1018, 1019 (7th Cir. 2023). "No longer, the Supreme Court made clear, can lower courts balance interests … to resolve the constitutionality of the challenged restriction."  *Id.*  Instead, *Bruen*'s "approach anchors itself exclusively in the Second Amendment's text and the pertinent history of firearms regulation, with the government bearing the burden of 'affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.'"  *Id.* (alteration in original) (quoting *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111, 2127 (2022)).  Rather than engage with that approach, the AG breezily asserts that HB 218's "firearm ban" does not even "*implicate* the Second Amendment" because (he says) "firearms for youth recreation" are not "the kind of 'arms' protected by the text" and "[m]inors are not part of the 'people' protected in the text of the Second Amendment."  PI.Opp.29 (emphasis added).  That is the sum-total of the AG's defense of HB 218's "firearm ban" on the merits.  And it is not enough.

The Seventh Circuit has "repeatedly made clear that perfunctory and undeveloped arguments that are unsupported by pertinent authority[] are waived (even where those arguments raise constitutional issues)."  *Kramer v. Banc of Am. Secs., LLC*, 355 F.3d 961, 964 n.1 (7th Cir.

2004) (quoting *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991)).  The AG does not

cite any cases from any court to support his *ipse dixit*.  *See* Pl.Opp.29 (citing nothing).  That is

textbook waiver.  *See, e.g.*, *Echo, Inc. v. Timberland Machines & Irrigation, Inc.*, 661 F.3d 959,

967 (7th Cir. 2011) (three-sentence argument that failed to explain how contract was allegedly

breached was "too skeletal, and amounted to waiver"); *Black & Decker*, 371 F.Supp.2d at 970.

Nor does the AG respond to the fact that firearms specifically designed for minors (who

tend to be smaller than adults) are particularly popular among smaller-statured adults.  *See*

Pl.Br.17; *see also* Dkt.27-3 (Scannell Decl.) ¶10 (Recoil Armory "offers for retail sale dozens of

shotguns and rifles" designated "Youth" model firearms, which "are specifically designed to be

safer for minors *and other smaller-statured people* to use." (emphasis added)); Dkt.27-4 (Hood

Decl.) ¶6 ("Hood's Guns & More currently offers for retail sale many models of shotguns and

rifles that are specifically designed to be safer for minors *and other smaller-statured people to use*

and that are specifically described as 'Youth' model firearms." (emphasis added)); Dkt.27-1

(Imperato Decl.) ¶13 ("We designed the Mini Bolt Youth specifically 'for smaller shooters.'").

That too suffices to defeat the AG's *ipse dixit*.  After all, adults are "part of the 'people,'"

no matter their height, and they have a constitutional right to keep and bear *for their own self-*

*defense* firearms that are specifically designed to be safely used by people of their stature.  To state

the obvious, adults purchasing firearms for self-defense is "conduct" that "the Second

Amendment's 'plain text' covers."  *Atkinson*, 70 F.4th at 1020.  After all, one can neither "keep"

nor "bear" something one cannot acquire in the first place.  *See* U.S. Const. amend. II (protecting

"the right of the people to keep and bear Arms"); *Teixeira*, 873 F.3d at 677 ("[T]he core Second

Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability

to acquire arms.").  And as the Supreme Court has squarely held, "the Second Amendment extends,

prima facie, to all instruments that constitute bearable arms." *Bruen*, 142 S.Ct. at 2132; *see also id.* (reiterating that "the Second Amendment's definition of 'arms'" extends to all "modern instruments that facilitate armed self-defense"). Section (b)(3) thus restricts conduct the Second Amendment "presumptively protects," *id.* at 2126, which means "the [AG] has only one way to defend [Section (b)(3)'s firearm ban]—by proving that it is 'consistent with this Nation's historical tradition of firearm regulation,'" *Atkinson*, 70 F.4th at 1020 (quoting *Bruen*, 142 S.Ct. at 2126).[7]

The AG has not even tried to do so. Nor has he tried to dispute that firearms designed for smaller-statured individuals are in common use. *See* PI.Br.16-17. The AG has thus failed to carry his burden to defend Section (b)(3)'s prohibition. HB 218's arms ban is unconstitutional.

### 2. HB 218's novel liability scheme violates the Second Amendment.

The AG agrees that, by making all manner of long-lawful firearm-related commerce grist for civil litigation, HB 218 effectively "regulate[s] the sales of firearms and ammunition." PI.Opp.30 n.11. For the reasons just explained, that means that HB 218's novel liability provisions regulate conduct that the Second Amendment presumptively protects (acquiring arms), and it is the AG's burden to identify a historical tradition justifying it. *See* p.28, *supra*. That, the AG does not and cannot do, as no historical tradition supports the sweeping liability HB 218 authorizes courts to impose on firearm industry members. The AG certainly points to none; he just asserts (in a footnote) that he "will be able to." PI.Opp.30 n.11. That confident prediction stands at stark odds with the views of Congress and the courts. *See, e.g.*, 15 U.S.C. §7901(a)(7) (deeming such

---

[7] That is true even under the Seventh Circuit's recent decision in *Bevis v. City of Naperville*, --- F.4th ----, 2023 WL 7273709 (7th Cir. Nov. 3, 2023), which is currently the subject of pending en banc proceedings. *Bevis* held that Illinois and its municipalities could ban the sale of so-called "assault weapons" on the theory that "the Arms protected by the Second Amendment do not include weapons that may be reserved for military use." *Id.* at *12. There is no argument that arms designed for smaller-statured adults are somehow better suited for military than civilian use.

lawsuits "without foundation in hundreds of years of the common law and jurisprudence of the United States"); *Camden Cnty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*, 273 F.3d 536, 540-41 (3d Cir. 2001) ("To extend public nuisance law to embrace the manufacture of handguns would be unprecedented under … state law and unprecedented nationwide."). In all events, the important point for present purposes is that it is not nearly enough to defeat NSSF's entitlement to preliminary injunctive relief. After all, neither NSSF nor this Court must "sift the historical materials for evidence to sustain [a law]. That is [the state's] burden." *Bruen*, 142 S.Ct. at 2150.

The AG tries to evade his burden by invoking dicta from *Heller*, which he says instructs that "conditions may be set on the commercial sales of arms." PI.Opp.30. Even if this dictum survives *Bruen*, it cannot save HB 218. Requiring, e.g., a manufacturer to "utilize reasonable controls" and "safeguards" to ensure that its distributors do not resell to retailers that fail to enforce "reasonable" anti-theft protections, *see* 815 ILCS 505/2BBBB-(b)(1)(A), (b)(1)(B), *is not* a "condition[] … on the commercial sale[] of arms." Conditions on sale happen at the point of sale, not three entities up the chain. Moreover, the universe of "laws imposing conditions … on the commercial sale of arms" contemplated by *Heller* is limited to laws that are "longstanding." *District of Columbia v. Heller*, 554 U.S. 570, 626-27 & n.26 (2008). And as Congress itself recognized in the PLCAA, attempts to subject the manufacture and sale of common arms to the sort of sprawling "reasonableness" theories HB 218 revives are "without foundation in hundreds of years of the common law and jurisprudence of the United States." 15 U.S.C. §7901(a)(7).

E.      **HB 218 Exceeds Constitutional Limits on Extraterritorial State Regulation.**

Rather than defend against the extraterritoriality claim NSSF has brought, the AG focuses on rebutting a claim NSSF does not assert. As the AG notes, the Supreme Court recently clarified that there is no "'per se' rule against state laws" that regulate only in-state conduct but nonetheless have serious, indirect effects on commerce in other states. *Nat'l Pork Producers Council v. Ross*,

598 U.S. 356, 373 (2023).  The AG vigorously defends that holding, and he argues that it saves HB 218.  *See* PI.Opp.32-34.  But that holding is irrelevant here, as NSSF has not brought an extraterritorial-*effects* claim.  NSSF's claim is and always has been that HB 218 is unconstitutional to the extent that it "directly regulate[s] out-of-state conduct."  PI.Br.18.  And *Ross* went out of its way to preserve the longstanding rule that state "law[s] that *directly* regulate[] out-of-state transactions" exceed "the territorial limits of state authority under the Constitution."  598 U.S. at 376 n.1 (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 641-43 (1982) (plurality op.)).

Direct regulation of out-of-state conduct is what happens when a state imposes liability on out-of-state actors based on "transactions completed wholly out of state" that the state deems "non-compliant" with its law (even if they are compliant with the law of the state where they occurred).  *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1102-03 (9th Cir. 2013).  That is exactly what HB 218 does, imposing liability on out-of-state actors for transactions and acts undertaken wholly out of state (and in full compliance with both federal and state law where they take place).  *See* PI.Br.18 (providing examples).  The AG does not deny this.  Instead, he argues that HB 218 does not run afoul of the prohibition on direct regulation of out-of-state conduct because it "regulates only conduct regarding … products … 'sold, made, or distributed in Illinois,' … 'intended to be sold or distributed in Illinois,' or … 'possessed in Illinois.'"  PI.Opp.34 (emphases omitted).  But what out-of-state conduct may be "regarding" is not what matters under "the direct regulation emanation."  *Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 614 (9th Cir. 2018).  Indeed, the Seventh Circuit has squarely held that the mere fact that conduct performed in State *B* involves products that are destined to be sold in State *A* does not give State *A* authority to directly regulate out of state.  *Legato Vapors, LLC v. Cook*, 847 F.3d 825, 833-84 (7th Cir. 2017).  Yet that is precisely what HB 218 does.  HB 218 requires manufacturers to "establish or utilize"

"reasonable procedures … that are designed" to "[p]revent the loss or theft of [their] product[s] from [their facilities]." 815 ILCS 505/2BBBB-(b)(1)(C). For those like Smith & Wesson, which "does not have any manufacturing operations in Illinois," Dkt.27-1 (Cupero Decl.) ¶8, the only manufacturing conduct that even possibly could be held to violate that requirement is out of state. That cannot be squared with *Legato Vapors*, which clearly held that, although "[t]he Commerce Clause does not prohibit [Illinois] from imposing reasonable … requirements on [] products sold in [Illinois]," the state "may not try to achieve that goal by direct extraterritorial regulation of the manufacturing processes and facilities of out-of-state manufacturers." 847 F.3d at 833-84.

Put differently, California is free to regulate the in-state sale of pork, even if that regulation of purely in-state conduct has serious ripple effects on commerce conducted in the Midwest. *See Ross*, 598 U.S. at 365-66 (explaining that Prop 12, the California law challenged in *Ross*, merely "forbids the in-state sale of whole pork meat" that fails to meet certain conditions); *id.* at 380 (describing Prop 12 as a "state law[] regulating the in-state sale of ordinary consumer goods"). But California could not hold the out-of-state pig farmer liable for its out-of-state operations, because that would be "directly regulat[ing] out-of-state transactions by those with no connection to the State." *Id.* at 376 n.1 (emphasis added). That is not what the statute in *Ross* did. *See id.* (noting that the petitioners there conceded as much). But it is exactly what HB 218 does. HB 218 exceeds "the territorial limits of state authority under the Constitution[]" to that extent. *Id.*

Finally, the AG offers no response to NSSF's independent argument that HB 218 creates liability for the criminal conduct of *others*, which by design invites burdensome litigation directed at firearm industry members and thereby imposes an "excessive burden[] on interstate commerce." *Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 549 (2015); *see* PI.Br.19. For that reason too, HB 218 violates the Commerce Clause and should be enjoined.

33

### III.    The Remaining Injunctive Factors Support Relief.

NSSF is likely to succeed on its claims; that is enough for irreparable injury.  In all events, the chilling effect HB 218 has already had on constitutionally protected speech, plus the loss of immunity from suit, *and* the irrevocable economic injury it will cause all suffice to show that NSSF and its members will suffer irreparable injury without injunctive relief.  *See* PI.Br.20.

The AG has no response to the argument that HB 218 will constrict the market for lawful arms, a textbook economic injury.  *See Craig*, 429 U.S. at 194.  Nor does he have any response to the argument that that injury is one for which no redress could be sought, thanks to the Eleventh Amendment; as a matter of constitutional law, any losses will be wholly unrecoverable from a defendant cloaked in sovereign immunity (unless the AG offered to forgo that immunity, which he conspicuously declines to do).  Instead, he just baldly asserts that "firearm industry members have long had to endure the costs of litigation."  PI.Opp.36.  But the whole point of the PLCAA is to relieve industry members of those costs, by providing not just an affirmative defense to liability, but an outright ban on the very bringing of certain lawsuits.  *See* 15 U.S.C. §7902(a) ("A qualified civil liability action *may not be brought* in any Federal or State court." (emphasis added)).  That is precisely why courts have repeatedly recognized that the PLCAA grants licensed manufacturers and sellers of firearms and related products a substantive, federal-law "immunity."  *Ileto*, 565 F.3d at 1142; *accord In re Acad.*, 625 S.W.3d at 32-36; *see* p.18, *supra*.  To say that industry members must wait until they are faced with the very lawsuits the PLCAA outlaws thus simply denies the operation of that federal statute (and, again, is particularly problematic when the suit is brought by a state actor protected by sovereign immunity).  Given the immunity the PLCAA confers, this is the unique context in which having "to endure" litigation *is* irreparable injury.  After all, even if an NSSF member *won* a suit brought under HB 218, it *still* would have suffered a deprivation of its federal-law immunity simply by virtue of having been forced to defend against it.

Finally, the AG has nothing to say about the wall of precedent holding that the public interest always favors enjoining laws that flout constitutional rights. *See, e.g.*, *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) ("the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional"); *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) ("injunctions protecting First Amendment freedoms are always in the public interest"). Nor does he deny that enjoining an invalid law causes a state no harm as a matter of law. *See* PI.Opp.37-38. That suffices to tip the final factors in NSSF's favor.

## CONCLUSION

The Court should deny the AG's motion to dismiss and grant a preliminary injunction.

Respectfully submitted,

PAUL D. CLEMENT<sup></sup>                                    *s/ Gary C. Pinter*
ERIN E. MURPHY<sup></sup>                                     GARY C. PINTER
MATTHEW D. ROWEN<sup></sup>                          SWANSON, MARTIN & BELL, LLP
CLEMENT & MURPHY, PLLC                     103 W. Vandalia Street
706 Duke Street                                          Suite 215
Alexandria, VA 22314                                 Edwardsville, IL 62025
                                                                (618) 655-3131
                                                                gpinter@smbtrials.com
  * admitted *pro hac vice*

                                                                ANDREW A. LOTHSON<sup></sup>
                                                                SWANSON, MARTIN & BELL, LLP
                                                                330 N. Wabash
                                                                Suite 3300
                                                                Chicago, IL 60611

November 20, 2023

## CERTIFICATE OF SERVICE

I certify that on November 20, 2023, I caused a copy of the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification to all counsel of record.

                                                                *s/ Gary C. Pinter*
                                                                GARY C. PINTER